No. 22-15259

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

NEIGHBORS OF THE MOGOLLON RIM, INC.,
*Plaintiff-Appellant*,

v.

UNITED STATES FOREST SERVICE ET AL.,
*Federal Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Arizona
No. 2:20-cv-00328-DLR
Hon. Douglas L. Rayes

PLAINTIFF-APPELLANT'S OPENING BRIEF

Andrew R. Missel
Lauren M. Rule
ADVOCATES FOR THE WEST
3701 SE Milwaukie Ave., Ste. B
Portland, OR 97202
(503) 914-6388

amissel@advocateswest.org
lrule@advocateswest.org

## **RULE 26.1 DISCLOSURE STATEMENT**

Plaintiff-Appellant Neighbors of the Mogollon Rim, Inc. is a non-profit organization. It has no public shares and no corporate parents or affiliates with public shares.

Date: July 1, 2022

*/s/ Andrew R. Missel*
Andrew R. Missel
Lauren M. Rule
**ADVOCATES FOR THE WEST**
3701 SE Milwaukie Ave., Ste. B
Portland, OR 97202
(503) 914-6388

*Attorneys for Plaintiff-Appellant*
Neighbors of the Mogollon Rim, Inc.

OPENING BRIEF                                    i

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................iv

INTRODUCTION ..........................................................................1

JURISDICTIONAL STATEMENT ....................................................2

ISSUES PRESENTED .....................................................................2

STATEMENT OF THE CASE ...........................................................3

    I.     HISTORY OF THE BAR X ..................................................3

        A.    Bar X Basics ...........................................................3

        B.    Grazing on the Bar X Before 1979 .............................5

        C.    The Forest Begins to Recover .....................................7

        D.    Grazing on the Bar X Since 2008 ................................9

    II.    THE FOREST SERVICE'S NEPA PROCESS AND DECISION ....12

    III.    PROCEEDINGS BELOW ...................................................16

STANDARD OF REVIEW ...............................................................17

SUMMARY OF THE ARGUMENT ....................................................18

ARGUMENT ...............................................................................20

I.    THE FOREST SERVICE FAILED TO CONSIDER A REASONABLE
RANGE OF ALTERNATIVES AS REQUIRED BY NEPA ......................21

II.    THE FOREST SERVICE FAILED TO TAKE A "HARD LOOK" AT THE
PROBABLE IMPACTS OF EXPANDING GRAZING, PARTICULARLY
THE IMPACTS TO THE COLCORD AND PONDEROSA
COMMUNITIES ...........................................................................29

A.    The Forest Service Almost Completely Ignored the Aesthetic, Economic, Social, and Health Impacts of the New Grazing Scheme on the Colcord and Ponderosa Communities ......................................29

B.    The Forest Service Failed to Take a "Hard Look" at Other Impacts of Its Preferred Alternative, Including Impacts to Vegetation, Soil, and Water Resources; Riparian Health; and Wildlife ...............................37

III.   THE FOREST SERVICE'S NEPA ANALYSIS WAS RIDDLED WITH MISSTATEMENTS AND ERRORS, FRUSTRATING NEPA'S GOALS OF FOSTERING INFORMED DECISIONMAKING AND PUBLIC PARTICIPATION ...........................................................................42

A.    The Forest Service Inaccurately Described Baseline Conditions and Relied on Incorrect Data and Calculations ..........................................43

B.    The Forest Service Made Many Misleading Statements Regarding Conditions and Data ................................................................................48

IV.   THE FOREST SERVICE'S DECISION NOT TO PREPARE AN EIS WAS ARBITRARY AND CAPRICIOUS ....................................................51

V.   THE NEW GRAZING SCHEME DOES NOT COMPORT WITH THE TONTO FOREST PLAN AND THUS VIOLATES NFMA .......................55

VI.   THIS COURT SHOULD SET ASIDE THE EA, DECISION NOTICE, AND ALL DECISIONS RELYING ON THEM AND ORDER THE DISTRICT COURT TO REMAND TO THE FOREST SERVICE .............59

CONCLUSION .........................................................................................................59

STATEMENT OF RELATED CASES ....................................................................60

CERTIFICATE OF COMPLIANCE .......................................................................61

CERTIFICATE OF COMPLIANCE .......................................................................61

ADDENDUM

## TABLE OF AUTHORITIES

### Cases

*350 Montana v. Haaland,*
        29 F.4th 1158 (9th Cir. 2022)................................................................12 n.8

*Alliance for the Wild Rockies v. U.S. Forest Service,*
        907 F.3d 1105 (9th Cir. 2018)........................................................55, 56, 58

*Bark v. U.S. Forest Service,*
        958 F.3d 865 (9th Cir. 2020).........................................................47

*Blue Mountains Biodiversity Project v. Blackwood,*
        161 F.3d 1208 (9th Cir. 1998)........................................................51

*Bob Marshall Alliance v. Hodel,*
        852 F.2d 1223 (9th Cir. 1988)........................................................21, 28

*California Wilderness Coalition v. U.S. Department of Energy,*
        631 F.3d 1072 (9th Cir. 2011)........................................................52

*Center for Biological Diversity v. Bernhardt,*
        982 F.3d 723 (9th Cir. 2020).........................................................34

*Center for Biological Diversity v. Esper,*
        958 F.3d 895 (9th Cir. 2020).........................................................17

*Center for Biological Diversity v. NHTSA,*
        538 F.3d 1172 (9th Cir. 2020)........................................................21, 35, 51

*Colorado Environmental Coalition v. Dombeck,*
        185 F.3d 1162 (10th Cir. 1999)......................................................28

*Corrigan v. Haaland,*
        12 F.4th 901 (9th Cir. 2021).........................................................17

*Earth Island Institute v. U.S. Forest Service,*
        697 F.3d 1010 (9th Cir. 2012)........................................................20

*Environmental Defense Center v. Bureau of Ocean Energy Management*,
　36 F.4th 850 (9th Cir. 2022)......................................9 n.13, 22, 51, 52, 55, 59

*Great Basin Resource Watch v. Bureau of Land Management*,
　844 F.3d 1095 (9th Cir. 2016)..........................................................43, 55 n.23

*High Country Conservation Advocates v. U.S. Forest Service*,
　951 F.3d 1217 (10th Cir. 2020).....................................................................28

*Idaho Sporting Congress v. Rittenhouse*,
　305 F.3d 957 (9th Cir. 2002)........................................................................56

*Jones v. Gordon*,
　792 F.2d 821 (9th Cir. 1986)........................................................................35

*LaFlamme v. FERC*,
　852 F.2d 389 (D.C. Cir. 1988) .....................................................................30

*Metropolitan Edison Co. v. People Against Nuclear Energy*,
　460 U.S. 766 (1983) ...........................................................30, 31, 32 n.16, 36

*Montana Wilderness Association v. Connell*,
　725 F.3d 988 (9th Cir. 2013).........................................................................30

*Myersville Citizens for a Rural Community, Inc. v. FERC*,
　783 F.3d 1301 (D.C. Cir. 2015) ....................................................................30

*Native Ecosystems Council v. Marten*,
　883 F.3d 783 (9th Cir. 2018)...................................................................43, 48

*Native Ecosystems Council v. U.S. Forest Service*,
　428 F.3d 1233 (9th Cir. 2006)..................................................................21, 26

*NRDC v. U.S. Forest Service*,
　421 F.3d 797 (9th Cir. 2005)...........................................................44, 50, 51

*New Mexico ex rel. Richardson v. Bureau of Land Management*,
　565 F.3d 683 (10th Cir. 2009).............................................................26 n.14

*Northern Plains Resource Council v. Surface Transportation Board*,
    668 F.3d 1067 (9th Cir. 2011).................................................................32

*Oregon Natural Desert Association v. Jewell*,
    840 F.3d 562 (9th Cir. 2016)...................................................................43

*Oregon Natural Desert Association v. U.S. Forest Service*,
    465 F.3d 977 (9th Cir. 2006)................................................................9 n.7

*Oregon Natural Desert Association v. U.S. Forest Service*,
    957 F.3d 1024 (9th Cir. 2020).................................................................56

*Oregon Natural Resources Council Fund v. Goodman*,
    505 F.3d 884 (9th Cir. 2007)................................................38, 39, 41, 42

*Oregon Natural Resources Council v. Lowe*
    109 F.3d 521 (9th Cir. 1997)...................................................................38

*Sierra Club v. U.S. Army Corps of Engineers*,
    772 F.2d 1043 (2d Cir. 1985)..................................................................36

*Sierra Forest Legacy v. Sherman*,
    646 F.3d 1161 (9th Cir. 2011).................................................................17

*Siskiyou Regional Education Project v. U.S. Forest Service*,
    565 F.3d 545 (9th Cir. 2009).............................................................17–18

*Te-Moak Tribe of Western Shoshone of Nevada v. U.S. Department of Interior*,
    608 F.3d 592 (9th Cir. 2010)...................................................................21

*United States v. Frederick*,
    78 F.3d 1370 (9th Cir. 1996)..............................................................49 n.22

*Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*,
    435 U.S. 519 (1978) ..............................................................................50

*Western Watersheds Project v. Abbey*,
    719 F.3d 1035 (9th Cir. 2013).............................................................21–22

*Western Watersheds Project v. Kraayenbrink*,
    632 F.3d 472 (9th Cir. 2011)............................................................................29

*WildEarth Guardians v. Bernhardt*,
    502 F. Supp. 3d 237 (D.D.C. 2020) ...........................................................49

*WildEarth Guardians v. Haaland*,
    2021 WL 3176109 (D.C. Cir. Apr. 28, 2021) ...............................49

*WildEarth Guardians v. Montana Snowmobile Association*,
    790 F.3d 920 (9th Cir. 2015)...........................................................................43

*WildEarth Guardians v. Provencio*,
    923 F.3d 655 (9th Cir. 2019)...................................................51, 52, 53, 54

## Statutes and Court Rules

16 U.S.C. § 1604 ............................................................................................56

28 U.S.C. § 1291 ..............................................................................................2

28 U.S.C. § 1331 ..............................................................................................2

42 U.S.C. § 4332 .........................................................................................2, 29

Ariz Rev. Stat. Ann. § 3-1427 ...................................................................33

Federal Rule of Appellate Procedure 4 ...................................................2

## Regulations

36 C.F.R. § 219.58................................................................................8 n.4

36 C.F.R. § 220.3..................................................................................8 n.5

40 C.F.R. § 1502.8 (2019)................................................................35 n.17

40 C.F.R. § 1508.8 (2019) ........................................................................30

40 C.F.R. § 1508.14 (2019) ......................................................18, 29, 30

40 C.F.R. § 1508.27 (2019) .............................................................52, 53

## Other Authorities

85 Fed. Reg. 43,304 (July 16, 2020) ...............................................30 n.15

87 Fed. Reg.  17,064 (Mar. 25, 2022) ..............................................8 n.4

Forest Service Handbook 2209.13, ch. 20, § 22.15 (2015) ....................27

Forest Service Handbook 2209.13, ch. 90, § 91 (2005) .........................28

Forest Service Handbook 2209.13, ch. 90, § 94 (2005) .........................24

Forest Service Handbook Region 3 Supp. 2209.13, ch. 90 (2016) ................46 n.20

## INTRODUCTION

In late 2019, the U.S. Forest Service decided to dramatically expand cattle grazing on the Bar X allotment in the Tonto National Forest in Arizona. Under the agency's new grazing scheme, up to nearly three times as many cattle may be grazed on the Bar X as were grazed in the past, and the Colcord/Turkey Pasture— an area closed to grazing for 40 years—has been reopened. This expansion of grazing threatens to further degrade soil, water, and riparian resources that are already failing to meet objectives set out in the Tonto Forest Plan.

The Forest Service's decision has a human cost, too. The Colcord/Turkey Pasture surrounds three private enclaves: the communities of Colcord Estates, Ponderosa Springs, and Ponderosa Springs Estates. Allowing cattle to graze on this long-closed portion of the Bar X will seriously affect the quality of life of the members of these communities, few of whom lived in the area when grazing was last allowed in 1979. Plaintiff-Appellant Neighbors of the Mogollon Rim, Inc. ("NOMR") represents the interests of members of these communities whose lives will be—indeed, already have been—negatively affected by the Forest Service's decision.

Before deciding to adopt its new grazing scheme, the Forest Service conducted an analysis under the National Environmental Policy Act ("NEPA"), which requires agencies to assess the effects that their decisions will have on the

"quality of the human environment." 42 U.S.C. § 4332. Unfortunately, that analysis was riddled with errors and failed to take full account of the probable effects of the agency's proposal to expand grazing on the Bar X. Because the Forest Service's decision was tainted by its unlawful NEPA analysis, that decision must be set aside, and the agency must go back and perform an appropriate NEPA analysis—including the preparation of a full environmental impact statement.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this case because NOMR's claims "aris[e] under the . . . laws . . . of the United States." 28 U.S.C. § 1331.

This Court has jurisdiction over this appeal because the district court entered a "final decision" in this case, resolving all claims as to all parties, on January 26, 2022, and NOMR timely appealed. 28 U.S.C. § 1291; Fed. R. App. P. 4(a)(1).

## ISSUES PRESENTED

1. Whether the Forest Service considered a reasonable range of alternatives in its environmental assessment, as required by NEPA;

2. Whether the Forest Service complied with NEPA's requirement to take a "hard look" at the effects of its decision on the human environment, including both ecological effects and effects to recreational, aesthetic, economic, and safety interests;

3.  Whether the Forest Service should have prepared an environmental impact statement; and

4.  Whether the Forest Service's decision complied with the National Forest Management Act.[1]

## STATEMENT OF THE CASE

## I.  HISTORY OF THE BAR X

### A.  Bar X Basics

The Bar X consists of four separate grazing allotments that are managed together: the Bar X, Haigler Creek, Young, and Colcord Canyon Allotments. The Bar X is located in the northeastern part of the Tonto National Forest, about eight miles north of Young, Arizona, in Gila County. The topography of the Bar X consists of a mixture of rolling, gently undulating hills and areas of steep, rugged slopes and rock outcroppings. Elevation ranges from 4,600 feet in the southern portion to 7,600 feet in the northernmost areas.[2] The lower elevations in the southern portion provide the majority of the grazing capacity for livestock. 3-ER-404, 574, 580–81. This is due in part to the fact that the ponderosa pine ecotype that dominates the northern portion of the Bar X has a lower density of grasses and

---

[1] An addendum contains relevant portions of the Forest Service Handbook.
[2] This brief does not contain record citations for "undisputed facts offered only for general background." 9th Cir. R. 28-2.8.

forb than other ecotypes, contributing to a lower forage production capacity. 2-ER-252.

Bisecting the Bar X from southwest to northeast is the Heber-Reno Sheep Driveway ("Driveway"), a roughly two-mile-wide string of eight pastures that is part of a route used to move sheep between private land near Chandler, Arizona and certain allotments on the Apache-Sitgreaves National Forests.[3] Every year, up to 8,000 sheep are herded along the Driveway in the spring and again in the late summer. Cattle grazing has also periodically occurred on the Driveway. Historically, four pastures on the Driveway have been associated with the Bar X: Lost Salt, Naegelin, McInturff, and Walnut. 2-ER-251.

The northernmost portions of the Bar X are the Colcord Canyon Allotment and the Turkey Peak Pasture, which is part of the Haigler Creek Allotment. *Id.* NOMR will refer to this area as the "Colcord/Turkey Pasture." The Colcord/Turkey Pasture consists of mountainous terrain and steep slopes dominated by ponderosa pine. 2-ER-252. Almost the entire Colcord/Turkey Pasture is characterized as belonging to the ponderosa pine ecotype. *Id.* Haigler Creek, a stream popular for fishing and recreation, cuts across the southern half of the Colcord/Turkey Pasture. *Id.* The Colcord/Turkey Pasture is bounded on the

---

[3] A very detailed map of the Bar X and Driveway is located at 3-ER-592.

north by the Mogollon Rim, which is a 200-mile long escarpment in central Arizona that forms the southern edge of the Colorado Plateau. The area is home to much wildlife, including elk, deer, and turkey. 3-ER-573–74, 580. The area's beauty and diverse flora and fauna attract many outdoor enthusiasts from the Phoenix area and beyond. *Id.*

The communities of Colcord Estates, Ponderosa Springs, and Ponderosa Springs Estates (collectively, the "Colcord and Ponderosa Communities") comprise over 300 homes situated on private enclaves in the Colcord/Turkey Pasture. 2-ER-252. Most of those homes do not have fences capable of keeping cattle out, in part because many of the homes were built after cattle were last grazed on the Colcord/Turkey Pasture in 1979. *Id.*; 2-ER-305. Residents of the Colcord and Ponderosa Communities and visitors to the area report enjoying the natural beauty of the area and the recreational opportunities afforded by the Forest, including hiking, fishing in Haigler Creek, hunting, and wildlife viewing. 2-ER-253; *see also* 3-ER-319–84 (NEPA comments and declarations).

## B. Grazing on the Bar X Before 1979

Cattle grazing has occurred in the Bar X area for over a century, 2-ER-84, often with serious adverse effects on soil, vegetation, and other resources. *See generally* 3-ER-385–440 (studies and analyses from the 1970s). A 1977 analysis conducted by a Forest Service wildlife biologist concluded that grazing had

"drastically reduced forage production[ and] increased soil compaction and erosion" on the Bar X, leading to a decline in habitat quality and a "serious impact on the wildlife resource." 3-ER-385. Several studies conducted by the Forest Service in the late 1970s reached similar conclusions. A 1978 "allotment analysis" stated that "[r]ange condition on the Bar X is generally poor with a downward trend" and that the cause of such poor conditions was "[a] prolonged history of overstocking and unsatisfactory management." 3-ER-398. That same analysis found that "[t]he Ponderosa Pine type"—which comprises nearly all of the Colcord/Turkey Pasture and all of the Lost Salt Pasture—"has been depleted severely by overgrazing," 3-ER-406, and that riparian areas, including Haigler Creek, "are all severely denuded by grazing," 3-ER-408. The Driveway was also adversely affected by cattle grazing in the 1970s. 2-ER-263; 3-ER-392, 395.

In 1979, the Forest Service prepared an environmental analysis ("1979 EA") in connection with its decision to alter the management of grazing on the Bar X. Relying on the "thorough on-the-ground investigation[s] concerning conditions on the Bar X" that had been synthesized in the 1978 allotment analysis, the 1979 EA compared several management alternatives, including closing the entire Bar X to domestic livestock grazing. 3-ER-414, 420–25. The Forest Service ultimately selected an alternative in which grazing levels on the Bar X were reduced, but grazing was not altogether prohibited. 2-ER-263–64. However, the selected

alternative excluded the Colcord/Turkey Pasture from grazing "due to the lack of grazing capability and severe conflicts between grazing and other resources" on that pasture. *Id.*; 3-ER-454.

## C. The Forest Begins to Recover

In 1985, following a few years of production-utilization studies[4] that suggested that the Bar X might support more grazing, the Forest Service prepared a new environmental assessment ("1985 EA") analyzing the effects of increased grazing levels. The 1985 EA noted that "[r]ange, soil, watershed, and wildlife habitat conditions have improved significantly since the 1978 range analysis." 3-ER-496. The 1985 EA pointed specifically to "the renewed presence of elk below the Naegelin Rim" as evidence of improved wildlife habitat, and also cited an increase in the abundance of turkey on the Bar X and improvements to the riparian habitat along Haigler Creek as positive developments. 3-ER-497; *see also* 2-ER-265–66 (discussing wildlife on the Colcord/Turkey Pasture).

In 1985, the Forest Service elected to increase the amount of grazing allowed on the Bar X, but it continued to exclude cattle from the Colcord/Turkey Pasture. 2-ER-265, 3-ER-499–500. That same year, the Forest Service completed

---

[4] "Production utilization studies are conducted as a snapshot in time of an area's carrying capacity. They measure how much herbaceous forage is available in a given key area compared to how much is being consumed by cattle." 2-ER-33.

the Tonto Forest Plan, which is still the governing forest plan.[5] 2-ER-29. The

Forest Plan "defines the long-term direction for managing the Tonto National

Forest." 3-ER-465. The Forest Plan contains goals, standards, and guidelines that

provide management direction for various resources and uses of the Forest. 2-ER-

253–62; *see also* 3-ER-457–92 (excerpts from the Forest Plan).

In 2007, the Forest Service and the U.S. Fish and Wildlife Service ("FWS")

began a consultation under the Endangered Species Act ("ESA") over the effects

of livestock grazing on 33 allotments in the Tonto National Forest, including the

Bar X. 3-ER-505. During consultation, the Forest Service verified that it would use

an adaptive management[6] approach on the Bar X as outlined in Chapter 90 of the

Forest Service Handbook. 3-ER-505–08, 512–13, 516–17. The agency also

verified that it would continue to employ other tools "to meet resource

---

[5] The Forest Service recently released a revised Forest Plan. 87 Fed. Reg. 17,064, 17,064 (Mar. 25, 2022). The new Forest Plan does not take effect until the Forest Service has resolved objections to its decision. 36 C.F.R. § 219.58(a).

[6] "Adaptive management" refers to "[a] system of management practices based on clearly identified intended outcomes and monitoring to determine if management actions are meeting those outcomes; and, if not, to facilitate management changes that will best ensure that those outcomes are met or re-evaluated." 36 C.F.R. § 220.3.

management objectives," including "conservative use" guidelines[7] and rotational grazing strategies. *Id.*

### D. Grazing on the Bar X Since 2008

The Bar X, LLC purchased the Bar X ranch around 2006 or 2007 and was issued a grazing permit by the Forest Service in 2007. 2-ER-266. In 2010, the Forest Service began allowing the Bar X permittee to graze some of the Driveway pastures associated with the Bar X. 2-ER-269. That same year, the Forest Service began authorizing the Bar X permittee to graze at levels exceeding the level set forth in the term permit: the 2010 annual operating instructions ("AOI")[8] for the Bar X authorized 162 cattle to graze year-long, 60 yearlings to graze for two-and-a-half months, and 12 bulls to graze for nine months—more than the 130 cattle year-long allowed under the term permit. *Compare* 3-ER-522 (2010 AOI), *with* 2-ER-266 (term grazing permit). From 2012 through 2017, the Forest Service

---

[7] "Conservative use" or "conservative utilization" is a way of describing grazing intensity. It corresponds to 30%–40% forage utilization by animals on "herbaceous perennials and 50% or less on woody browse species." 3-ER-508; *see also* 2-ER-80; 3-ER-569.

[8] "[P]rior to the beginning of a grazing season, the Forest Service issues an AOI to grazing permit holders. Whereas the [allotment management plan] relates the directives of the applicable forest plan to the individual grazing allotment, and the grazing permit sets grazing parameters through a ten-year period, the AOI annually conveys these more long-term directives into instructions to the permittee for annual operations." *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 980 (9th Cir. 2006).

continued to allow the Bar X permittee to graze Driveway pastures and continued to authorize grazing at levels in excess of the term permit. 3-ER-525–50.

In 2015, the Forest Service authorized the Bar X permittee to graze the Colcord/Turkey Pasture. 3-ER-537–38. This was the first time since 1979 that Bar X cattle had grazed the Colcord/Turkey Pasture. 2-ER-265. No explanation was offered in the 2015 AOI for why the pasture had been reopened after 35 years, nor was any NEPA analysis done prior to the authorization. 3-ER-537–40; 2-ER-26.

When cattle were allowed to graze on the Colcord/Turkey Pasture in 2015, many of them made their way up to the Colcord and Ponderosa Communities. *E.g.*, 3-ER-319, 326, 334. This caused a great number of problems for community members and visitors to the area. Many community members had run-ins with cattle on or near their properties, almost resulting in injuries. *E.g.*, 3-ER-326, 331, 375. Cattle trampled over septic leach fields, threatening the integrity of septic systems. *E.g.*, 3-ER-331, 342, 360–61. Community members and visitors noticed a decrease in the number of elk, deer, and turkey in the area, which diminished their enjoyment of living in the forest. *E.g.*, 3-ER-319, 371, 375. Cattle left "cow pies" on and near community members' properties and generated noxious odors. 3-ER-319, 331, 356. And cattle even found their way on to the roads near the Colcord and Ponderosa Communities, creating hazards for motorists. *E.g.*, 3-ER-330, 348.

Cattle also caused problems in other parts of the Colcord/Turkey Pasture. For instance, both community members and visitors to the area found cattle on or near hiking trails. *E.g.*, 3-ER-319, 368. This interfered with their enjoyment of the forest. *Id.* Cattle also congregated in and near portions of Haigler Creek that run through the Colcord/Turkey Pasture. *E.g.*, 3-ER-364, 368. People visiting the creek to fish and/or swim found that the cattle—which defecated in and around the creek—interfered with their activities. *Id.*

Following the events of 2015, community members and others mounted a campaign to make the Forest Service aware of their concerns, sending over 120 petitions to the Forest Supervisor asking that the Colcord/Turkey Pasture remain closed to grazing. 3-ER-361. In 2016 and 2017, the Forest Service continued to authorize grazing on the Bar X in excess of permitted levels, did not allow grazing on the Colcord/Turkey Pasture. 3-ER-541–50.

In January 2018, however, the Forest Service issued an AOI authorizing grazing on the Colcord/Turkey Pasture in the amount of 240 cows and 18 bulls for part of the year, again with no NEPA analysis or explanation in the AOI for reopening the Colcord/Turkey Pasture. 3-ER-551–55; 2-ER-26. In response, NOMR filed suit against the Forest Service in the District of Arizona, raising claims under NEPA, the National Forest Management Act ("NFMA"), and the Federal Land Policy Management Act. 3-ER-576–77, 582.

After NOMR filed suit, the Forest Service issued an amended 2018 AOI. 3-ER-556–59. The amended AOI reduced the level of grazing on the Bar X to be consistent with the term grazing permit and did not authorize grazing on the Colcord/Turkey Pasture or on any of the Driveway pastures. *Id.*

In October 2018, NOMR and the Forest Service entered into a settlement agreement and stipulation of dismissal of the case. 3-ER-577, 583. Consistent with the agreement, the 2019 AOI, like the revised 2018 AOI, allowed grazing at the levels set out in the term grazing permit and did not authorize grazing on the Colcord/Turkey Pasture or the Driveway. *Id.*; 3-ER-560–63.

## II.    THE FOREST SERVICE'S NEPA PROCESS AND DECISION.

In response to NOMR's first lawsuit, the Forest Service initiated a NEPA analysis[9] to determine whether and how to modify grazing management on the Bar X. 3-ER-586. In October 2018, the Forest Service sent FWS a biological assessment ("BA") as part of the ESA consultation process over the new grazing

---

[9] NEPA requires agencies to take a "hard look" at the probable effects of their actions before those actions are undertaken. *350 Montana v. Haaland*, 29 F.4th 1158, 1169, 1177 (9th Cir. 2022). To do this, agencies engage in a public process in which they disseminate relevant information about proposed actions and accept and respond to comments from interested members of the public. Typically, the process results in either an environmental impact statement or, if the agency determines that the action at issue will not have a "significant" effect on the environment, an environmental assessment. *Id.* at 1169–70.

scheme. 2-ER-278–80. In that BA, the Forest Service described its proposed new grazing scheme for the Bar X. The new scheme included (1) reopening the Colcord/Turkey Pasture to grazing and (2) increasing the total amount of grazing allowed on the Bar X. *Id.*

Over the next 14 months, the Forest Service's proposed grazing scheme did not change appreciably. The agency released a preliminary environmental assessment ("PEA") in March 2019 and a draft environmental assessment ("Draft EA") in June 2019. 2-ER-280–81. The Draft EA considered just two alternatives[10] in any depth: the proposed scheme and a "no grazing" option in which all grazing on the Bar X would be terminated. *E.g.*, 2-ER-194; *see also* 2-ER-75–76 (same alternatives in Final EA).

NOMR, members of the Colcord and Ponderosa Communities, and others were concerned that opening up the Colcord/Turkey Pasture to grazing would lead to annual repeats of the events of 2015 and other negative effects. During the NEPA process,[11] they suggested to the Forest Service that it consider a third alternative in which grazing would continue on some parts of the Bar X but the

---

[10] "Under NEPA, agencies must evaluate the environmental impacts of alternatives to the proposed action . . . ." *Envt'l Defense Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, slip op. at 26 (9th Cir. 2022).

[11] The comments included in Volume 3 of the Excerpts of Record represent a small fraction of the comments submitted to the Forest Service during the NEPA process.

Colcord/Turkey Pasture would remain closed to grazing. *E.g.*, 2-ER-200, 308. In addition, community members and others expressed concerns to the Forest Service about the following effects, *see* 2-ER-281–82:

- personal safety issues related to the presence of cattle on and near their properties, *e.g.*, 3-ER-320, 328–29;

- the threat of damage to septic systems caused by cattle grazing over their leach fields, *e.g.*, 3-ER-322, 342;

- safety hazards to motorists caused by cattle making their way to roads near the Colcord and Ponderosa Communities, *e.g.*, 3-ER-330, 335, 348;

- reduced opportunities to view wildlife such as elk, deer, and turkey due to cattle driving those species off the Colcord/Turkey Pasture, *e.g.*, 3-ER-330, 331, 334;

- negative impacts to recreation, including hiking, swimming, and fishing, *e.g.*, 3-ER-324, 331, 333, 350;

- foul smells due to cattle and cattle feces, *e.g.*, 3-ER-334, 348;

- potential decreases in property values due to the presence of cattle near their properties, *e.g.*, 3-ER-335, 350;

- the expense of installing fencing to keep cattle off their properties, *e.g.*, 2-ER-189, 305; and

- negative impacts to water quality and riparian resources, particularly near Haigler Creek, *e.g.*, 2-ER-230; 3-ER-322, 347.

In September 2019, the Forest Service issued a Final Environmental Assessment ("Final EA" or "EA") and a Draft Decision Notice/Finding of No Significant Impact ("Draft DN/FONSI") proposing to adopt the new grazing scheme analyzed during the NEPA process. 3-ER-578, 584. Under the new scheme, grazing would be allowed on the Colcord/Turkey Pasture, and up 9,250 total animal unit months ("AUMs")[12] of grazing could potentially be authorized each year on the Bar X and associated Driveway pastures: 4,000 AUMs on the Bar X itself and 5,250 AUMs on the associated Driveway pastures. 2-ER-57–58. In terms of the number of animals allowed to graze, this corresponds to 552 cow/calf pairs grazing for an entire year and 160 yearlings grazing for four to five months. 2-ER-58, 75. The prior scheme allowed the agency to authorize up to 130 cow/calf pairs to graze year-round. 2-ER-266; 3-ER-560.

NOMR objected to the draft decision under the administrative process set out in the 26 C.F.R. part 218 regulations. 2-ER-183. The Forest Service did not change course in response to the objections, and released a Final DN/FONSI in

---

[12] An AUM is a measure of grazing intensity equal to an "animal unit" grazing for one month. 2-ER-196.

December 2019. 2-ER-173–82. The Final DN/FONSI memorializes the agency's determination that its new scheme will not have a "significant" effect on the environment and thus does not require an environmental impact statement ("EIS"). 2-ER-179. The Final DN/FONSI also memorializes the agency's determination that its new scheme is consistent with the Tonto Forest Plan. 2-ER-180.

In late December 2019, the Forest Service issued a new term grazing permit and released a new allotment management plan for the Bar X. 3-ER-578, 584. The agency also issued an AOI for 2019. 3-ER-564–67. The 2019 AOI did not authorize grazing on the Colcord/Turkey Pasture. 3-ER-565.

## III.  PROCEEDINGS BELOW.

NOMR filed suit in the District of Arizona in February 2020, naming the Forest Service and FWS as defendants. 3-ER-595–96. Summary judgment briefing was completed in January 2021. 3-ER-598.

In early 2021, soon after the completion of summary judgment briefing, NOMR learned that the Forest Service would allow grazing on the Colcord/Turkey Pasture during the upcoming summer. 3-ER-568–71. NOMR asked the Forest Service to refrain from allowing grazing on the Colcord/Turkey Pasture during the pendency of the summary judgment motions, but the Forest Service refused. 3-ER-591. NOMR then filed a motion for a preliminary injunction to keep cattle off the Colcord/Turkey Pasture pending final judgment in the case. 3-ER-598.

The district court denied NOMR's motion for a preliminary injunction on June 30, 2021. 3-ER-597. On July 28, 2021, the court held a hearing on the cross-motions for summary judgment. *Id.* On January 26, 2022, the district court granted the Forest Service's motion for summary judgment and denied NOMR's motion for summary judgment. 1-ER-2–17. NOMR timely appealed. 3-ER-593–94.

## STANDARD OF REVIEW

This Court "'review[s] de novo a challenge to a final agency action decided on summary judgment and pursuant to Section 706' of the Administrative Procedure Act ('APA')." *Corrigan v. Haaland*, 12 F.4th 901, 906 (9th Cir. 2021) (quoting *Ctr. for Biological Diversity v. Esper*, 958 F.3d 895, 903 (9th Cir. 2020)). "De novo review of a district court judgment concerning a decision of an administrative agency means [this Court] views the case from the same position as the district court and reviews directly the agency's action under the [APA's] arbitrary and capricious standard." *Id.* (cleaned up).

"Agency decisions that allegedly violate NEPA and NFMA are reviewed under the APA, and may be set aside only if they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1176 (9th Cir. 2011) (cleaned up). When assessing whether an agency acted in an arbitrary and capricious manner, the *scope* of this Court's review is narrow, but the *depth* of its analysis is not: the APA "requires . . .

OPENING BRIEF                              17

court[s] to engage in a substantial inquiry, a thorough, probing, in-depth review" of the agency action to ensure that the agency has provided adequate and reasonable justifications for its conclusions and decision. *Siskiyou Reg'l Educ. Project v. U.S. Forest Serv.*, 565 F.3d 545, 554 (9th Cir. 2009) (cleaned up).

## SUMMARY OF THE ARGUMENT

The Forest Service decided on its new grazing scheme for the Bar X following a deeply flawed NEPA process. Specifically, the agency made three key errors in its NEPA analysis. *First*, the agency failed to analyze a reasonable range of alternatives. NEPA requires agencies to consider all reasonable alternatives in order to foster better decisionmaking. But the Forest Service did not consider all reasonable alternatives; it considered only a "no grazing" alternative and its preferred scheme, refusing to analyze a third option in which the Colcord/Turkey Pasture would remain closed to grazing—as it was for 40 years—while grazing would continue to be allowed elsewhere on the Bar X.

*Second*, the agency failed to take a "hard look" at the probable effects of its preferred scheme. NEPA requires agencies to consider how their decisions will affect the "human environment," which "include[s] the natural and physical environment *and the relationship of people with that environment*." 40 C.F.R. § 1508.14 (2019) (emphasis added). The agency did not take a "hard look" at the social, aesthetic, recreational, economic, and health effects that opening the

Colcord/Turkey Pasture to grazing will have on the Colcord and Ponderosa Communities—in fact, the agency largely ignored those effects. As for its analysis of ecological effects, the agency never explained how increasing the amount of grazing allowed on the Bar X while keeping everything else the same will somehow lead to an improvement in environmental conditions. Furthermore, the agency's analysis was riddled with errors, misleading statements and omissions, and sloppy math, all of which made it impossible for decisionmakers and the public to get an accurate view of the stakes involved in the agency's decision.

*Third*, the Forest Service erroneously concluded that it did not need to prepare a full environmental impact statement in connection with its decision. Under NEPA, an agency must prepare an EIS, rather than a less detailed environmental assessment, for every action that may have a "significant" impact on the human environment. Despite the presence of a substantial dispute as to the effects of the new scheme on the Colcord and Ponderosa Communities—and despite evidence that the new scheme may affect the health and safety of those communities—the Forest Service concluded that it did not need to prepare an EIS.

In addition to these NEPA violations, the Forest Service violated the National Forest Management Act by selecting a grazing scheme that does not comport with the Tonto Forest Plan. At the very least, the agency failed to provide a reasoned explanation for how the new scheme comports with the Forest Plan—

specifically, how increasing the amount of grazing in pastures that are already impaired and re-opening a pasture that had long been closed due to prior degradation from cattle will lead to an improvement in forest conditions.

Because the Forest Service violated NEPA and NFMA in analyzing and adopting its new grazing scheme for the Bar X, this Court should reverse the district court's grant of summary judgment to the Forest Service.

## ARGUMENT

NEPA is intended to "ensure that agencies will make informed decisions about the environmental effects of proposed federal actions and . . . make this information available to the public." *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1012 (9th Cir. 2012). In this case, serious deficiencies in the Forest Service's[13] NEPA analysis made it impossible for agency decisionmakers to reach an "informed decision[]" about the future of grazing on the Bar X. Moreover, the decision the agency made conflicts with the Tonto Forest Plan and thus violates NFMA. For those reasons, this Court should reverse the judgment of the district court; set aside the EA, decision notice, and other decision documents; and remand to the district court with instructions to remand to the Forest Service.

---

[13] NOMR brought one claim against FWS, but that claim is not being pursued on appeal. Thus, this brief refers to the Forest Service, not "Federal Defendants."

## I.   THE FOREST SERVICE FAILED TO CONSIDER A REASONABLE RANGE OF ALTERNATIVES AS REQUIRED BY NEPA.

The Forest Service considered just two alternatives in depth in its EA for the Bar X allotment: a "no grazing" alternative and the proposed action. NEPA required the Forest Service to consider a wider range of alternatives. In particular, the Forest Service should have analyzed a third alternative that would allow grazing to continue on the pastures authorized under the prior permit but keep the Colcord/Turkey Pasture closed to grazing, as it had been for 40 years.

"[C]onsideration of alternatives is critical to the goals of NEPA." *Bob Marshall All. v. Hodel*, 852 F.2d 1223, 1228–29 (9th Cir. 1988). "Agencies are required to consider alternatives in . . . EAs and must give full and meaningful consideration to all reasonable alternatives." *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 601–02 (9th Cir. 2010) (citation omitted). Agencies should consider a broad range of alternatives. *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1218–19 (9th Cir. 2008) ("*CBD v. NHTSA*"). However, "NEPA does not require . . . agencies to consider alternatives that are substantially similar to other alternatives." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1249 (9th Cir. 2005). If an agency decides to eliminate from detailed consideration a particular alternative, it must give "an appropriate explanation" for doing so. *Id.* at 1246. "The existence of a viable but unexamined alternative renders an EA inadequate."

*W. Watersheds Proj. v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013) (citation, quotation, and alteration omitted).

There is no dispute that the Forest Service refused to examine in depth a third alternative that would keep the Colcord/Turkey Pasture closed to grazing while allowing grazing on the remainder of the Bar X. 2-ER-74–75, 208, 217. The question is whether the agency gave a reasonable explanation for that refusal.

As an initial matter, it must be stressed that the agency gave an explanation only for its refusal to consider a pure "status quo" alternative of "continuing current management." 2-ER-74–75, 217. But NOMR, its supporters, and other members of the public did not ask the agency to consider a pure "status quo" alternative; they asked the agency to consider *some* alternative that would keep the Colcord/Turkey Pasture closed to grazing while allowing grazing elsewhere on the Bar X. *E.g.*, 2-ER-217, 221, 247; 3-ER-353. The Forest Service never explained its refusal to do so. In the absence of any such explanation, this Court cannot sustain the agency's choice of alternatives. *See Envt'l Defense Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, slip op. at 48–51 (9th Cir. 2022) (holding that agencies violated NEPA by failing to provide a contemporaneous explanation for refusing to consider alternatives suggested by the public).

To the extent that the Forest Service's explanation for not considering a pure "status quo" alternative can be taken to apply to *any* alternative along the lines

suggested by NOMR and its members, that explanation is simply not reasonable. The Forest Service offered three reasons for its refusal to consider a pure "status quo" alternative: (1) such an alternative would not "formally incorporate adaptive management," (2) such an alternative would be "within the range of alternatives between the No Grazing and the Proposed action," and (3) such an alternative would "not meet the purpose and need to manage resources in a manner that achieves Forest Plan objectives and desired conditions." 2-ER-74–75. None of these reasons holds water.

*First*, there is no inconsistency between "formally incorporating adaptive management" and the alternative suggested by NOMR and others. The Forest Service could simply revise the allotment management plan and grazing permit to formally incorporate adaptive management for the pastures long authorized for grazing while keeping the Colcord/Turkey Pasture closed to grazing.[14] The Forest Service's first reason is thus not responsive to the question of why the agency could not give full consideration to an alternative along the lines suggested by NOMR and its members.

---

[14] Of course, as a factual matter, the Forest Service has been using adaptive management on the Bar X for years. *See supra* p. 8; "Formally incorporating" adaptive management is literally a paper exercise.

*Second*, an alternative in which the Colcord/Turkey Pasture remains closed to grazing while grazing is allowed elsewhere on the Bar X is meaningfully distinct, legally and practically, from the two alternatives considered in the EA. Legally, if the Forest Service were to elect to keep the Colcord/Turkey Pasture closed to grazing, any future decision to re-open the pasture would require another revision of the allotment management plan, a new term grazing permit, and further NEPA analysis. *See* FS Handbook ("FSH") 2209.13, ch. 90, § 94 (2005) (discussing the process for making grazing authorization decisions). Under the chosen alternative, on the other hand, the Forest Service may authorize grazing on the Colcord/Turkey Pasture in any year without further NEPA analysis or revision of the allotment management plan or grazing permit. *Id.* Practically speaking, this makes all the difference in the world to NOMR's members and supporters: under the chosen scheme, in any given year, cattle might be allowed on the Colcord/Turkey Pasture; under their suggested third alternative, NOMR's members and supporters could be certain that no legal grazing would occur until the Forest Service went through another process and again revised the allotment management plan for the Bar X.

Moreover, even putting aside the effects to the Colcord and Ponderosa Communities, the third alternative suggested by NOMR and others is not "substantially similar to" the chosen alternative because the Colcord/Turkey

Pasture is unique. Unlike other pastures on the Bar X, it had not been grazed (except for 2015) in 40 years at the time of the Forest Service's decision, which led wildlife to concentrate there and allowed other resources to recover. And the past impacts of cattle grazing on the Colcord/Turkey Pasture were *particularly* bad—indeed, that was why it was closed in the first place. *See, e.g.*, 3-ER-454 (stating that the Colcord/Turkey Pasture had been closed to grazing "due to the lack of grazing capability and severe conflicts between grazing and other resources").

The district court reasoned that a third alternative along the lines suggested by NOMR and others is "subsumed within" the chosen alternative. 1-ER-9. That might be true if the key difference between the chosen alternative and the third alternative were simply the total amount of grazing permitted. But that is *not* the key difference—rather, the key difference between the two alternatives is the presence of grazing on a particular part of the Bar X that is differently situated than other parts due to its history of non-use and proximity to human communities. Indeed, an alternative allowing some amount of grazing on all pastures across the Bar X and an alternative allowing the *same* amount of grazing on all pastures

except for the Colcord/Turkey Pasture would not be "substantially similar to" each other.[15]

*Third*, an alternative along the lines suggested by NOMR and others would plainly meet the broad purpose and need laid out in the EA. *See Native Ecosystems Council*, 428 F.3d at 1246–47 (agencies need not consider alternatives that do not advance the purpose of the project). The EA defines the purpose and need of the action as follows: "to *consider* livestock grazing opportunities on public lands *where consistent with management objectives*" and "to authorize livestock grazing *in a manner consistent with direction* to move ecosystems towards their desired conditions." 2-ER-53–54 (emphasis added). This statement of purpose and need does not favor (or disfavor) grazing, as the Forest Service conceded below. *See* 3-ER-585 ("The Forest Service does not claim that its purpose and need statement 'prioritize[d] grazing on the Colcord/Turkey Pasture.'"). Rather, the statement of

---

[15] The proposed third alternative is obviously not "substantially similar to" the "no grazing" alternative. Although both would result in no grazing near the Colcord and Ponderosa Communities, the "no grazing" alternative would not serve the Forest Service's desire to ensure the "permittee's success and productivity." 2-ER-54. And complete closure of the Bar X to grazing would be a substantial departure from past management, whereas keeping the Colcord/Turkey Pasture closed while allowing grazing elsewhere on the Bar X would not be. *See New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 711 (10th Cir. 2009) (holding that an alternative in which only part of an area would be closed to fluid minerals development was meaningfully different from an alternative in which the entire area would be closed).

purpose and need directs the agency to "consider" grazing where appropriate, which necessarily includes looking at alternatives with and without grazing in different areas. Especially in light of the fact that the Colcord/Turkey Pasture was closed to grazing for 40 years, "considering" grazing there requires taking a careful look at alternatives with and without grazing on that pasture, with conditions on the remainder of the Bar X held constant.

In the district court, the Forest Service argued that NOMR's suggested alternative would not meet the broad purpose and need because "an alternative excluding a single suitable pasture from th[e] analysis does not align with" the need to "prioritize[] *considering* grazing opportunities on all portions of the project area that have been evaluated as suitable for grazing." 3-ER-585 (emphasis in original). This makes no sense. "Suitability" for grazing is a necessary condition to allow grazing in a particular area, but the Forest Service retains discretion to close areas to grazing even when they are deemed suitable. *See* FSH 1909.12, ch. 20, § 22.15 (2015) ("A [forest] plan's identification of certain lands as suitable for a use is not a commitment to allow such use but only an indication that the use *might be* appropriate.") (emphasis added). By emphasizing the need to "consider" grazing opportunities across the Bar X in the purpose and need statement, the Forest Service was indicating that it had *not yet decided whether to exercise that discretion*—indeed, that was the decision that the NEPA process was supposed to

help the agency make. *See* FSH 2209.13, ch. 90, § 91 (2005) ("Although an area may be deemed suitable for use by livestock in a [forest plan], a project-level analysis evaluating the site-specific impacts of the grazing activity, in conformance with NEPA, is required in order to authorize livestock grazing on specific allotment(s)."). Eliminating NOMR's suggested alternative from consideration frustrated the agency's ability to explore the full range of its discretion by limiting it to "all or nothing" options. *See Bob Marshall Alliance*, 852 F.2d at 1228 ("The consideration of alternatives requirement . . . guarantee[s] that agency decisionmakers have before them and take into proper account all possible approaches to a particular project . . . which would alter the environmental impact and the cost-benefit balance.") (cleaned up); *High Country Conservation Advocates v. U.S. Forest Serv.*, 951 F.3d 1217, 1224 (10th Cir. 2020) (stating that agencies have an "obligation under NEPA to 'provide legitimate consideration to alternatives that fall between the obvious extremes'") (quoting *Colo. Envt'l Coal. v. Dombeck*, 185 F.3d 1162, 1175 (10th Cir. 1999)).

The Forest Service refused to consider any alternative that would keep the Colcord/Turkey Pasture closed to grazing while continuing to allow grazing on the remainder of the Bar X. Such an alternative is substantially different from the two alternatives the agency did consider and would meet the purpose and need of the action. The agency violated NEPA by refusing to consider such an alternative.

II.   **THE FOREST SERVICE FAILED TO TAKE A "HARD LOOK" AT THE PROBABLE IMPACTS OF EXPANDING GRAZING, PARTICULARLY THE IMPACTS TO THE COLCORD AND PONDEROSA COMMUNITIES.**

NEPA demands that agencies take a "hard look" at the probable environmental effects of their proposed decisions in order "to foster environmentally informed decision-making." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 486 (9th Cir. 2011). Here, the Forest Service failed to take such a "hard look." The agency largely ignored the impacts of its preferred grazing scheme on the Colcord and Ponderosa Communities, and it understated impacts to ecological resources across the Bar X. Moreover, in presenting information to the public and decisionmakers, the agency made many serious erroneous or misleading statements and omissions, and even simple arithmetical mistakes, rendering a truly "informed decision" impossible.

A.   **The Forest Service Almost Completely Ignored the Aesthetic, Economic, Social, and Health Impacts of the New Grazing Scheme on the Colcord and Ponderosa Communities.**

The Forest Service failed to consider in any meaningful way the impacts of its new grazing scheme on the Colcord and Ponderosa Communities. NEPA's focus is on the "human environment," 42 U.S.C. § 4332(C), which "include[s] [both] the natural and physical environment *and the relationship of people with*

*that environment*," 40 C.F.R. § 1508.14 (2019) (emphasis added).[16] Therefore, an agency preparing an EA must consider the "aesthetic, . . . economic, social, [and] health" effects that might be caused by a proposed action, 40 C.F.R. § 1508.8, provided those effects have a "sufficiently close connection to the physical environment," *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 778 (1983). This includes effects on recreational opportunities, *LaFlamme v. FERC*, 852 F.2d 389, 399–400 (9th Cir. 1988); effects on human well-being caused by an action's sounds, smells, and noises, *Montana Wilderness Ass'n v. Connell*, 725 F.3d 988, 1003 (9th Cir. 2013); and economic effects, including effects on property values, *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1324–25 (D.C. Cir. 2015); *see also* 40 C.F.R. § 1508.14 ("When . . . economic . . . and natural or physical environmental effects are interrelated, then the environmental impact statement will discuss all of these effects on the human environment.").

   Throughout the Bar X NEPA process, members of the Colcord and Ponderosa Communities raised serious concerns about the effects of opening up

---

[16] The NEPA regulations were revised in 2020. 85 Fed. Reg. 43,304 (July 16, 2020). But the NEPA process in this case was completed before September 14, 2020, so the prior version of the regulations applies here. 85 Fed. Reg. at 43,372–73. Accordingly, all citations to NEPA regulations are to that prior version.

the Colcord/Turkey Pasture to grazing after 40 years of closure. Those concerns were largely motivated by the events of 2015, when the Forest Service allowed Bar X cattle to graze on the Colcord/Turkey Pasture for the first time since 1980. This led to dangerous run-ins between humans and cattle; decreased opportunities to view deer, elk, and turkey; interference with hiking, swimming, and other recreational activities; and a general diminishment in community members' quality of life. *See supra* pp. 10–11. Each of the effects cited by NOMR's members has a "sufficiently close connection to the physical environment" to be considered under NEPA because each is proximately caused by a change in the physical environment—namely, the presence of Bar X cattle on the Colcord/Turkey Pasture and near the Colcord and Ponderosa Communities. *See Metro. Edison Co.*, 460 U.S. at 774.

Many of these effects were simply ignored in the Forest Service's NEPA analysis. Specifically, the agency never addressed the costs of putting up fencing, the smells associated with cattle congregating near the Colcord and Ponderosa Communities, the dangers posed by cattle on roads near the communities, potential decreases in property values, and the threat that cattle might drive away other wildlife—elk, deer, and turkey—that community members enjoy viewing from

their properties.[17] Of course, completely failing to address foreseeable impacts violates NEPA. *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1082 (9th Cir. 2011)

To the extent that the agency responded to NOMR's members' concerns at all, it did so by (1) stating that "it is the responsibility of private landowners . . . to construct a lawful fence to keep out cattle," *e.g.*, 2-ER-56, 2-ER-197; (2) claiming that any effects to the Colcord and Ponderosa Communities would not be "significant" because "these subdivisions have always been within an active grazing allotment," *e.g.*, 2-ER-56, 2-ER-212; and (3) stating that "'same place-same time' encounters between uses . . . are not considered conflicts or safety issues that require consideration in grazing authorization planning analyses," 2-ER-56. These responses do not reflect a "hard look" at the effects of opening the Colcord/Turkey Pasture to grazing after 40 years.

---

[17] In response to a comment by NOMR that raised many of these issues, the Forest Service stated that "[t]here are potential conflicts between the multiple uses that the Forest Service manages its public lands for, but those potential conflicts are not unique to this project area. The Forest Service requires these sorts of interactions to be governed by accepted rules of public behavior, not National Forest management actions." 2-ER-220. This is nonsense. It was precisely the Forest Service's duty under NEPA to assess, in a reasonable way, what conflicts might foreseeably arise from its decision, provided those conflicts bear a "sufficiently close connection to the physical environment." *Metro. Edison Co.*, 460 U.S. at 778.

*Fencing*

For at least three reasons, the Forest Service's invocation of private landowners' supposed "responsibility" to construct fencing did not reasonably address the probable effects of the agency's decision that were raised by NOMR's members and others.

*First*, fencing would not prevent many of the threatened impacts. For instance, fencing would not stop cattle from driving elk, turkey, and deer away from the area; it would not stop the noxious odors caused by cattle congregating near community members' properties; and it would not stop cattle from reaching nearby roads, potentially causing accidents.

*Second*, the Arizona law cited by the agency for the proposition that "it is the responsibility of private landowners . . . to construct a lawful fence to keep out cattle" does not require the erection of fencing; it merely makes it impossible for landowners who do not install fencing to recover damages from the owners of livestock that trespass on their properties. *See* Ariz. Rev. Stat. Ann. § 3-1427. In other words, it is a law that *incentivizes* fencing, not a law that *mandates* it. Given that—and given that many community members told the Forest Service that they did not want to and/or could not afford to put up fencing, *e.g.*, 3-ER-334—it is entirely reasonable to expect that some members of the Colcord and Ponderosa Communities might not install fencing. The Forest Service should have assessed

the probable impacts to such members of the community from opening the Colcord/Turkey Pasture to grazing.

*Third*, as the Forest Service would agree, the decision to put up fencing to protect one's land from cattle is an entirely reasonable choice for those who can afford it—in other words, an "indirect effect" of the reopening of the Colcord/Turkey Pasture. *See Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 737–38 (9th Cir. 2020) (discussing how NEPA requires agencies to consider "reasonably foreseeable" indirect effects of their actions). Thus, the Forest Service should have considered the economic (*i.e.*, cost of fencing), aesthetic (*i.e.*, fencing-as-eyesore), and other impacts associated with putting up fencing. Instead, the Forest Service simply stated that fencing is the "responsibility" of landowners and left it at that.

### *"Always Been Within an Active Grazing Allotment"*

The Forest Service's statement that the impacts of its new grazing scheme "will not be significant as the[] [Colcord and Ponderosa Communities] have always been within an active grazing allotment" mangles both the facts and the law. First, as to the facts: aside from 2015, there was *no cattle grazing* on the Colcord/Turkey Pasture from 1980 through the time the Final EA was prepared. Thus, few residents of the Colcord and Ponderosa Communities have ever had to regularly contend with cattle grazing near their property. The clear implication of

the Forest Service's statement, though, is that community members will not be seriously affected by opening the Colcord/Turkey Pasture to grazing because they are (or should be) accustomed to cattle grazing. As the events of 2015 showed, that is simply not true: introducing cattle to the Colcord/Turkey Pasture seriously impacted community members' lives. Thus, regardless of whether the communities were always legally within the borders of an active grazing allotment,[18] reintroducing cattle after 40 years of non-use would change the on-the-ground facts, and the agency should have assessed the effects of that change.

As to the law, "[a]n agency cannot avoid its statutory responsibilities under NEPA merely by asserting that an activity it wishes to pursue will have an insignificant effect on the environment." *Jones v. Gordon*, 792 F.2d 821, 828 (9th Cir. 1986) (cleaned up). Indeed, one of the main purposes of an EA is to determine *whether* a proposed action will have "significant" effects, thus triggering the requirement to prepare a full EIS. *CBD v. NHTSA*, 538 F.3d at 1185.

––––––––––––––––––

[18] Whether the Colcord/Turkey Pasture has "always been within an active grazing allotment" in a strictly legal sense is irrelevant. However that statement might be read by a lawyer familiar with the intricacies of federal land management, it gives the lay reader the incorrect impression that community members are or should be accustomed to grazing in their area. And it is the lay reader, not the specialist lawyer, whose perspective matters when reading NEPA documents. *See* 40 C.F.R. § 1502.8 (2019) ("Environmental impact statements shall be written in plain language . . . so that decisionmakers and the public can readily understand them.").

_Same-Place, Same-Time Encounters_

Finally, the Forest Service is dead wrong that "'same-place same-time' encounters" between cattle and "other uses" need not be considered under NEPA—on the contrary, these are precisely the types of impacts that must be considered. The introduction of cattle to an area that has not seen grazing for decades is a "change in the physical environment" of the area, _Metro Edison Co._, 460 U.S. at 773; any reasonably foreseeable resultant impacts to safety, recreation, and other interests must be analyzed under NEPA, _id._ at 773–75 & 775 n.9. For instance, cattle are likely to gather in portions of Haigler Creek located in the Colcord/Turkey Pasture; in addition to reducing NOMR's members' enjoyment of visiting the creek, their presence could lead to dangerous encounters between cattle and humans. Those effects must be taken into account in a NEPA analysis.

\*\*\*

NEPA is a procedural statute that does not mandate particular results, but it does require that agencies be honest—with themselves and the public—about the environmental consequences of their actions. Agencies cannot ignore "stubborn, difficult-to-answer objections" or "sweep[] them under the rug." _Sierra Club v. U.S. Army Corps of Eng'rs_, 772 F.2d 1043, 1049–50 (2d Cir. 1985). But that is precisely what the Forest Service did here with the concerns raised by members of the Colcord and Ponderosa Communities. Rather than forthrightly acknowledge

the social, aesthetic, economic, and recreational impacts of opening the

Colcord/Turkey Pasture to grazing for the first time in 40 years, the Forest Service

swept those impacts under the rug. That, in turn, made it impossible to make an

informed decision about the future of grazing on the Bar X.

B.     **The Forest Service Failed to Take a "Hard Look" at Other Impacts of Its Preferred Alternative, Including Impacts to Vegetation, Soil, and Water Resources; Riparian Health; and Wildlife.**

The Forest Service at least attempted to analyze the effects of its decision on

soil, water, and other ecological resources, but its analysis fell far short of NEPA's

"hard look" requirement.

Again and again, the EA relies on three features of the new grazing scheme

to conclude that it is unlikely to lead to further degradation of soil, water, riparian,

and other resources: conservative utilization guidelines, adaptive management, and

rotational grazing practices. *See, e.g.*, 2-ER-84 (vegetation/range), 87 (soils); 89

(watersheds and riparian areas), 147–48, 154 (wildlife). The trouble is that none of

these features is new. The conservative utilization guidelines in the new scheme

are the same ones that have been used for years. *Compare* 2-ER-267–68 (prior

utilization guidelines), *with* 2-ER-289 (guidelines in new scheme); *see also* 3-ER-

505 (2008 BA prepared by the Forest Service discussing conservative use on the

Bar X). The adaptive management approach is the same one that has been

employed on the ground since at least 2008. *Compare* 3-ER-505 ("[a]n adaptive

management approach will be adopted as outlined in Chapter 90 of FSH 2209.13"), *with* 2-ER-57, 62 (citing the same guidance). And grazing rotation practices have been employed on the Bar X for decades. *E.g.*, 3-ER-445, 495, 505.

In truth, the only meaningful differences between the old scheme and the new one are that (1) the amount of grazing potentially allowed is much higher under the new scheme and (2) the Colcord/Turkey Pasture, long closed to grazing, is now open. And yet the EA insists that vegetation, soil, riparian, and other resources will *improve* under the new scheme, even as they have remained stubbornly suboptimal under the old one. There is simply a disconnect between the facts in the record and the Forest Service's conclusions. That disconnect renders the agency's NEPA analysis arbitrary and capricious. *See Or. Nat. Res. Council Fund v. Goodman*, 505 F.3d 884, 889 (9th Cir. 2007) (stating that agencies' NEPA analyses must "articulate a rational connection between the facts found and the conclusions made") (quoting *Or. Nat. Res. Council v. Lowe*, 109 F.3d 521, 526 (9th Cir.1997)).

### *Vegetation (Range) and Soil*

The Final EA acknowledges, as it must, that cattle grazing can have deleterious effects on range and soil resources. *See* 2-ER-80 ("[e]xcessive grazing" in ponderosa pine areas "may reduce plant diversity and decrease soil stability"); 2-ER-87 ("[h]oof action of cattle can cause direct impacts by compacting soils"

and "[g]razing can have detrimental effects on the amount of biological crusts"). And the EA also acknowledges that current soil conditions on the Bar X are far from ideal, with *no* pastures rated as having "good" soil conditions. 2-ER-35–41. Even the Colcord/Turkey Pasture—which has been grazed just once since 1979— has "fair" soil conditions. 2-ER-37. The proposed grazing scheme would open the Colcord/Turkey Pasture to grazing and dramatically increase the amount of grazing permitted on the remainder of the Bar X, increasing the impacts to range and soil that will occur compared to prior grazing levels.

The Forest Service considered all these facts and yet somehow concluded that the proposed grazing scheme will not have negative effects on soil and vegetation resources. 2-ER-84, 87. The agency justified this conclusion by relying on the three features mentioned above: adaptive management, conservative use guidelines, and rotational grazing strategies. *Id.* This "explanation," such as it is, is insufficient, because these features are not new. Simply put, there is a disconnect between the facts—(1) already-impaired vegetation and soil resources, (2) *more* grazing than in past, and (3) no change in management strategies—and the Forest Service's conclusion about the effects of its new scheme. *See Goodman*, 505 F.3d at 889 (agencies must provide a rational connection between facts and conclusions).

_Water Resources and Riparian Areas_

The EA admits that "[t]en of the 11 watersheds that touch the project area are considered functioning at risk," 2-ER-87, and that riparian vegetation is in "fair"—not "good"—condition in the four primary watersheds affected by the project, 2-ER-44. Moreover, Haigler Creek is not attaining all designated uses because of a measured _E. coli_ exceedance. 2-ER-45. The EA also admits that, because cattle tend to congregate near water, they can have especially deleterious effects on riparian areas and water quality. For instance, they "tend to deposit a greater amount of waste close to water sources than they create in other areas of the range," leading to an increase in disease-causing organisms in the water. 2-ER-89.

Despite all this, the Forest Service concluded that expanding grazing is "not likely to limit the attainment" of desired conditions for riparian areas and water quality in the Bar X. 2-ER-91. Because those "desired conditions" include "properly functioning" watersheds and water bodies that "fully support[]" designated beneficial uses," 2-ER-44–47, the Forest Service's conclusion necessarily implies that the agency believes its grazing scheme will allow for _improvements_ to riparian and water resources.

As it did with soil and vegetation resources, the agency attempted to justify this seemingly far-fetched result by pointing to certain features of the grazing

scheme—utilization guidelines, rotational grazing practices, and adaptive management. For instance, the EA states that the new grazing scheme will not harm riparian vegetation (and thereby watershed health) because "[r]iparian utilization guidelines" will be used and "cattle [will be] moved when use guidelines are met." 2-ER-89. But, again, these features of the new scheme have been part of the management of the Bar X for years. *See supra* pp. 37–38. The EA fails to explain in any reasonable way how increasing grazing levels under the same management approach and re-opening an area that has had almost no cattle grazing for 40 years will allow for improvement of riparian conditions. *See Goodman*, 505 F.3d at 889.

### *Wildlife*

The Final EA acknowledges the facts that cattle can compete for food with elk and deer and that elk and deer "would likely prefer grazing in pastures with no livestock," 2-ER-147. The EA also acknowledges that grazing negatively affects turkey and other bird species by reducing ground cover needed for nesting, 2-ER-146, 149–50. Given that, it is not surprising that both elk and turkey on the Bar X are concentrated in Canyon Creek, the Colcord Mountains, Naegelin Canyon, and Turkey Peak—all of which are located in the Colcord/Turkey and Lost Salt Pastures, which were long closed to grazing. 2-ER-141. But despite all this—and despite the history of cattle displacing wildlife on the Bar X, *see supra* pp. 6–7—

the agency concluded that its new grazing scheme will not seriously affect turkey, elk, and deer, relying on the same features of the scheme cited in the analysis of soil, water, and other resources. 2-ER-147–48, 154. Like its conclusions regarding those resources, the Forest Service's conclusions vis-à-vis effects to wildlife are simply not tied to the record in any rational way. *See Goodman*, 505 F.3d at 889.

\*\*\*

Even with the Colcord/Turkey Pasture closed to grazing and with relatively moderate grazing levels on the Bar X for many years, soil, water, riparian, wildlife, and other resources are impaired. The new scheme increases the amount of grazing allowed on the previously-authorized Bar X pastures and opens the Colcord/Turkey Pasture to grazing, but does not change management practices (*i.e.*, utilization guidelines, adaptive management, etc.). According to the Forest Service, though, its new scheme will not further degrade conditions, and will in fact *improve* them. Perhaps it is theoretically possible that the agency could bridge the gap between the facts and its conclusions, but it did not do so here.

## III. THE FOREST SERVICE'S NEPA ANALYSIS WAS RIDDLED WITH MISSTATEMENTS AND ERRORS, FRUSTRATING NEPA'S GOALS OF FOSTERING INFORMED DECISIONMAKING AND PUBLIC PARTICIPATION.

In conducting its NEPA analysis, the Forest Service made several significant errors that undermined its assessment of impacts. Specifically, the agency used inaccurate baseline data concerning past grazing levels on the Bar X and

misapplied its own grazing capacity analysis. Relatedly, the Forest Service misrepresented the nature of its analysis and data throughout the NEPA process, misleading both the public and decisionmakers.

### A. The Forest Service Inaccurately Described Baseline Conditions and Relied on Incorrect Data and Calculations.

"An agency fails to meet its 'hard look' obligation [under NEPA] when it relies on incorrect assumptions or data." *Native Ecosystems Council v. Marten*, 883 F.3d 783, 795 (9th Cir. 2018) (internal quotation, citation, and alteration omitted). "[T]he data the Forest Service provides to the public to substantiate its analysis and conclusions must . . . be accurate." *Id.* (quoting *WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 926 (9th Cir. 2015)). Relatedly, an agency's "assessment of baseline conditions 'must be based on accurate information and defensible reasoning.'" *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1101 (9th Cir. 2016) (quoting *Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 570 (9th Cir. 2016)).

The Final EA states that livestock numbers on the Bar X "averaged 3,707 [AUMs] per year" over the 12 years prior to the 2020 decision. 2-ER-26. The EA also states that, "[f]rom 2011-2018, the Driveway [pastures associated with the Bar X] w[ere] authorized for a yearly average of 1,720 AUMs." 2-ER-27. Thus, the EA reports a total amount of grazing on the Bar X plus associated Driveway pastures of approximately 5,400 AUMs in the years leading up to the 2020 decision.

That figure is a gross overstatement of historical grazing levels. As the Forest Service now admits, the average level of grazing on the Bar X plus the associated Driveway pastures from 2008–2019 was just 3,187 AUMs. 1-ER-9–10; 2-ER-272–73. From 2013 through 2019, the average level of grazing on the Bar X and Driveway was 3,715 AUMs. 2-ER-273. Thus, the EA overstates the amount of grazing in the years leading up to the decision by some 45–70%.

This is not a minor mathematical error. By overstating past grazing levels, the EA makes the new scheme seem like less of a departure from past practice than it really is. In fact, it is a radical departure: under the new scheme, the total amount of grazing allowed on the combined Bar X pastures and Driveway pastures could be as high as 9,250 AUMs, nearly *three times* higher than the average amount of grazing from 2008–2019. The EA thus obscures the magnitude of the expansion of grazing on the Bar X, misleading decisionmakers and the public. *See NRDC v. U.S. Forest Serv.*, 421 F.3d 797, 812 (9th Cir. 2005) (holding that erroneous information in an EIS "subverted NEPA's purpose of providing decision makers and the public with an accurate assessment of the information relevant to evaluate the" proposed action).

Relatedly, the erroneous information about historical grazing numbers skews the EA's assessment of baseline conditions. The adverse environmental effects observed on the Bar X pastures in recent years (*e.g.*, poor soil and watershed

health) have been caused by a *significantly* lower level of grazing than the levels reported in the EA. In other words, the relevant baseline is that of an allotment struggling to meet desired conditions with 3,187 AUMs of grazing, not an allotment struggling to meet desired conditions with 5,400 AUMs of grazing.[19] An inaccurate baseline leads to an inaccurate assessment of effects when comparing the proposed action to the baseline.

The EA's assessment of the Bar X's grazing capacity is similarly flawed. Both the EA itself and the Forest Service's responses to public comments state that the agency relied on a "grazing capacity analysis" to support the grazing levels in the proposed action. 2-ER-33, 59, 190, 209. But that capacity analysis does not actually support the new grazing levels. According to the capacity analysis, the Bar X pastures—not including the Driveway pastures—can support 3,108 AUMs, and the Bar X-associated Driveway pastures can support 3,973 AUMs.[20] 2-ER-312–14;

---

[19] The Forest Service's repeated statements to the effect that the Colcord and Ponderosa Communities have "always been within an active grazing allotment" can also be seen as a misrepresentation of baseline conditions.

[20] Unfortunately, the capacity analysis is not labeled very clearly, leading to a dispute between the parties concerning the calculated grazing capacity. *See* 2-ER-291–93 (response to NOMR's statement of facts). But the numbers do not lie: the third page of the capacity analysis, which purports to calculate the carrying capacity (in AUMs) of the "Bar X," covers the total acreage of the Bar X pastures, *including* the Colcord/Turkey Pasture. *See* 2-ER-314; *see also* 2-ER-292–93. The acres included in the analysis on the fourth page, which covers the "Colcord Pasture," 2-ER-315, are thus a *subset* of the acres included in the analysis on the

*see also* 2-ER-292–93. The proposed grazing scheme, however, allows up to 4,002 AUMs on the Bar X pastures and 5,250 AUMs on the Driveway pastures—around 30% more grazing than is supported by the capacity analysis.

The district court reasoned that, because the Forest Service based the AUMs in the proposed action on "a host of variables"—not just the grazing capacity analysis—any error the agency made with respect to the capacity analysis did not render the agency's overall analysis arbitrary and capricious. 1-ER-10–11. But the agency relied heavily on the capacity analysis, gesturing at other "variables" in a cursory fashion, if at all. For instance, in response to criticism about the maximum AUMs allowed under the new scheme, the Forest Service replied that "AUM's [sic] were derived from a capacity analysis," with no mention of the other "variables" considered. 2-ER-190.

More fundamentally, the disconnect between the results of the Forest Service's grazing capacity analysis and the higher number of AUMs allowed under the new scheme is not explained or even acknowledged anywhere in the EA. Given the purpose of—even the *name* of—a capacity analysis,[21] the Forest Service should

---

third page. 2-ER-293. In other words, to determine the capacity study's result for the total AUMs that can be supported on the Bar X, *including* the Colcord/Turkey Pasture, one need only look to the number on the third page: 3,108 AUMs.

[21] As explained in the Region 3 Supplement to the Forest Service Handbook, a capacity analysis is used to estimate "carrying capacity," which is "[t]he average

have disclosed and explained why its new scheme allows grazing in excess of the

numbers calculated in that analysis. In other words, even assuming that the Forest

Service could, in theory, reasonably conclude that grazing at levels higher than

those found in its own capacity analysis is sustainable, it did not provide an

explanation for that conclusion.[22] The EA's vague references to "utilization,

condition and trend data"— considered, in some unexplained manner, "in

combination with" the capacity analysis—do not amount to such an explanation.

*See Bark v. U.S. Forest Serv.*, 958 F.3d 865, 872 (9th Cir. 2020) ("conclusory

statements, based on vague and uncertain analysis, . . . are insufficient to satisfy

NEPA's requirements") (cleaned up).

_____

number of livestock and/or wildlife that may be *sustained* on a management unit
compatible with management objectives for the unit." FSH Region 3 Supp.
2209.13, ch. 90, § 92.14a (2016) (emphasis added).

[22] It appears that the Forest Service may have simply misinterpreted the capacity
analysis. As the agency itself has acknowledged, it has not always been consistent
about converting between AUMs and numbers of animals. 2-ER-271. The capacity
analysis yielded a carrying capacity in terms of AUMs, 2-ER-291–92, which was
then converted into "animals" so as "to give the reader a sense of what the AUMs
actually mean." 2-ER-293. The conversion factor used was 1.0 cow/calf pairs per
12 AUMs—*not* the proper factor of 1.32 cow/calf pairs per 12 AUMs. *See* 2-ER-
293, 314 (259 "animals" = 3,108 AUMs/12); 2-ER-190, 196 (1.32 is proper
factor). What likely happened next is that the "animals" figure was converted back
to AUMs using the proper 1.32 factor, yielding a maximum authorized amount of
grazing roughly 32% higher than that calculated by the capacity analysis. *Compare*
2-ER-292 (calculated grazing capacity of 3,973 AUMs on the Bar X-associated
Driveway pastures), *with* 2-ER-58 (up to 5,250 AUMs = 1.3214 * 3,973 AUMs
allowed on the Bar X-associated Driveway pastures).

**B.**    **The Forest Service Made Many Misleading Statements Regarding Conditions and Data.**

"An agency fails to meet its 'hard look' obligation when it . . . presents information that is so incomplete or misleading that the decisionmaker and the public could not make an informed comparison of alternatives." *Marten*, 883 F.3d at 795 (internal quotation and citation omitted).

The Final EA is riddled with statements that are at best misleading and at worst outright false. In addition to the inaccurate descriptions of baseline conditions and the results of the capacity analysis described above, the Forest Service also seriously misrepresented other aspects of the analysis it conducted in developing its new grazing scheme. The Final EA states that "[c]urrent management history [wa]s evaluated by looking at the last 12 years of data," 2-ER-26, but there are only four years of forage data available for the Colcord/Turkey Pasture and *no* forage data for the Lost Salt Pasture, 2-ER-290–91. The EA states that production-utilization studies were done to evaluate the probable effects of the new grazing scheme, 2-ER-33, 59, but it is not possible that any such studies were done for the Colcord/Turkey and Lost Salt pastures, because the Forest Service did not gather utilization data following 2015, the one year any of those pastures was grazed. 2-ER-275. Similarly, the EA's repeated statements about "trial grazing" periods on the Colcord/Turkey Pasture in 2015 and 2018, *e.g.*, 2-ER-26, are seriously misleading, if not outright false: the record makes clear that grazing was

not authorized on Colcord/Turkey in 2015 for trial purposes, 2-ER-274–76, no

utilization data was actually gathered following that grazing season, *id.*, and there

was no grazing *at all* on Colcord/Turkey in 2018, 2-ER-276.

Predictably, the Forest Service has characterized the errors detailed above as

"flyspecks." Putting aside for a moment that errors on the order of 30% or 50% are

hardly flyspecks, the agency's characterization ignores the *cumulative* effect of the

EA's many errors. Errors—even small errors that "may be flyspecks standing

alone"—can combine to undermine the accuracy of a NEPA document in a way

that defeats NEPA's purpose of fostering informed decisionmaking.[23] *WildEarth*

*Guardians v. Bernhardt*, 502 F. Supp. 3d 237, 256–57 (D.D.C. 2020), *appeal*

*dismissed sub nom. WildEarth Guardians v. Haaland*, 2021 WL 3176109 (D.C.

Cir. Apr. 28, 2021).

Where, as here, the individual errors are relatively large, the cumulative

distortive effect of those errors can be great. The table below summarizes the key

misstatements, misleading statements, and omissions of the EA discussed above:

---

[23] This principle is hardly unique to the NEPA or administrative law context. *See, e.g.*, *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) (discussing the cumulative error doctrine in criminal law, under which "the cumulative effect of multiple [trial] errors may . . . prejudice a defendant" even though "no single trial error examined in isolation is sufficiently prejudicial to warrant reversal").

| Topic | Misstatement or Misleading Statement/Omission | Actual Facts |
|---|---|---|
| Recent Grazing Levels | Total: ~5,400 AUMs per year (3,707 AUMs on the Bar X and 1,720 AUMs on the Driveway). | Total: 3,187 AUMs per year from 2008–2019. |
| Capacity Analysis | "AUM's [sic] were derived from a capacity analysis . . . ." 2-ER-190. Implication throughout that authorized AUMs do not exceed capacity. | The new scheme authorizes ~32% more AUMs than the capacity analysis concluded the pastures could support. |
| Status of Colcord Pasture | Repeated statements that the Colcord and Ponderosa Communities "have always been within an active grazing allotment." | There was no grazing on the Colcord/Turkey Pasture after 1979, save for 2015. |
| Years of Data Used to Support Proposal | "Current management history [wa]s evaluated by looking at the last 12 years of data." | There are only four years of data for the Colcord/Turkey Pasture and no data for the Lost Salt Pasture. |
| Production-Utilization Studies | Production-utilization studies were used to evaluate carrying capacity and develop the proposed scheme. | No production-utilization studies were done for the Colcord/Turkey or Lost Salt pastures. |
| Trial Grazing on Colcord | Repeated statements that there were two years of "trial grazing" on the Colcord/Turkey Pasture. | There was no grazing in 2018, and the characterization of grazing in 2015 as being for "trial" purposes is a post hoc rationalization. |

Again, some of these misstatements are *by themselves* serious enough to defeat NEPA's goal that "agency action is 'fully informed and well considered.'" *NRDC v. U.S. Forest Serv.*, 421 F.3d at 811 (quoting *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978)). When viewed in aggregate, though, it is impossible to escape the conclusion that decisionmakers (and the public) were

presented with a wildly misleading analysis of the effects of the Forest Service's new scheme, making an "informed comparison of . . . alternatives" impossible. *Id.* at 813.

## IV. THE FOREST SERVICE'S DECISION NOT TO PREPARE AN EIS WAS ARBITRARY AND CAPRICIOUS.

The Forest Service concluded that its new grazing scheme "will not have significant effects on the quality of the human environment." 2-ER-179. Because the Forest Service failed to take a "hard look" at the potential environmental impacts of the new scheme in the EA, that conclusion was necessarily arbitrary and capricious. *CBD v. NHTSA*, 538 F.3d at 1223–24. And, because the record before the Forest Service "demonstrates that the [new grazing scheme] *may* have a significant impact" on the human environment, the agency should have prepared an EIS. *Id.* at 1225 (emphasis added).

An agency must prepare a full EIS if a proposed "action *might* significantly affect environmental quality." *WildEarth Guardians v. Provencio*, 923 F.3d 655, 668–69 (9th Cir. 2019) (emphasis added). In other words, "to prevail on a claim that [an agency] violated its statutory duty to prepare an EIS, a plaintiff need not show that significant effects will in fact occur. It is enough for the plaintiff to raise substantial questions whether a project may have a significant effect on the environment." *Id.* at 669 (quoting *Blue Mtns. Biodiversity Proj. v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) (internal quotations omitted)). "This presents a

'low standard' that is permissive for environmental challenge." *Envt'l Defense Ctr.*, 36 F.4th 850, slip op. at 51 (quoting *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1097 (9th Cir. 2011)).

Whether an action "may" have a significant effect depends on the action's "context and intensity." *Provencio*, 923 F.3d at 669. Taking into account an action's "context" requires understanding that "[s]ignificance varies with the setting of the proposed action. . . . [I]n the case of a site-specific action, significance . . . usually depend[s] upon the effects in the locale rather than in the world as a whole." 40 C.F.R. § 1508.27(a). The "intensity" of a proposed action depends on many factors, ten of which are set out in NEPA's implementing regulations. *See id.* § 1508.27(b) (listing factors). "Meeting just one of these 'significance factors' may be sufficient for [a court] to require an agency to prepare an EIS . . . ." *Envt'l Defense Ctr.*, 36 F.4th 850, slip op. at 52 (citation omitted). An agency's decision not to prepare a full EIS is reviewed under the "arbitrary and capricious" standard. *Provencio*, 923 F.3d at 675.

Because this is a site-specific action, the "significance" of the proposed grazing scheme depends on the scheme's effects in and around the Bar X. Viewed in that context, the record clearly demonstrates that the new grazing scheme "may" have a significant effect on environmental quality. At least two of the factors identified in the NEPA regulations are present here.

*First*, there is a serious threat that "the proposed action [will] affect[] public health or safety." 40 C.F.R. § 1508.27(b)(2). The best evidence of this is what happened in 2015, the one year that the Forest Service allowed grazing on the Colcord/Turkey Pasture. That year, there were several close encounters between Bar X cattle and community members or their guests and cattle found their way on to the roads passing through the Colcord and Ponderosa Communities, posing a danger to motorists. *See supra* p. 10. And cattle also gathered in portions of Haigler Creek running through the Colcord/Turkey Pasture, defecating in the water and adding to water quality concerns. *See supra* p. 11.

*Second*, the new grazing scheme's "effects on the quality of the human environment are likely to be highly controversial," 40 C.F.R. § 1508.27(b)(4), in the sense that "there is a substantial dispute about the . . . effect[s]" of the scheme, *Provencio*, 923 F.3d at 673 (citation and alteration omitted). "A substantial dispute exists when evidence, raised prior to the preparation of an EIS or FONSI casts serious doubt upon the reasonableness of an agency's conclusions." *Id.* (citation omitted). Here, the Forest Service concluded that its new grazing scheme will not have a significant effect on the Colcord and Ponderosa Communities because they "have always been within an active grazing allotment," implying that the new scheme will not constitute a dramatic change from the status quo. But evidence put before the agency throughout the NEPA process undercut that conclusion, making

clear that the residents of the communities as well as recreators have come to rely on the absence of cattle on the Colcord/Turkey Pasture. At the very least, the evidence put before the Forest Service "casts serious doubt" on the agency's conclusions regarding the effects of its decision on the Colcord and Ponderosa Communities. This dispute alone warrants analysis in an EIS.

Furthermore, the "thorough on-the-ground investigation[s] concerning conditions on the Bar X" from the late 1970s and 1980s, 3-ER-414, cast serious doubt on the Forest Service's conclusions regarding the ecological effects of its new plan, particularly where the Colcord/Turkey Pasture is concerned. Given the absence of any recent production-utilization data for the Colcord/Turkey Pasture, those studies, though 40 years old, are still the best indication of what will happen if cattle graze there, and they suggest that the effects may be devastating. At the very least, the studies raise "substantial questions" as to whether the new scheme may have significant effects, requiring an EIS to be prepared. *Provencio*, 923 F.3d at 669.

Finally, the Forest Service's errors in substantially overstating prior grazing levels and grazing capacity for the Bar X and Driveway pastures also raise substantial questions about the significance of effects from the new scheme. The increase in grazing levels from the prior scheme is much greater than what the

agency disclosed in its EA, resulting in controversy about the extent of environmental effects that will occur under the new scheme.

Taken separately or together, these factors demand that the Forest Service prepare a full EIS for its new grazing scheme. *See Envt'l Defense Ctr.*, 36 F.4th 850, slip op. at 52. The new grazing scheme—and in particular the opening of the Colcord/Turkey Pasture to grazing—will disrupt the lives of members of the Colcord and Ponderosa Communities and could very well lead to environmental devastation not seen since the 1970s. These threats are sufficiently serious to meet the "low standard" for preparation of an EIS. *Id.* at 51.

## V.  THE NEW GRAZING SCHEME DOES NOT COMPORT WITH THE TONTO FOREST PLAN AND THUS VIOLATES NFMA.[24]

The Forest Service violated NFMA by choosing to move forward with a grazing scheme that is inconsistent with the Tonto Forest Plan. At the very least, the Forest Service did not provide a reasoned explanation for how the new grazing scheme is consistent with the Forest Plan.

"NFMA charges the Forest Service with the management of national forest land, including planning for the protection and use of the land and its natural

---

[24] If the Court rules for NOMR on any of its NEPA claims, it may not be necessary to reach NOMR's NFMA claim. *See, e.g.*, *Great Basin Res. Watch*, 844 F.3d at 1111 (declining to address substantive challenges to an agency decision after ruling in the plaintiffs' favor on a NEPA claim).

resources." *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1109 (9th Cir. 2018). The Forest Service conducts planning at the forest-wide level when it prepares forest plans. *Id.*; 16 U.S.C. § 1604(a). Later site-specific actions—including grazing authorizations—must be consistent with the forest plan. 16 U.S.C. § 1604(i); *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 957 F.3d 1024, 1035 (9th Cir. 2020). An action is not consistent with a forest plan if it will move the forest away from desired conditions in the long run. *All. for the Wild Rockies*, 907 F.3d at 1115–16.

Courts review the Forest Service's consistency determination for a given site-specific action under the APA. *Id.* at 1112. A consistency determination may violate NFMA and the APA for two distinct reasons: (1) the action is so plainly inconsistent with the forest plan that it is "not in accordance with law," *cf. Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957, 969–70 (9th Cir. 2002); or, more commonly, (2) the agency has provided an inadequate or unreasonable explanation for how the action is consistent with the forest plan, violating the requirement of reasoned decisionmaking embedded in the "arbitrary and capricious" standard, *see All. for the Wild Rockies*, 907 F.3d at 1115–16.

The Tonto Forest Plan includes the following relevant goals, standards, and guidelines: for soils, "emphasize improvement of soil productivity," 3-ER-469; for the range resource, "[e]mphasize a program of range administration which will

bring the range resource under proper management and improve range forage

conditions," 3-ER-473; for riparian areas, "enhance riparian ecosystems, by

improved management," 3-ER-469, "move degraded riparian vegetation toward

good condition as soon as possible," 2-ER-255–56, and prevent "[d]amage to

riparian vegetation, streambanks, and channels," *id.*; and, for watersheds, "manage

watersheds in a manner aimed at improving them to or maintaining them at a

satisfactory or better condition," 2-ER-256. The Forest Plan also states that the

Forest Service should "[a]llow for forage to *maximize* Threatened and Endangered

. . . species, management indicator species, and emphasis harvest species." 2-ER-

256 (emphasis added). For Management Area 5D—which includes nearly all of the

Colcord/Turkey and Lost Salt pastures, *id.*—the Forest Plan provides that the

"primary emphasis" of management should include "creation of wildlife habitat

diversity, increased populations of emphasis harvest species, and recreation

opportunity." 3-ER-481.

Simply put, the Forest Service's new grazing scheme will not move the

Tonto National Forest towards the long-term resource goals set out in the Forest

Plan. As discussed *supra* pp. 37–42 in the context of NEPA, the Bar X's soil

resources are impaired, none of its watersheds are functioning properly, riparian

vegetation is rated as "fair" (rather than "good"), and Haigler Creek is not

achieving all designated uses due to an *E. coli* exceedance. All of these conditions

reflect years of grazing at levels much lower than the levels in the new scheme, and also reflect 40 years of non-use of the Colcord/Turkey and Lost Salt pastures. Re-opening those pastures will not only degrade soil, vegetation, and riparian resources, it will displace harvest species such as deer, elk, and turkey. Given this, the new scheme will so clearly fail to move the Forest towards its goals that it is not consistent with the Forest Plan and thus "not in accordance with" NFMA. *Rittenhouse*, 305 F.3d at 969–70.

But even putting aside the substantive invalidity of the new scheme, the Forest Service failed to adequately explain how the scheme is consistent with the Forest Plan. As discussed *supra* pp. 37–42 in the NEPA context, the Forest Service's explanations for why its scheme will not have serious negative effects on soil, riparian, wildlife, and other resources were unreasonable. Those same unreasonable explanations—relying on utilization guidelines and adaptive management that have already proven inadequate to protect resources, etc.—do not suffice under NFMA and the APA, because they do not "show [the new grazing scheme's] consistency with" the Forest Plan. *All. for the Wild Rockies*, 907 F.3d at 1115. In addition, the agency never explained how re-opening the Colcord/Turkey and Lost Salt pastures fulfills the Forest Plan's goals of maximizing harvest species and threatened species. The Forest Service was required to explain, in a

reasonable way, how increasing the level and area of grazing will move the Bar X

towards the long-term goals set out in the Forest Plan, and it utterly failed to do so.

## VI. THIS COURT SHOULD SET ASIDE THE EA, DECISION NOTICE, AND ALL DECISIONS RELYING ON THEM AND ORDER THE DISTRICT COURT TO REMAND TO THE FOREST SERVICE.

If this Court agrees with NOMR on any claim, it should reverse the decision

below, set aside the decision notice and all decisions flowing from it (*e.g.*, the new

allotment management plan), and order the district court to remand the matter to

the Forest Service. *See Envt'l Def. Ctr.*, 34 F.4th 850, slip op. at 59 (awarding

vacatur after finding that the lower court erred in granting summary judgment to

the defendant federal agencies). If this Court rules in favor of NOMR on any

NEPA claim, this Court should also vacate the EA. *Id.*

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's

judgment.

Date: July 1, 2022                    Respectfully submitted,

                                      */s/ Andrew R. Missel*
                                      Andrew R. Missel
                                      Lauren M. Rule
                                      **ADVOCATES FOR THE WEST**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

**9th Cir. Case Number: 22-15259**

The undersigned attorney states the following:

[x]  I am unaware of any related cases currently pending in this court.

[  ]  I am unaware of any related cases currently pending in this court other than the cases identified in the initial brief filed by the other party.

[  ]  I am aware of one or more related cases currently pending in this court that were not identified in the initial brief filed by the other party. The case number and name of each related case and its relationship to this case are:

**Signature**       */s/ Andrew R. Missel*          **Date**        July 1, 2022

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Certificate of Compliance for Briefs

**9th Cir. Case Number: 22-15259**

I am the attorney for Plaintiff-Appellant.

**This brief contains 13,999 words,** excluding the items exempted by Fed. R.

App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P.

32(a)(5) and (6).

I certify that this brief *(select only one)*:

[x] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**    */s/ Andrew R. Missel*    **Date**    July 1, 2022

[THIS PAGE LEFT INTENTIONALLY BLANK PER 9th Cir. R. 28-2.7]

## ADDENDUM

Forest Service Handbook 2209.13, ch. 20, § 22.15 (2015) .................................. A-1

Forest Service Handbook 2209.13, ch. 90, § 91 (2005) ..................................... A-4

Forest Service Handbook 2209.13, ch. 90, § 94 (2005) ..................................... A-6

Forest Service Handbook Region 3 Supp. 2209.13, ch. 90, § 92.14a (2016) ...... A-9

ADDENDUM TABLE OF CONTENTS

WO AMENDMENT 1909.12-2015-1                                        1909.12_20
EFFECTIVE DATE: 01/30/2015                                        Page 41 of 134
DURATION:  This amendment is effective until superseded or removed.

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

## 22.15 – Suitability of Lands

> **(v) *Suitability of lands*.  Specific lands within a plan area will be identified as suitable for various multiple uses or activities based on the desired conditions applicable to those lands.  The plan will also identify lands within the plan area as not suitable for uses that are not compatible with desired conditions for those lands.  The suitability of lands need not be identified for every use or activity.  Suitability identifications may be made after consideration of historic uses and of issues that have arisen in the planning process.  Every plan must identify those lands that are not suitable for timber production (§ 219.11).**  (36 CFR 219.7(e)(1)(v)).

National Forest System lands are generally suitable for a variety of uses consistent with the purposes for which they are administered (outdoor recreation, grazing, timber, watershed, and wildlife and fisheries).  As discussed in the beginning of section 22 of this Handbook, the set of plan components including the suitability of lands in the plan area should integrate social, economic, cultural, and ecological considerations.  The identification of suitability of lands is not required for every resource or activity.  If suitability of lands is identified for a resource or activity, such identification does not need to be made for every acre of the plan area.  For some resources, identifying the suitability of use or activity in a particular area may be more appropriately made at the project or activity level with site-specific analysis, stakeholder participation, and proposed design criteria.

Identifying suitability helps determine if future projects and activities are consistent with desired conditions.  The identification of suitability or nonsuitability of lands is based on the desired condition for those lands and the inherent capability of the land to support the use.

Identifying which uses to focus on when identifying lands as "suitable " or not for the uses may arise from issues raised in public participation.  When beginning to identify specific lands as suitable for various uses, the Interdisciplinary Team should consider what they learned from existing uses, monitoring, project planning, and resource plans including fire management plans, travel management plans, watershed plans, and other resource plans.

The Responsible Official should document and make available to the public the rationale for identifying the suitability of lands and the information sources, tools, standards, technical guidance documents, and databases used in the identification.

Responsible officials should not identify suitability of lands for any resource, such as certain minerals, if an entity other than the U.S. Department of Agriculture (USDA) has sole authority over the resource.  Section 23.22i of this Handbook gives guidance for plan components and mineral resources.

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 42 of 134

FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN

The effect of identifying lands as *suitable* for a use is notably different from identifying lands as *not suitable* for a use. The difference is as follows:

   1. <u>Lands identified as suitable for certain uses or activities</u>. A plan's identification of certain lands as suitable for a use is not a commitment to allow such use but only an indication that the use might be appropriate. A specific use or activity may be approved or may be disapproved in an area identified as suitable for such types of use. For instance, a plan may identify a management area as suitable for utility corridors; however, that suitability determination does not imply that specific application for pipeline construction would be approved.

   2. <u>Lands specified as not suitable for uses or activities</u>. If a plan identifies certain lands as not suitable for a use, then that use or activity may not be authorized. Public uses for which a special use authorization is not required, such as biking, boating, camping, hiking, or hunting, will not be affected by such a designation in the plan; such uses can only be restricted by an action such as a closure order (sec. 21.8 of this Handbook). See chapter 60 of this Handbook for identification of lands not suitable for timber production.

   A plan may not identify a use or activity as being suitable in the plan area or relevant part of the plan area, and should identify the area as not suitable for that use or activity, if any of the following conditions apply:

      a. A law, regulation, Executive Order, or Forest Service directive prohibits the use;

      b. The use would result in substantial and permanent impairment of the productivity of the land or renewable resources; or

      c. The use is not compatible with the desired conditions and objectives for the plan area, or relevant portion thereof.

Plans may include suitability or nonsuitability statements for uses such as: administrative or commercial communication sites, commercial harvest of nontimber forest products, cross-country over-snow vehicle use, helicopter skiing, mechanized travel, motorized travel, nonmechanized travel, nonmotorized travel, range structures, recreational trails, research activities, tethering and grazing of recreational stock, utility corridors, and others.

Plans should not include any suitability or nonsuitability statements for the use of management tools such as prescribed fire, clearcutting, or use of chemicals. A guideline or standard may be used to provide limitations or direction on whether or how use of a specific tool is appropriate.

There are many approaches for identifying suitable or not suitable lands for uses, including: geographical (variety of mapping techniques); narrative descriptions of types of physical, ecological, or economic conditions; photos showing types of conditions; and tying specific uses to suitability tables of management areas. An example of a narrative description of identifying

WO AMENDMENT 1909.12-2015-1
EFFECTIVE DATE: 01/30/2015
DURATION: This amendment is effective until superseded or removed.

1909.12_20
Page 43 of 134

**FSH 1909.12 - LAND MANAGEMENT PLANNING HANDBOOK
CHAPTER 20 – LAND MANAGEMENT PLAN**

not suitable lands is "Timber production is not suitable on soil types B-2 and C-5 as defined in the Forest Soils Handbook." If maps are used to show where plan components apply, substantive changes to such maps require a plan amendment.

## 22.16 – Goals

> *Optional plan component: goals.* **A plan may include goals as plan components. Goals are broad statements of intent, other than desired conditions, usually related to process or interaction with the public. Goals are expressed in broad, general terms, but do not include completion dates.** (36 CFR 219.7(e)(2)).

The Responsible Official may choose to include goals as optional plan components. Goals may be used to organize plan components similar to the Forest Service Strategic Plan. Goals may be appropriate to describe a state between current conditions and desired conditions but without specific amounts of indicators (acres, percentages, frequencies). Goals may also be appropriate to describe overall desired conditions of the plan area that are also dependent on conditions beyond the plan area or Forest Service authority. Goals for resource conditions may be appropriate if scientific information is not adequate to provide sufficient specificity to establish desired condition. However, using goals in lieu of desired conditions should be avoided.

Goals instead of objectives may be appropriate if the Responsible Official is not sure a concise, measurable, and time-specific statement of a desired rate of progress is within the control of the unit; however, using goals in lieu of objectives should be avoided. Examples are:

1. If the outcome is the result of a partnership between the Forest Service and other land owners within the broader landscape.

2. If the outcome is uncertain, because it could be beyond the fiscal capability of the unit.

## 22.2 – Where Plan Components Apply

The public, governmental entities and Forest Service employees need to know where plan components apply. The plan must indicate which plan components apply unit-wide, which apply to specific parcels of land, and which apply to land of specific character). Plans use management areas or geographic areas to apply plan components to specific mapped parcels of land. Some plan components apply to land of specific character (for example riparian areas, roads, springs, streams, and wetlands) and this is explained in the wording of the plan component itself.

A plan can have complicated land allocation schemes. Some plans may include static areas (for example, old forest emphasis areas), overlapping areas (for example, wildland-urban interface may overlap with old forest emphasis areas), and dynamic areas that may change over time (for example, spotted owl protected activity centers). If a plan has overlapping areas and direction that overlaps, the plan must clearly explain which direction has priority.

WO AMENDMENT 2209.13-2005-10
EFFECTIVE DATE:  09/09/2005
DURATION:  This amendment is effective until superseded or removed.

2209.13_90
Page 2 of 16

**FSH 2209.13 - GRAZING PERMIT ADMINISTRATION HANDBOOK**
**CHAPTER 90 - RANGELAND MANAGEMENT DECISIONMAKING**

This chapter focuses on National Environmental Policy Act (NEPA) (42 U.S.C. 4321 et seq.) analysis, NEPA-based decisions, and the implementation of those decisions regarding rangeland management and livestock grazing with an objective of achieving and maintaining desired rangeland conditions on National Forest System (NFS) lands.  The direction that follows is for determining whether livestock grazing is an acceptable use on a given allotment of National Forest System land.  General environmental analysis requirements are set forth in regulations adopted by the Council on Environmental Quality at 40 CFR 1500 et seq. and at FSH 1909.15.

A proposed action may be relatively broad, encompassing several actions intended to achieve desired rangeland conditions, or the proposed action could be relatively narrow and focus only on the authorization of livestock grazing.  In the latter case, the proposed action need only be consistent with the land and resource management plan (LRMP).

Most livestock grazing on National Forest System lands has occurred in the areas presently grazed, in a variety of forms, for over a hundred years.  Typically during that time numerous grazing systems have been implemented along with accompanying range improvements.  Stocking rates and seasons of use have been adjusted; the timing, intensity, frequency, and duration of grazing have been continually fine tuned over time.  More recently, further adjustments have been made on many allotments to provide for the needs of species listed under the Endangered Species Act (ESA) of 1973 (16 U.S.C. 1531 et seq.), clean water, and archeological structures and artifacts.  This dynamic evolution of management, on most allotments, results in the ability to narrow the range of alternatives that must be analyzed in detail.  When a proposed action includes authorization of livestock grazing, and lacks any significant issues identified during scoping, alternatives analyzed in detail would be limited to: the proposed action, no action (which is no grazing), and current management.

## 91 - RANGELAND MANAGEMENT DIRECTION IN LAND AND RESOURCE MANAGEMENT PLANS (PROGRAMMATIC PLANNING LEVEL)

Among other things, LRMPs identify the suitability of land on National Forest System units to produce forage for grazing animals and establish programmatic direction for grazing activities, including goals, objectives, desired conditions, standards, guidelines, and monitoring requirements.  Although an area may be deemed suitable for use by livestock in a LRMP, a project-level analysis evaluating the site-specific impacts of the grazing activity, in conformance with NEPA, is required in order to authorize livestock grazing on specific allotment(s).  See FSM 1920 and FSH 1909.12 for basic direction for addressing rangeland resources in LRMPs.

### 91.1 - Consistency with Land and Resource Management Plan

Under the National Forest Management Act (NFMA) of 1976 (16 U.S.C. 1600 et seq.), project-level decisions, which authorize the use of specific National Forest System lands for a particular purpose like livestock grazing must be consistent with the broad programmatic direction

WO AMENDMENT 2209.13-2005-10
EFFECTIVE DATE: 09/09/2005
DURATION: This amendment is effective until superseded or removed.

2209.13_90
Page 3 of 16

**FSH 2209.13 - GRAZING PERMIT ADMINISTRATION HANDBOOK
CHAPTER 90 - RANGELAND MANAGEMENT DECISIONMAKING**

established in the LRMP. Consistency is determined by examining whether the project-level decision implements the goals, objectives, desired conditions, standards and guidelines, and monitoring requirements from the LRMP. Where necessary, grazing permits must be modified to ensure consistency with the LRMP.

## 91.2 - Relationship of Land and Resource Management Plans to Grazing Permit

Pertinent direction in LRMPs relating to livestock grazing are included directly in part 3 of the grazing permit (sec. 94.2) on Forms FS-2200-10a, FS-2200-10b, and FS-2200-10c if an allotment management plan (AMP) either does not exist or is inconsistent with the LRMP. The AMP becomes a part the grazing permit form, part 3. These forms are available electronically on the forms webpage on the FS Web/Intranet.

## 92 - PHASES OF RANGELAND MANAGEMENT PLANNING

There are three distinct phases in the rangeland project planning process:

    1. The analysis process leading up to and including the development of a proposed action, referred to as "plan-to-project";

    2. Project initiation; and

    3. The project-level planning and NEPA compliance process which is focused on site-specific analysis of the proposed action and alternative actions.

These analyses may be conducted on an allotment or group of allotments that share similar ecological conditions and resource issues. If a thorough analysis is conducted in development of the proposed action, the NEPA process can move more quickly and efficiently.

## 92.1 - Plan-to-Project Analysis

The responsible official has broad discretion in determining what analysis precedes formal NEPA analysis and documentation. The steps that follow lend themselves to those project proposals that involve a higher level of complexity and can be adjusted as warranted. These are important steps that, if taken in preparation for a project-level NEPA proposal, increase the efficiency of the NEPA planning process. These steps include:

    1. Identification of desired conditions (sec. 92.11);

    2. Identification of existing conditions (sec. 92.12);

    3. Identification of resource management needs (sec. 92.13);

WO AMENDMENT 2209.13-2005-10
EFFECTIVE DATE: 09/09/2005
DURATION: This amendment is effective until superseded or removed.

2209.13_90
Page 12 of 16

**FSH 2209.13 - GRAZING PERMIT ADMINISTRATION HANDBOOK
CHAPTER 90 - RANGELAND MANAGEMENT DECISIONMAKING**

## 93.2 - National Historic Preservation Act (NHPA) of 1966 (16 U.S.C. 470 *et seq.*)

For further direction, refer to the National Programmatic Agreement between the Forest Service and the Advisory Council on Historic Preservation Regarding Rangeland Management Activities on National Forest System lands (FSM 1539.61), and also to State or local programmatic agreements.

## 93.3 - Clean Water Act (CWA)

Compliance with the CWA is achieved through the proper site-specific design, implementation and monitoring of Best Management Practices (BMP). BMPs are practices approved by the State and the Environmental Protection Agency (EPA) that are intended to result in compliance with State water quality standards. BMPs are usually a component of land and resource management plans (LRMPs), and are often listed in Chapter 2 of a LRMP with Forest Standards. As approved practices or as Forest Standards, BMPs are one of the required elements of each environmental assessment and AMP. A key concept of BMPs is that if monitoring identifies any circumstance of noncompliance with State water quality standards, then the Forest Service is obligated to respond to the situation to restore compliance. As long as BMPs have been applied and monitoring and adjustments are ongoing, then the Forest Service is in compliance with the CWA. See EPA's SAM-32 direction, 8/87, *http://www.epa.gov/waterscience/library/wqstandards/npscontrols.pdf* for further direction.

When an allotment contains streams or lakes included on a State's 303(d) list of impaired waters (these waters are also included in the State's bi-annual 305(b) report), it means that a State-led Total Maximum Daily Load (TMDL) process for restoration is required. The process is the responsibility of the States to design, and the Forest Service to implement and monitor. The TMDL shall include specific restoration and monitoring requirements, even on Federal lands. Check with your Regional Office to determine whether a Memorandum of Understanding has been established with the State that allows the Forest Service to perform the required TMDL process, or allows collaboration with the State in its development. Prior to the establishment of a formal TMDL, management may continue as long as BMPs are applied and subsequent monitoring is implemented.

## 94 - NEPA-BASED DECISIONS AND IMPLEMENTING ACTIONS THAT FOLLOW

Except as authorized under section 504(a) of the Rescissions Act of 1995 (Pub.L. 104-19) or the 2004 Omnibus Appropriations Resolution (Pub.L. 108-108, Nov. 10, 2003), the project-level NEPA-based decision to authorize grazing on one or more allotments is made by the authorized officer upon completion of site-specific environmental analysis. The decision to authorize

WO AMENDMENT 2209.13-2005-10
EFFECTIVE DATE:  09/09/2005
DURATION:  This amendment is effective until superseded or removed.

2209.13_90
Page 13 of 16

**FSH 2209.13 - GRAZING PERMIT ADMINISTRATION HANDBOOK
CHAPTER 90 - RANGELAND MANAGEMENT DECISIONMAKING**

grazing is made in the NEPA-based decision document whose major focus is on maintaining or achieving the desired land condition.  The grazing permit, accompanying allotment management plan (AMP) (sec. 94.1) as appropriate, and annual operating instructions (sec. 94.3) all serve to implement the project-level decision to authorize grazing (sec. 96).  The AMP becomes a part of the grazing permit.  If an AMP currently exists, it should be revised to reflect new information from the most recent project-level decision.  The grazing permit is then modified to include the revised AMP.  Subsequent modifications to grazing or related management activities may be made as long as those changes are within the scope of the project-level decision.

## 94.1 - Allotment Management Plans (AMPs)

AMPs contain the pertinent livestock management direction from the project-level NEPA-based decision (sec. 92.23, para. 2).  AMPs also refine direction in the project-level NEPA based decision deemed necessary by the authorized officer to implement that decision.  AMPs should be developed concurrently with the completion of the site-specific analysis and project-level decision.

Each AMP shall become a part of Part 3 of the grazing permit with a letter to the permittee(s) notifying them of this modification.

## 94.2 - Grazing Permits

A grazing permit is the instrument that authorizes a specific holder of the grazing permit to graze livestock on certain National Forest System or other lands under Forest Service jurisdiction.  The grazing permit contains specific terms and conditions as provided by the NEPA based decision that authorized the grazing use.  The timely issuance of a grazing permit constitutes implementation of a project-level NEPA-based decision. The terms and conditions of the grazing permit must be consistent with the project-level decision.  Where site-specific analysis and a project-level decision are completed subsequent to issuance of a grazing permit pursuant to section 504(a) of the Rescissions Act, or the 2004 Omnibus Appropriations Resolution (Pub.L. 108-108, Nov. 10, 2003) it may be necessary to modify the existing permit or issue a new permit with new terms and conditions to ensure that it conforms to the direction of the project-level decision.

## 94.3 - Annual Operating Instructions (AOI)

The AOIs specify those annual actions that are needed to implement the management direction set forth in the project-level NEPA-based decision.  Actions in the AOIs must be within the scope of the project-level decision, and as such are not required to undergo any additional site-specific environmental analysis.

WO AMENDMENT 2209.13-2005-10
EFFECTIVE DATE:  09/09/2005
DURATION:  This amendment is effective until superseded or removed.

2209.13_90
Page 14 of 16

**FSH 2209.13 - GRAZING PERMIT ADMINISTRATION HANDBOOK**
**CHAPTER 90 - RANGELAND MANAGEMENT DECISIONMAKING**

To the extent feasible, the AOI should be developed with the permittee.  The AOIs shall clearly and concisely identify the obligations of the permittee and the Forest Service, and clearly articulate annual grazing management requirements, standards, and monitoring necessary to document compliance.

The AOIs should set forth:

1.  The maximum permissible grazing use authorized on the allotment for the current grazing season and should specify numbers, class, type of livestock, and timing and duration of use.

2.  The planned sequence of grazing on the allotment, or the management prescriptions and monitoring that will be used to make changes.

3.  Structural and non-structural improvements to be constructed, reconstructed, or maintained and who is responsible for these activities.

4.  Allowable use or other standards to be applied and followed by the permittee to properly manage livestock.

5.  Monitoring for the current season that may include, among other things, documentation demonstrating compliance with the terms and conditions in the grazing permit, AMP (sec. 94.1), and AOI.  In addition, the permittee may be asked to provide information regarding livestock distribution or the condition of improvements.  Where adaptive management prescriptions are being followed, this section of the AOI must provide details about  those monitoring items and decision points needed to determine when a change is necessary and to guide the direction that those changes take (sec. 95).

## 95 - MONITORING

Monitoring shall be included in the project-level decision.  This includes monitoring required as a result of section 7 of the Endangered Species Act regarding consultation (sec. 93.1).  Monitoring can determine whether the project-level decision is being implemented as planned (implementation monitoring) and, if so, whether the objectives identified in the LRMP and AMP (sec. 94.1) are being achieved in a timely manner (effectiveness monitoring).  Allotment monitoring should be an open, cooperative, and inclusive process.  Invite participation from rangeland users and other interested parties where feasible.  Implementation and focused effectiveness monitoring are critical to determine when or if adaptive management changes should be made and to guide the direction that those changes take.

R3 SUPPLEMENT 2209.13-2016-1
EFFECTIVE DATE: 5/6/2016
DURATION: This supplement is effective until superseded or removed

2209.13
Page 18 of 63

**FSH 2209.13 – GRAZING PERMIT ADMINISTRATION HANDBOOK
CHAPTER 90 – RANGELAND MANAGEMENT DECISIONMAKING**

1. varying seasons of use, (i.e. year-long, and seasonal use and on/off dates) which ensure vegetation growth conducive to withstanding grazing pressure and soils dry enough to withstand damage;
2. allow for mixed kinds and classes of livestock to achieve economic and ecological objectives;
3. various grazing systems;
4. control timing of use and grazing period, by employing herders to provide for riparian area recovery or to influence species composition;
5. control timing of grazing to allow for recreational needs such as hunting season; and
6. position salt to increase livestock grazing in select areas, in order to remove vegetation, decreasing litter build-up to provide open areas for increasing forb component of the community.

Possible management practices should address any and all actions that will or are likely to be applied through an adaptive management strategy as described in section 92.23b. Documentation of all likely actions that could be implemented in an adaptive management strategy provides the responsible official the ability to facilitate changes in management that are needed to meet resource management objectives and/or improve resource conditions.

Refer to exhibit 02 for guidance in stating management actions to be employed.

## 92.14a – Estimating Capacity

An estimate of carrying capacity is critical within an adaptive management framework. Analyses were conducted and determinations made of grazing capability and suitability during land management plan development for all current plans created or revised under the 1982 rule. These plan-level determinations should be considered guidance when evaluating capability and estimating capacity at the allotment level, not a decision or allocation of resources made by the land management plan. There is no requirement for such determinations in land management plans revised under the 2012 rule. This section provides direction for conducting an allotment-level capability and capacity analysis therefore suitability should not be readdressed at the project level.

Carrying capacity is an estimate of the average number of livestock which can be sustained on a management unit compatible with achieving objectives for the unit (SRM 1999). Carrying capacity is a function of capability, forage production, proper use by livestock, and the level of management that is applied. Management objectives beyond those established for livestock grazing for a particular landscape must be considered when estimating grazing capacity. It must be recognized that carrying capacity is highly dependent on many factors that vary seasonally, annually, or over decades. Thus, estimates of carrying capacity are general approximations that must be tempered with other information, experience and judgment (Smith et al. 2007). Therefore carrying capacity estimates consider the kind and amount of vegetation (i.e., productivity), topography, infrastructure and multiple use goals.

R3 SUPPLEMENT 2209.13-2016-1
EFFECTIVE DATE: 5/6/2016
DURATION: This supplement is effective until superseded or removed

2209.13
Page 19 of 63

**FSH 2209.13 – GRAZING PERMIT ADMINISTRATION HANDBOOK
CHAPTER 90 – RANGELAND MANAGEMENT DECISIONMAKING**

Due to precipitation variability and fluctuations in annual forage production, a range of livestock numbers or Animal-Unit-Months (AUMs) or a maximum level of livestock numbers or AUMs is described, analyzed, authorized, and permitted rather than an average number of livestock or average number of AUMs. An Animal-Unit-Month (AUM) is the amount of oven-dry forage (forage demand) required by one animal unit for a standardized period of 30 animal-unit days. The term AUM is commonly used in three ways: (a) stocking rate, as in "acres per AUM"; (b) forage allocations, as in "X AUMs in Allotment A"; and/or (c) utilization, as in "X AUMs taken from Unit B" (SRM 1999).

Capacity can be estimated during the Plan-to-Project analysis and adjusted adaptively with a stock and monitor approach. "The stock and monitor approach involves measuring the effects of actual stocking levels over time (either short-term or long-term) on utilization and utilization patterns, composition of vegetation, vigor, soil cover, and other factors (including wildlife) to see if changes in stocking and/or management are needed….The stock and monitor approach is recommended for establishing proper livestock stocking rates on grazing allotments. It is adaptive management i.e. continually reviewing and revising as necessary to meet changes in weather or other environmental factors as well as changes in management objectives. Utilization data can guide stocking when combined with other data or observations that indicate a change either up or down is probably needed." (Smith et al. 2012).

Where actual stocking records or trend data is lacking, other approaches can be used to estimate an initial carrying capacity. Forage inventory and various models can be helpful. Average forage production is assessed along with landscape features such as slope and distance to water to estimate the amount of usable forage available to a particular kind and class of livestock. This commonly involves reduction in carrying capacity for those areas of steeper slope and farther distances to water (Holechek. 1988). This provides an initial idea of carrying capacity and should be closely monitored. As Stoddart et al. (1975) described, "[t]rue grazing capacity can be determined only by stocking with an estimated number of animals and watching the range trend."

Production-Utilization Surveys (PUs) address both forage inventory and actual ungulate utilization on a specific allotment. The value lies in gaining the knowledge of the forage crop being produced and how it is actually being used. Although production data is gathered, the utilization documentation is primarily used to address grazing capacity. PUs provide a comprehensive analysis of the grazing situation, including a detailed range inspection, a forage inventory, and an estimated grazing capacity, within a graphic illustration of the allotment. Carrying capacity estimates are derived from a comparison of actual use to assigned allowable use.

In lieu of PUs, monitoring can be helpful when estimating capacity. Implementation monitoring includes actual use, observation of utilization compared with established guidelines and utilization patterns. Compliance with annual operating instructions such as livestock movements and maintenance of range improvements are also important. Implementation monitoring data

R3 SUPPLEMENT 2209.13-2016-1                                    2209.13
EFFECTIVE DATE: 5/6/2016                                        Page 20 of 63
DURATION: This supplement is effective until superseded or removed

**FSH 2209.13 – GRAZING PERMIT ADMINISTRATION HANDBOOK**
**CHAPTER 90 – RANGELAND MANAGEMENT DECISIONMAKING**

can help with understanding possible relationships between management and ecosystem response which is addressed with effectiveness monitoring. Monitoring informs any associated adjustments in management (i.e. adaptive management) including refinement of estimated grazing capacity.

Further information for assessing capability and estimating capacity can be found in the Rangeland Analysis and Management Training Guide.

## 92.14b – Describing Grazing Intensity

Grazing intensity may be described in terms herbage removed during the grazing and/or growing period, or as a utilization level at the end of the growing period. It is important to clearly define how intensity is being viewed and described. Removal of leaf material, when the plant is actively growing can affect root growth which in turn affects future leaf growth. Sufficient leaf area is essential to support plant functions through photosynthesis. Heavy to severe intensity or utilization can affect current plant development and growth, as well as growth during subsequent growing seasons.

Grazing Intensity is discussed by Holechek and others (Holechek, Jerry L., Rex D. Pieper, and Carlton H. Herbel. 2004. Range Management, Principles & Practices. Prentice Hall, page 248):

> Light - Only choice plants are used. There is no use of poor forage plants. The range appears practically undisturbed.

> Moderate - About ½ of the good and fair forage value plants are used. There is little evidence of livestock trailing and most of the accessible range shows some use.

> Heavy - Range has a clipped or mowed appearance. Over half of the fair and poor value forage plants are used. All accessible parts of the range show use and key areas are closely cropped. They may appear stripped if grazing is very severe and there is evidence of livestock trailing to forage.

The above descriptions may be especially helpful when reviewing grazing during the growing season.

Grazing Intensity as depicted as a utilization level at the end of the growing season as discussed by Holechek and Galt (Holechek, Jerry L. and Dee Galt. 2000. Grazing Intensity Guidelines. *Rangelands* 22(3): 11-14):

|                   |                 |
|-------------------|-----------------|
| Light to non-use  | 0-30 percent    |
| Conservative      | 31-40 percent   |
| Moderate          | 41-50 percent   |
| Heavy             | 51-60 percent   |
| Severe            | 61+ percent     |