No. 22-15259

_____

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

NEIGHBORS OF THE MOGOLLON RIM, INC.,
*Plaintiff/Appellant*,

v.

UNITED STATES FOREST SERVICE, et al.,
*Defendants/Appellees*.

_____

Appeal from the United States District Court for the District of Arizona
No. 2:20-cv-00328-DLR (Hon. Douglas L. Rayes)

_____

**APPELLEES' ANSWERING BRIEF**

_____

                                    TODD KIM
                                    *Assistant Attorney General*
                                    BRIAN C. TOTH
                                    EMMA HAMILTON
                                    BENJAMIN RICHMOND
Of Counsel:                         *Attorneys*
                                    Environment and Natural Resources Division
DAWN DICKMAN                        U.S. Department of Justice
*Attorney*                          Post Office Box 7415
Office of the General Counsel       Washington, D.C. 20044
U.S. Department of Agriculture      (202) 514-3977
                                    benjamin.richmond@usdoj.gov

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................... iii

INTRODUCTION ...................................................................................... 1

STATEMENT OF JURISDICTION.............................................................. 2

STATEMENT OF THE ISSUES................................................................... 2

PERTINENT STATUTES AND REGULATIONS ...................................... 3

STATEMENT OF THE CASE ..................................................................... 4

      A.     Statutory and regulatory background .......................................... 4

           1.     National Environmental Policy Act ............................ 4

           2.     National Forest Management Act ............................... 5

           3.     Grazing statutes and regulations ................................ 5

      B.     Factual background ..................................................................... 7

           1.     The Bar X ................................................................... 8

           2.     Heber-Reno Sheep Driveway .................................... 11

           3.     Plaintiff and the prior litigation................................. 13

           4.     The challenged action ............................................... 14

      C.     Procedural background........................................................... 16

SUMMARY OF ARGUMENT ................................................................ 17

STANDARD OF REVIEW ..................................................................... 20

ARGUMENT .......................................................................................... 21

I.     The Forest Service complied with NEPA. .................................... 21

A.     The Forest Service's EA considered a reasonable range of alternatives. ...........................................................21

B.     The Forest Service took a hard look at environmental impacts as required under NEPA. .......................................31

     1.    Impacts on the subdivisions ......................................31

     2.    Ecological impacts ....................................................38

C.     Plaintiff misconstrues the Forest Service's EA...................45

     1.    Plaintiff's cumulative allegations of error ................46

     2.    Management history...................................................47

     3.    Capacity analysis.......................................................51

     4.    Plaintiff's other misperceptions of the EA ...............53

D.     The Forest Service was not required to prepare an EIS.....................56

II.    The proposed action complies with NFMA. ..................................58

III.    Plaintiff's requested remedy is inappropriate.................................62

CONCLUSION .........................................................................................63

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*Akiak Native Cmty. v. U.S. Postal Serv.*,
  213 F.3d 1140 (9th Cir. 2000) ............................................................22

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993) ...........................................................62

*Am. Rivers v. FERC*,
  201 F.3d 1186 (9th Cir. 1999) ............................................................50

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
  462 U.S. 87 (1983)..............................................................................40

*Bicycle Trails Council v. Babbit*,
  82 F.3d 1445 (9th Cir. 1996) ..............................................................38

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
  419 U.S. 281 (1974)............................................................................47

*Buckingham v. Sec'y of U.S. Dep't of Agric.*,
  603 F.3d 1073 (9th Cir. 2010) ..............................................................6

*California Communities Against Toxics v. U.S. E.P.A.*,
  688 F.3d 989 (9th Cir. 2012) ..............................................................62

*Carrow Co. v. Lusby*,
  167 Ariz. 18 (1990).............................................................................35

*Center for Biological Diversity v. Bernhardt*,
  982 F.3d 723 (9th Cir. 2020) ..............................................................35

*City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*,
  123 F.3d 1142 (9th Cir. 1997) ..................................................... 21, 35

*City of Sausalito v. O'Neill*,
  386 F.3d 1186 (9th Cir. 2004) ............................................................20

*Dep't of Transp. v. Pub. Citizen*,
　541 U.S. 752 (2004) ................................................................. 23, 35

*Earth Island Inst. v. U.S. Forest Serv.*,
　697 F.3d 1010 (9th Cir. 2012) ................................................. 22, 29

*F.C.C. v. Fox Television Stations, Inc.*,
　556 U.S. 502 (2009) ........................................................................33

*Fence Creek Cattle Co. v. U.S. Forest Serv.*,
　602 F.3d 1125 (9th Cir. 2010) ......................................................20

*Forest Guardians v. U.S. Forest Serv.*,
　329 F.3d 1089 (9th Cir. 2003) ........................................................5

*Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy*,
　383 F.3d 1082 (9th Cir. 2004) ......................................................32

*Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*,
　857 F.2d 505 (9th Cir. 1988) .................................................. 45, 48

*Idaho Wool Growers Ass'n v. Vilsack*,
　816 F.3d 1095 (9th Cir. 2016) ..................................... 45, 47, 49, 53

*McQuillion v. Schwarzenegger*,
　369 F.3d 1091 (9th Cir. 2004) ......................................................52

*Metro. Edison Co. v. People Against Nuclear Energy*,
　460 U.S. 766 (1983) ........................................................ 32, 34, 38

*National Mining Ass'n v. Zinke*,
　877 F.3d 845 (9th Cir. 2017) ........................................................21

*Native Ecosystems Council v. Marten*,
　883 F.3d 783 (9th Cir. 2018) ..................................... 47, 51, 53, 54

*Native Ecosystems Council v. U.S. Forest Serv.*,
　428 F.3d 1233 (9th Cir. 2005) ..................................... 22, 24, 57, 58

*Native Ecosystems Council v. Weldon*,
  697 F.3d 1043 (9th Cir. 2012) ...............................................................59

*Natural Resources Defense Council v. U.S. Forest Serv.*,
  421 F.3d 797 (9th Cir. 2005) ................................................................50

*Neighbors of Cuddy Mountain v. Alexander*,
  303 F.3d 1059 (9th Cir. 2002) ..............................................................20

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.*,
  137 F.3d 1372 (9th Cir. 1998) ...................................................... 25, 31

*Neighbors of the Mogollon Rim, Inc. v. U.S. Forest Serv.*,
  No. 2:18-cv-1111-MHB (D. Ariz. Oct. 11, 2018) ...................................... 13, 14

*North Alaska Environmental Center v. Kempthorne*,
  457 F.3d 969 (9th Cir. 2006) ................................................................29

*North Idaho Cmty. Action Network v. U.S. Dep't of Transp.*,
  545 F.3d 1147 (9th Cir. 2008) ..............................................................22

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004) ...............................................................................60

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
  523 U.S. 726 (1998) ...............................................................................5

*Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*,
  465 F.3d 977 (9th Cir. 2006) ..............................................................6, 7

*Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*,
  957 F.3d 1024 (9th Cir. 2020) ..............................................................59

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
  795 F.3d 956 (9th Cir. 2015) ................................................................45

*Presidio Golf Club v. Nat'l Park Serv.*,
  155 F.3d 1153 (9th Cir. 1998) ..............................................................57

*Robertson v. Methow Valley Citizens Council,*
  490 U.S. 332 (1989) .......................................................................................4

*Sierra Medical Services Alliance v. Kent,*
  883 F.3d 1216 (9th Cir. 2018) ................................................... 26, 40

*Tri-Valley CAREs v. U.S. Dep't of Energy,*
  671 F.3d 1113 (9th Cir. 2012) ...........................................................21

*Trout Unlimited v. Morton,*
  509 F.2d 1276 (9th Cir. 1974) ...........................................................37

*United States v. Alpine Land and Reservoir Co.,*
  887 F.2d 207 (9th Cir. 1989) ................................................... 40, 55

*United States v. New Mexico,*
  438 U.S. 696 (1978).............................................................................7

*Vermont Yankee Nuclear Power Corp. v. NRDC, Inc.,*
  435 U.S. 519 (1978).....................................................................4, 31

*Westlands Water Dist. v. U.S. Dep't of Interior,*
  376 F.3d 853 (9th Cir. 2004) ................................................. 22, 28, 30

## Statutes

5 U.S.C. § 701 ..............................................................................................2

5 U.S.C. § 704..............................................................................................20

5 U.S.C. § 706..................................................................................... 20, 45, 59

16 U.S.C. § 528 ............................................................................................5

16 U.S.C. § 531 ............................................................................................5

16 U.S.C. § 551 ............................................................................................6

16 U.S.C. § 580l............................................................................................6

16 U.S.C. § 1531 ................................................................................2

16 U.S.C. § 1600 .............................................................................2, 5

16 U.S.C. § 1604 ...........................................................................5, 59

28 U.S.C. § 1291 ................................................................................2

28 U.S.C. § 1331 ................................................................................2

42 U.S.C. § 4321 ................................................................................2

42 U.S.C. § 4332 ..........................................................................4, 30

43 U.S.C. §§ 1751–1752 ....................................................................6

Ariz. Rev. Stat. Ann. § 3-1427 .......................................................35

## Rules

Fed. R. App. P. 4 ...............................................................................2

## Regulations

36 C.F.R. Part 222 .............................................................................6

36 C.F.R. § 222.1 ...............................................................................6

36 C.F.R. § 222.3 ...............................................................................6

40 C.F.R. § 1500.3 ...........................................................................45

40 C.F.R. § 1502.14 .........................................................................22

40 C.F.R. § 1502.16 .........................................................................32

40 C.F.R. § 1508.8 ...........................................................................32

40 C.F.R. § 1508.9 ............................................................... 4, 5, 22, 56

40 C.F.R. § 1508.13 ....................................................................5

40 C.F.R. § 1508.27 ............................................................ 56, 57

## Other Authorities

43 Fed. Reg. 55,978 (Nov. 29, 1978)............................................4

85 Fed. Reg. 43,304 (July 16, 2020)............................................4

Forest Service Handbook 1909.12, ch. 20, § 22.15 ...................26

Forest Service Handbook 2209.13, ch. 10, § 16.16 ...................55

Forest Service Handbook 2209.13, ch. 90, § 92.23b ................27

Forest Service Handbook 2209.13, ch. 90, § 92.32 .................28

## INTRODUCTION

This case concerns the Forest Service's authorization of continued cattle grazing on a set of grazing allotments within the Tonto National Forest, in central Arizona. Until the challenged decision, the Forest Service had not regularly authorized grazing in recent decades on one of these allotments, which contains an inholding of private subdivisions, even though the applicable Forest Plan designates the allotment as suitable for grazing. Plaintiff Neighbors of the Mogollon Rim, whose members live in these subdivisions, challenged the Forest Service's continued grazing authorization under the National Environmental Policy Act ("NEPA") and National Forest Management Act ("NFMA").

As the district court correctly held, the Forest Service complied with the procedural requirements of NEPA when it prepared an Environmental Assessment ("EA") and issued a decision notice and Finding of No Significant Impact. The agency reasonably eliminated Plaintiff's preferred alternative from further study because that alternative failed to meet the purpose and need for the action; it concluded that the proposed grazing authorization would not have a significant effect on the environment; and it properly relied on data and modeling in the record. The agency similarly complied with NFMA by explaining how the proposed action was consistent with standards and guidelines in the Tonto Forest Plan.

1

Because Plaintiff's members would prefer that cattle not be allowed to graze near their properties in the subdivisions, they seek to use NEPA and NFMA to invalidate Congress' multiple-use mandate for National Forest System lands. But neither the preferences of Plaintiff's members, nor the statutory challenges at issue here, can overcome Congress' explicit direction to consider the use of the National Forest for livestock grazing.

## STATEMENT OF JURISDICTION

(a)     The district court had subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff's claims arose under NEPA, 42 U.S.C. § 4321 et seq., NFMA, 16 U.S.C. § 1600 et seq., the Endangered Species Act, 16 U.S.C. § 1531 et seq., and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq. SER-23.

(b)     The district court's judgment was final because it disposed of all claims against all defendants. 1-ER-2. This Court has jurisdiction under 28 U.S.C. § 1291.

(c)     The judgment was entered on January 26, 2022. *Id.* Plaintiff filed its notice of appeal on February 22, 2022, or 27 days later. 3-ER-593–94. The appeal is timely under Federal Rule of Appellate Procedure 4(a)(1)(B).

## STATEMENT OF THE ISSUES

1.     Whether the Forest Service complied with NEPA when it:

a.     considered a reasonable range of alternatives in its EA by studying the proposed action and a no-action alternative;

b.     took a hard look at environmental impacts;

c.     made, at most, harmless error in slightly misestimating prior average grazing in the background section of the EA, and incorrectly transcribing a figure related to the proposed action's authorized level of grazing; and

d.     reasonably determined that it was not required to prepare an Environmental Impact Statement ("EIS") because the environmental effects of the proposed action were not significant.

2.     Whether the Forest Service complied with NFMA, given that it explained how the proposed action was consistent with Forest Plan goals, standards, and guidelines.

3.     Whether, if Plaintiff prevails on appeal, the challenged decision notice should be vacated.

## PERTINENT STATUTES AND REGULATIONS

All pertinent statutes and regulations are set forth in the Addendum following this brief.

## STATEMENT OF THE CASE

### A.    Statutory and regulatory background

#### 1.    National Environmental Policy Act

NEPA is an "essentially procedural" statute.  *Vermont Yankee Nuclear Power Corp. v. NRDC, Inc.*, 435 U.S. 519, 558 (1978).  By itself, NEPA "does not mandate particular results."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).  Rather, NEPA mandates a process to ensure that federal decision-makers consider a proposed action's potential environmental consequences.  *Id*.  Whenever a federal agency proposes to take a "major Federal action[] significantly affecting the quality of the human environment," the agency must prepare a detailed EIS describing the likely environmental effects of the proposal and reasonable alternatives.  42 U.S.C. § 4332(2)(C).

Alternatively, an agency may first prepare an EA.  *See* 40 C.F.R. § 1508.9.[1] The EA is a "concise public document" which "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement" or to make "a finding of no significant impact" ("FONSI").

---

[1] Because the claims in this case arise under the NEPA regulations first promulgated in 1978, 43 Fed. Reg. 55,978 (Nov. 29, 1978), all citations to NEPA regulations in this brief refer to those codified prior to the 2020 NEPA revisions. *See* 85 Fed. Reg. 43,304 (July 16, 2020).

*Id.* § 1508.9(a)(1). An agency's FONSI renders the preparation of an EIS

unnecessary. *Id.* § 1508.13.

### 2. National Forest Management Act

NFMA establishes a multi-step approach for the Forest Service's

management of the National Forest System. *See* 16 U.S.C. § 1600 et seq. In the

first step, the Forest Service adopts "land and resource management plans for units

of the National Forest System," otherwise known as forest plans. *Id.* § 1604(a),

(f)(4), (f)(5). These forest plans are broad, long-term, programmatic documents

used to "guide all natural resource management activities," on National Forest

System lands. *See Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 728–29

(1998). They must "provide for multiple use and sustained yield of the products

and services obtained," including uses such as "outdoor recreation, range, timber,

watershed, wildlife and fish, and wilderness." 16 U.S.C. § 1604(e)(1). In the

second step of National Forest System management, the Forest Service implements

a forest plan through individual site-specific projects, which must be consistent

with the operative plan. *Id.* § 1604(i).

### 3. Grazing statutes and regulations

The Forest Service "is required by federal law to consider the use of

National Forest lands for grazing of livestock." *Forest Guardians v. U.S. Forest

Serv.*, 329 F.3d 1089, 1097 (9th Cir. 2003); *see* 16 U.S.C. §§ 528, 531, 1604(e)(1).

5

It promulgates regulations regarding the placement of livestock on these lands pursuant to authority granted by the Organic Administration Act of 1897, 16 U.S.C. § 551; the Granger-Thye Act of 1950, 16 U.S.C. § 580l; and the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. §§ 1751–1752. Pursuant to these regulations, codified at 36 C.F.R. Part 222, the Forest Service uses three different types of site-specific actions to govern range management. *Buckingham v. Sec'y of U.S. Dep't of Agric.*, 603 F.3d 1073, 1076 (9th Cir. 2010)).

First, the Forest Service issues term grazing permits, typically in periods of ten years, which "authoriz[e] livestock to use National Forest System [lands] . . . for the purpose of livestock production." 36 C.F.R. § 222.1(b). Term permits establish the maximum number, kind, and class of livestock that may grazed on an allotment[2] during a specified period of use. *See* 36 C.F.R. § 222.3(c)(1)(vi).

Second, the Forest Service develops an "allotment management plan" ("AMP"), which "[p]rescribes the manner in and extent to which livestock operations will be conducted." 36 C.F.R. § 222.1(b). The AMP "is a land management directive for a specific allotment within a national forest that the Forest Service has designated for livestock grazing." *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 980 (9th Cir. 2006).

---

[2] An allotment is a designated area of land available for livestock grazing. 36 C.F.R. § 222.1(b)(1).

Third, the Forest Service issues annual operating instructions ("AOI"), which provide "instructions to the permittee for annual operations." *Id.* "Because an AOI is issued annually, it is responsive to conditions that the Forest Service could not or may not have anticipated and planned for in the AMP or grazing permit, such as drought conditions, timing and duration of rainfall over the grazing season, success or failure of habitat restoration projects, water quality, or degree of risk to threatened or endangered species affected by grazing." *Id.* at 980–81.

### B. Factual background

This case concerns livestock grazing on multiple grazing allotments, collectively referred to as the Bar X allotment, and livestock use of the adjacent Heber-Reno Sheep Driveway, located on the Tonto National Forest in central Arizona. The Tonto National Forest, like all National Forest System lands, was "established for economic reasons." *United States v. New Mexico*, 438 U.S. 696, 708 (1978). The Forest Service undertook the proposed actions at issue in this case under the 1985 Tonto Forest Plan, as amended. *See* 2-ER-29. The purpose of the plan is to "provide for multiple use and sustained yield of goods and services from the Forest in a way that maximizes long-term net public benefits in an environmentally sound manner," which includes livestock grazing. 3-ER-465, 492.

### 1. The Bar X

The Bar X, Colcord Canyon, Haigler Creek, and Young grazing allotments in the Tonto National Forest have been managed together as a single operation under one term grazing permit since 1973, and are referred to collectively as the Bar X allotment. 2-ER-26. This case focuses on the Colcord Canyon allotment and the Turkey Peak pasture in particular, which span roughly 11,000 acres, and lie at the north end of the Bar X, and are referred to collectively as the "Colcord/Turkey pasture." SER-27. The Bar X allotment, including the Turkey Peak pasture, is depicted in the map below.

**Map of Bar X with Pastures**



The Bar X had an early history of overuse, dating back to at least the 1940s when the Forest Service began keeping records on grazing. SER-77–80. The Forest Service completed and approved an allotment analysis for the Bar X in 1978, 3-ER-396, which concluded that range condition in the Bar X was "generally poor with a downward trend," as a result of "over-stocking and unsatisfactory management," "the excessive abuse and mismanagement of the grazing resource," the permittee grazing "without compliance to specified management," and poor maintenance of range improvements. 3-ER-398–99, 401, 411.

In 1979, after preparing an EA, the Forest Service adjusted livestock numbers downward on the Bar X and did not authorize grazing on the Colcord/Turkey pasture. 3-ER-421, 424. The Forest Service then approved an AMP for the Bar X in 1981, outlining range improvements and a revised grazing management system. 3-ER-441–453. The AMP similarly did not authorize grazing on the Colcord/Turkey pasture. 3-ER-442, 454. However, it noted the possibility that "future evaluations" may "determine that the [Colcord/Turkey pasture] have recovered and are capable of supporting domestic livestock on a sustained yield basis." *Id.*

In 1985, the Forest Service prepared another EA and FONSI, concluding that range resources in the Bar X had sufficiently recovered to allow increased livestock grazing. 3-ER-493–500. The EA stated that "completed Production-

9

Utilization . . . studies indicate that the range resource has recovered to a point which would allow for increasing term permitted numbers," 3-ER-495, "[r]ange, soil, watershed, and wildlife habitat conditions have improved significantly since the 1978 range analysis," 3-ER-496, and "range which was classified as poor and very poor with a downward trend *is in the fair to good category with an upward trend*." *Id.* (emphasis added). The 1985 EA did not authorize grazing on the Colcord/Turkey pasture (consistent with the 1981 AMP), *see* 3-ER-495–96, but that same year the Forest Service identified in the 1985 Tonto Forest Plan that the entire Bar X, including the Colcord/Turkey pasture, was suitable for grazing. *See* 2-ER-29–30; 3-ER-484, 492; SER-73–76.

The Forest Service did not take any other significant actions as relevant to this case until 2007, when it issued a new term grazing permit for the Bar X. SER-72. Since 2007, authorized grazing levels have increased, ranging between 1,000 and 4,700 Animal Unit Months ("AUMs").[3] 2-ER-26; 3-ER-518. The Forest Service also issued trial AOIs authorizing cattle grazing on the Colcord/Turkey pasture in 2015 and 2018 to gather data for possible future grazing authorizations in this area. 2-ER-26. Although no grazing occurred on the Colcord/Turkey pasture in 2018 due to a lawsuit filed by Plaintiff, *see infra*, pp. 13–14, the Forest

---

[3] The Forest Service defines AUMs as "[t]he amount of forage needed by an 'animal unit' (AU) grazing for one month." 2-ER-57. An "animal unit" is a mature 1,000-pound cow and her suckling calf. *Id.*

Service gathered monitoring data from the Colcord/Turkey pasture after trial use in 2015.  2-ER-275; SER-15–17.

### 2.     Heber-Reno Sheep Driveway

The Heber-Reno Sheep Driveway bisects the Bar X from the southwest to the northeast, running 26 linear miles and covering 33,780 acres.  2-ER-24–25.

**Map of Driveway with Pastures**



The Driveway has been used "to move sheep to and from winter grazing grounds to summer pastures . . . above the Mogollon Rim since the late 1890s,"

11

before the establishment of the National Forest System. 2-ER-26. Although the permittee can currently graze up to 8,000 sheep on the Driveway each year, in the past decade it has sought authorization to do so only four times and at lower levels of use. 2-ER-28.

Based on recent monitoring, the Forest Service determined that the Driveway had excess forage that could be grazed by cattle. 2-ER-27. Thus, in 2010, the Forest Service gave the Bar X permittee permission to return to grazing some portions of the Driveway historically granted as part of the Bar X allotment, as well as to increase its total authorized level of grazing due to this additional acreage. *Id.*[4] Indeed, the 2016, 2017, and 2018 AOIs for the Bar X explained that authorized use was greater than the use provided for in the Bar X term grazing permit because three large, underused pastures on the Heber-Reno Sheep Driveway (McInturff, Walnut, Naeglin) had been incorporated into the pasture rotation. 3-ER-541, 546, 551.[5]

_____

[4] The portions of the Driveway historically associated with the Bar X are the Lost Salt, Naeglin, McInturff, and Walnut pastures. 2-ER-58.

[5] Plaintiff asserts that "[i]n 2016 and 2017, the Forest Service continued to authorize grazing on the Bar X in excess of permitted levels" without providing this explanation. *See* Pl's. Br. 11.

### 3. Plaintiff and the prior litigation

The Colcord Estates, Ponderosa Springs, and Ponderosa Spring Estates subdivisions are a collection of over 300 homes located on mostly unfenced private inholdings, within the boundaries of the Colcord/Turkey pasture on the Tonto National Forest. 1-ER-4; 2-ER-56; 3-ER-592. At least one of the subdivisions "commenced development in 1982." SER-70. In contrast, cattle grazing has occurred on the Bar X for over a century. 1-ER-4; *see* SER-77–80. Before the agency action challenged here, grazing had not occurred on the Colcord/Turkey pasture since 1979, with the exception of trial grazing during the 2015 season. *Id.* However, grazing has remained an allowable use on the Colcord/Turkey pasture under the 1985 Forest Plan. *See* 2-ER-29–30.

Plaintiff is a non-profit organization comprising property owners and residents of the three subdivisions. *See* SER-24. It sued the Forest Service in 2018, alleging that the agency had authorized grazing on the Bar X, and in particular on the Colcord/Turkey pasture surrounding the subdivisions, in violation of FLPMA, NFMA, and NEPA. *See Neighbors of the Mogollon Rim, Inc. v. U.S. Forest Serv.*, No. 2:18-cv-1111-MHB (D. Ariz. Oct. 11, 2018). The parties settled and stipulated to dismissal. *Id.* at ECF 31.

Pursuant to the settlement agreement, the Forest Service agreed to ensure that AOIs for the Bar X would be consistent with the existing term grazing permit

13

until the agency has "issue[d] a new term livestock grazing permit and Allotment Management Plan for the Bar X allotment, accompanied by a new NEPA analysis . . . as appropriate." *Id.* at ECF 29, ¶ 4. Accordingly, the Bar X's 2018 AOI, as amended, and 2019 AOI did not include grazing on the Colcord/Turkey pasture or Driveway. 3-ER-556, 560.

### 4. The challenged action

In February 2019, the Forest Service began the NEPA process for a new grazing authorization on the Bar X allotment and Driveway. 2-ER-55. In June 2019 it issued a Draft EA for public comment. *Id.*; *see also* 2-ER-186–248 (responding to comments). In December 2019, the agency issued its Final EA, a decision notice, and FONSI. 2-ER-19, 179–80.

The EA evaluated two alternatives in detail. First, under the "no grazing" alternative, "term grazing permits on all Bar X [g]razing allotments within the project area would be cancelled," and "[t]he Driveway would not be authorized for use by cattle." 2-ER-56.

Second, under the "proposed action" alternative, the Forest Service would authorize livestock grazing on a set of pastures more than twice as large as that previously available for Bar X grazing. *See* 2-ER-24–25, 41, 57. These pastures would span the entire Bar X, including on the Colcord/Turkey pasture, as well as four pastures of the Driveway historically associated with grazing on the Bar X. 2-

14

ER-57–58.  The action contemplates a "proposed yearly maximum authorized use" of 552 adult cattle, and 160 yearlings for an annual period of 4.5 months.  *Id.*  It also provides that "as range improvements are installed, or as conditions on the Driveway allow, authorized numbers [of cattle] may be increased up to the proposed maximum [authorized use]."  2-ER-61.

The proposed action's adaptive management framework further illustrates this flexible approach.  Adaptive management "provides the flexibility to continually modify management, based on monitoring, in order to achieve specific objectives."  2-ER-62.  Under that framework, "actual numbers of livestock may vary based on the class of livestock, duration of use and climatic conditions," and grazing systems may be "modified as needed to meet stated management objectives."  *Id.*  The proposed action also includes a specified set of range improvements to "facilitate livestock distribution," conservation measures to "reduce impacts," and monitoring measures "to determine if management is being properly implemented and if the actions are effective at achieving or moving toward desired conditions."  2-ER-63–69.

The Forest Service concluded in its decision notice and FONSI that the proposed action "will not have significant effects on the quality of the human environment considering the context and intensity of impacts," and thus that it was not required to prepare an EIS.  2-ER-179.  The agency separately issued a new

15

AMP on December 20, 2019, SER-69, and a new term grazing permit on December 30, 2019.  SER-63.

## C.     Procedural background

On February 12, 2020, Plaintiff commenced this litigation by filing its complaint, alleging that the Forest Service failed to:  (1) prepare an EIS; (2) consider an adequate range of alternatives in its EA; (3) take a hard look at the effects of the proposed action; and (4) act consistently with the Tonto Forest Plan. SER-50–57.[6]  Plaintiff and Federal Defendants filed cross-motions for summary judgment.  SER-14, 18.[7]  On January 26, 2022, the district court granted summary judgment in favor of Federal Defendants.  1-ER-3–17.  On Plaintiff's NEPA claims, the court held that the Forest Service considered a reasonable range of alternatives, any errors that Forest Service made in its EA were harmless, the Forest Service took a hard look at environmental effects of the proposed action, and the agency properly did not prepare an EIS.  1-ER-6–15.  The court also held that the Forest Service properly complied with NFMA.  1-ER-16–17.

_____

[6] Plaintiff also alleged claims against the U.S. Fish and Wildlife Service under the Endangered Species Act, but it abandoned those claims on appeal.

[7] Plaintiff moved for a preliminary injunction to enjoin grazing on the Colcord/Turkey pasture, SER-10–11, but the district court denied Plaintiff's motion.  SER-6.

## SUMMARY OF ARGUMENT

1.      The Forest Service complied with NEPA by considering a reasonable range of alternatives, taking a hard look at environmental impacts, appropriately relying on relevant data, and rationally concluding it was not required to prepare an EIS.

    a.      The Forest Service's EA considered a reasonable range of alternatives—the proposed action and a no grazing alternative—as required by NEPA.  It appropriately eliminated from further study Plaintiff's preferred alternative of continuing current grazing authorizations on the Bar X, because the alternative did not meet the purpose and need for the action.  Plaintiff's preferred alternative did not consider grazing opportunities on the lands within the project area designated as suitable for grazing, and failed to appropriately incorporate adaptive management.  The Forest Service also was not required to study Plaintiff's preferred alternative in detail because it was substantially similar to the agency's proposed action.

    b.      The Forest Service reasonably took a "hard look" at environmental impacts as required pursuant to NEPA.

    *First*, the Forest Service took a hard look at the proposed action's possible impacts to the subdivisions.  It determined these impacts were not significant because the subdivisions have always been within the boundaries of an active grazing allotment on National Forest System land, and it is responsibility of private

17

landowners to build fences to keep out the cattle under Arizona law. The EA also reasonably addressed impacts associated with recreation, wildlife, odors, and same-time same-place encounters between cattle and humans.

*Second*, the Forest Service took a hard look at the proposed action's impacts to ecological resources. The agency examined baseline resource conditions for vegetation, soil, watersheds, water, and wildlife based on the best available science, and determined that these resources were either in compliance with, or moving towards, standards and guidelines in the Forest Plan. It then determined that the proposed action, both by building on successful management techniques used in the past and employing adaptive management across an expanded set of pastures, would continue to move these resources towards desired conditions. Thus, the proposed action's impacts to these resources were not significant.

c. The Forest Service's decision appropriately relied on available data and modeling. Plaintiff attempts to flyspeck the EA, but at most raises two harmless errors and various mischaracterizations, which do not warrant reversal of the district court.

*First*, the Forest Service slightly misestimated the prior average level of grazing within the project area in its general description of "management history." But this measure was not used to calculate the proposed action's authorized levels of grazing, or to establish baseline conditions for affected resources. At most, the

18

Forest Service provided the figure for context that the proposed action could result in more grazing than in the past, and this minor error did not hinder that purpose.

*Second*, the Forest Service made a transcription error in copying the maximum number of authorized AUMs for the proposed action into the EA. However, the EA listed the *correct* maximum number of cattle for the proposed action, and the Forest Service relied on that correct number of cattle throughout its analysis, including for the 2019 term grazing permit and the 2020 and 2021 AOIs. In light of the Forest Service's reliance on correct cattle numbers, the transcription error in the EA related to AUMs is harmless.

*Third*, Plaintiff points to other alleged errors in the EA, but they amount to mischaracterizations of the EA's text and have no bearing on the agency's decision.

d.      The Forest Service appropriately examined the context and intensity of the proposed action, and rationally explained why an EIS was not required. The proposed action does not present significant public health or safety effects in terms of interactions between humans and cattle, or impacts to water. Plaintiff's opposition to the proposed action and reliance on outdated studies from the 1970s do not raise a substantial dispute that would make the proposed action highly controversial.

2.     The Forest Service's grazing authorization complied with NFMA because the agency rationally explained how the proposed action would meet Tonto Forest Plan standards and guidelines.  The Forest Service used Forest Plan standards and guidelines to develop desired conditions in the EA, and reasonably determined that the proposed action and related management practices would move resources towards those desired conditions.

3.     The remedy requested by Plaintiff, vacating the EA and all decisions flowing from the decision notice, is inappropriate.  If the Court finds errors in the EA, it should remand the agency's decision notice without vacatur due to the risk of harm to the agency and permittee.

For these reasons, the district court's judgment should be affirmed.

## STANDARD OF REVIEW

This Court reviews de novo the district court's grant of summary judgment. *Fence Creek Cattle Co. v. U.S. Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010). The Court reviews Plaintiff's NEPA and NFMA claims under the APA.  *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1067 (9th Cir. 2002); *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1205–06 (9th Cir. 2004).  A court may reverse a reviewable agency action only if it is "arbitrary[,] capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.* at 1206 (quoting 5 U.S.C. § 706(2)(A)); *see* 5 U.S.C. § 704.  This standard is "highly deferential."  *National*

20

*Mining Ass'n v. Zinke*, 877 F.3d 845, 866 (9th Cir. 2017). "An agency will have acted arbitrarily and capriciously only when 'the record plainly demonstrates that [the agency] made a clear error in judgment . . . .'" *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1124 (9th Cir. 2012).

## ARGUMENT

### I.     The Forest Service complied with NEPA.

#### A.     The Forest Service's EA considered a reasonable range of alternatives.

The Forest Service properly considered two alternatives in its EA, the proposed action and a "no grazing" alternative, as required under NEPA.  During the NEPA process, Plaintiff proposed that the agency analyze a "continue current management" option of "no change in allotment management," meaning the Forest Service would continue grazing on the Bar X without access to the Colcord/Turkey pasture and the four associated Driveway pastures.  2-ER-74.  The Forest Service reasonably eliminated separate analysis of this alternative because it did not meet the action's purpose and need, and it was encompassed within the alternatives already analyzed in the EA.

This Court reviews an agency's selection of alternatives in a NEPA analysis under the "rule of reason."  *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997).  The "touchstone" for reviewing a challenge to the range of alternatives considered is whether the "selection and discussion of

alternatives fosters informed decision-making and informed public participation." *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004). However, "an agency's obligation to consider alternatives under an EA is a lesser one than under an EIS." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005). "[W]hereas with an EIS, an agency is required to '[r]igorously explore and objectively evaluate all reasonable alternatives,' *see* 40 C.F.R. § 1502.14(a), with an EA, an agency only is required to include a brief discussion of reasonable alternatives." *North Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008) (citing 40 C.F.R. § 1508.9(b)).

As an initial matter, the Forest Service's examination of the "no grazing" and proposed action alternatives satisfied NEPA. NEPA "does not impose a numerical floor on alternatives to be considered," and "a plain reading of the regulations dooms th[e] argument" that the agency must consider more than "only two final alternatives—no action and a preferred alternative." *Native Ecosystems*, 428 F.3d at 1246. This Court should uphold the Forest Service's EA here consisting of two alternatives, as it has done with similar EAs. *See id.* at 1246–49; *Akiak Native Cmty. v. U.S. Postal Serv.*, 213 F.3d 1140, 1148 (9th Cir. 2000); *North Idaho Cmty. Action Network*, 545 F.3d at 1153–54; *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1021–22 (9th Cir. 2012).

22

The Court should also reject Plaintiff's suggestion that the Forest Service was required to consider alternatives beyond the "continue current management" alternative Plaintiff proposed. *See* Pl's. Br. 22. "Persons challenging an agency's compliance with NEPA must structure their participation so that it . . . alerts the agency to the parties' position and contentions." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004) (cleaned up). Plaintiff and its members flouted this rule by submitting NEPA comments proposing that the Forest Service examine a number of *non-specific* alternatives in its EA. *See, e.g.*, 2-ER-221 ("NOMR looks to the Forest Service to develop additional alternatives that recognize the lessons learned and detailed in the studies of the '70s and '80s . . . ."); *see also* 2-ER-217, 247; 3-ER-353. Given the non-specific nature of these comments, the Forest Service reasonably determined that commenters were proposing continuing current grazing management, and examined such an alternative in the EA. *See* 2-ER-74, 217, 221, 247–48. The Forest Service also reasonably determined that commenters proposed middle-ground alternatives encompassed by the proposed action. *See id.* In light of such explanations, the Forest Service's treatment of the range of alternatives in the EA was reasonable.

Moving to Plaintiff's proposed "continue current management" alternative, 2-ER-74, the Forest Service declined to further examine the alternative for three

separate reasons, each of which is sufficient to affirm the judgment of the district court.

*First*, the Forest Service reasonably determined that Plaintiff's preferred alternative would not meet the action's purpose of considering authorizing livestock grazing on all suitable lands within the project area. "Alternatives that do not advance the purpose of the [proposed action] will not be considered reasonable or appropriate." *Native Ecosystems*, 428 F.3d at 1247. Here, the Forest Service defined the proposed action's purpose as, in relevant part, "to consider livestock grazing opportunities on public lands where consistent with management objectives," and in particular to consider authorizing grazing on those areas "evaluated as suitable for grazing." 2-ER-54. In developing this purpose, the agency appropriately relied on relevant statutes, regulations, and policy that prioritize grazing on suitable lands.[8] *See id.*

The Forest Plan classifies the Driveway and the Bar X, including the Colcord/Turkey pasture, as suitable for livestock grazing. 2-ER-29–30. Thus, as the EA explained, Plaintiff's preferred alternative "does not meet the purpose and need to manage resources in a manner that achieves Forest Plan objectives and

---

[8] Plaintiff misrepresents that the Forest Service "conceded" that the "statement of purpose and need does not favor (or disfavor) grazing." Pl's. Br. 26. The Forest Service "prioritized considering grazing opportunities on all portions of the project area that have been evaluated as suitable for grazing." 3-ER-585.

desired conditions." 2-ER-74. Essentially, because the Forest Plan designated the *entire* Bar X as suitable for grazing, Plaintiff's preferred alternative of excluding grazing on Colcord/Turkey pasture was not consistent with the EA's purpose and need. *See* 2-ER-29–30, 54.

Plaintiff's arguments misinterpret the EA's purpose and need statement. Plaintiff asserts that the statement of purpose and need "directs the agency to 'consider' grazing *where appropriate*," which according to Plaintiff includes "looking at alternatives with and without grazing" on the Colcord/Turkey Pasture "with conditions on the remainder of the Bar X held constant." Pl's. Br. 27 (emphasis added). NEPA, which is governed by the rule of reason and provides for agency discretion, does not require such a specific set of considerations. *See Neighbors of Cuddy Mountain v. U.S. Forest Service*, 137 F.3d 1372, 1376 (9th Cir. 1998). In any event, the EA directs consideration of livestock grazing opportunities on those areas "evaluated as suitable for grazing," 2-ER-54, not "where appropriate." Pl's. Br. 27. Thus, because the controlling Forest Plan designates the Colcord/Turkey pasture as suitable for grazing, Plaintiff's preferred alternative does not meet the action's purpose and need. *See* 2-ER-29–30, 54.

Plaintiff argues that eliminating its preferred alternative unlawfully limited the Forest Service's discretion, Pl's. Br. 27–28, but the Forest Service's purpose

and need statement reasonably guided the agency's analysis.[9]  Indeed, the purpose

and need statement affirmatively exercised the agency's discretion to consider

grazing in all suitable areas.  *See* 2-ER-54.  To the extent Plaintiff attempts to

challenge the EA's purpose and need statement, it forfeited such a challenge by not

raising it in its complaint.  *See Sierra Medical Services Alliance v. Kent*, 883 F.3d

1216, 1223 (9th Cir. 2018) (holding that claim not pled in the operative complaint

was forfeited); SER-20–62.

 *Second*, Plaintiff's preferred alternative did not meet the EA's purpose and

need because it does not sufficiently allow for adaptive management.  The EA

defines the purpose and need as "to authorize livestock grazing in a manner

consistent with direction to move ecosystems towards their desired conditions."  2-

ER-54, and adaptive management is a method of management used to move

ecosystems toward desired conditions.  *See* 2-ER-62.  Thus, the Forest Service

reasonably eliminated Plaintiff's alternative because it did not "formally

incorporate adaptive management that allows for sufficient management

---

[9] Plaintiff argues the Forest Service retains "discretion to close areas to grazing even when they are deemed suitable."  Pl's. Br. 27 (emphasis added).  The agency may have such discretion in its overall management of National Forest lands, but permanently "closing" the allotment to grazing would likely require a separate NEPA analysis and Forest Plan amendment.  *See* U.S. Forest Service, Forest Service Handbook ("FSH") 1909.12, ch. 20, § 22.15.  In any event, having the discretion to close an area to grazing does not mean the agency was obligated to do so here.

flexibility." 2-ER-74. Essentially, under Plaintiff's preferred management alternative, the Forest Service had no formal flexibility to regularly shift grazing to different pastures or to adjust overall levels of grazing to optimize resource conditions on the range. *See id.* As the EA explained, "within [] current allotment management, there is no opportunity for adaptive management, making it difficult to change yearly authorized AUM[]s as necessary based on current resource conditions." 2-ER-74–75.

Plaintiff argues that the Forest Service could "simply revise the allotment management plan and grazing permit to formally incorporate adaptive management" for the pastures included within its "continue current management" alternative.[10] Pl's. Br. 23. But such an approach would not formally include access to the Driveway and Colcord/Turkey pasture, which would hamper the agency's ability to practice adaptive management. For example, the Forest Service previously shifted grazing to the Driveway in 2016–2018, and executed trial grazing on the Colcord/Turkey pasture in 2015. *See supra*, pp. 10, 12. Yet without adaptive management formally incorporated across these pastures, Plaintiff

---

[10] Plaintiff's suggestion that the agency can make administrative changes to incorporate adaptive management is incorrect. The agency must conduct a NEPA analysis in order to institute a formal adaptive management policy. *See* FSH 2209.13, ch. 90, § 92.23b.

sued to prevent the Forest Service from pursuing these management practices. *See supra*, pp. 13–14 (discussing 2018 litigation).

*Third*, the Forest Service reasonably eliminated Plaintiff's preferred alternative from further study because the proposed action is not significantly distinguishable from Plaintiff's preferred alternative. An agency is not required "to undertake a separate analysis of alternatives which are not significantly distinguishable from alternatives actually considered." *Westlands Water Dist.*, 376 F.3d at 868 (cleaned up). The Forest Service explained that it eliminated Plaintiff's preferred alternative because the scope of the alternative, authorizing less grazing than the proposed action, "places it within the range of alternatives between the No Grazing and the Proposed action," and "the Proposed Action was developed with the strategy to minimize or eliminate the need for additional alternatives to be developed." 2-ER-75. Essentially, because "[t]he proposed action . . . includes Adaptive Management which in reality, offers many alternatives," 2-ER-217, and the Forest Service's evaluation of a proposed action's effects includes "[a]ll adaptive management options included in the alternatives," FSH 2209.13, ch. 90, § 92.32, Plaintiff's preferred alternative was not "significantly distinguishable" from the proposed action and did not require separate analysis. *See Westlands Water Dist.*, 376 F.3d at 868.

28

The agency's conclusion was reasonable in light of well-established precedent. In *North Alaska Environmental Center v. Kempthorne*, 457 F.3d 969 (9th Cir. 2006), this Court held that BLM need not study a "middle ground alternative," because the agency's action alternative "included some protections similar to those in" plaintiffs' preferred alternative, such as placing "numerous limitations" on the relevant oil and gas leases. *Id.* at 978. Here too, the proposed action is similar to Plaintiff's "middle ground" alternative because it limits grazing through adaptive management, allowing for grazing authorizations preferred by Plaintiff, such as an alternative excluding grazing from the Colcord/Turkey pasture. *See* 2-ER-62.

In addition, this Court has held that "it makes little sense to fault an agency for failing to consider more environmentally sound alternatives to a project which it has properly determined, through its decision not to file an impact statement, will have no significant environmental effects anyway." *Earth Island Inst.*, 697 F.3d at 1023 (cleaned up). That same reasoning applies here: it does not serve NEPA's purposes to require the Forest Service to study an alternative with somewhat less grazing than the proposed action, when the Forest Service already determined that the proposed action does not have significant environmental effects. *See infra*, pp. 31–44.

29

Plaintiff's attempts to distinguish its preferred alternative does not make that alternative "distinct" or "substantially" different from the Forest Service's proposed action. Pl's. Br. 24–26. Plaintiff asserts that its preferred alternative is meaningfully different because it would entail more NEPA analysis and administrative process, such that Plaintiff "could be certain" that grazing would not occur in the Colcord/Turkey pasture.[11] Pl's. Br. 24. But these arguments do not concern differences in *environmental effects*, *see* 42 U.S.C. § 4332(2), and so would not further NEPA's purpose of fostering "informed decision-making." *Westland Water District*, 376 F.3d at 868.

Similarly, Plaintiff argues that there are differences in the alternatives based on the Colcord/Turkey pasture's "history of non-use and proximity to human communities." Pl's. Br. 25. But the EA already examined the Colcord/Turkey pasture as part of its analysis of existing conditions. *See* 2-ER-29–54. Nothing more can be gained in a NEPA analysis by separately analyzing the effect of Plaintiff's preferred alternative on these existing conditions, given that the proposed action and "no grazing" alternative already discuss the effects of grazing or not grazing on such existing conditions. *See Westland Water District*, 376 F.3d

---

[11] The "continue current management" alternative Plaintiff proposes would not "keep the Colcord/Turkey Pasture closed to grazing." Pl's. Br. 24. This pasture has never been "closed," but simply had not been authorized for grazing despite its designation as suitable for grazing. *See supra*, pp. 9–10.

at 868. And neither NEPA, nor agency regulations, require the Forest Service to break down its survey of existing conditions on a pasture-by-pasture basis, as envisioned by Plaintiff. *See Vermont Yankee*, 435 U.S. at 524 (holding that "reviewing courts are generally not free to impose [additional procedural requirements] if the agencies have not chosen to grant them").

## B. The Forest Service took a hard look at environmental impacts as required under NEPA.

This Court employs "a rule of reason" to determine whether an agency's NEPA analysis "contains a reasonably thorough discussion of the significant aspects of probable environmental consequences." *Neighbors of Cuddy Mountain*, 137 F.3d at 1376 (cleaned up). "Under this standard, review consists only of insuring that the agency took a hard look." *Id.* Contrary to Plaintiff's arguments, the Forest Service took a hard look at the impacts of the proposed action on (1) the subdivisions where Plaintiff's members live, and (2) ecological resources. The Forest Service reasonably concluded that these impacts were not significant and did not require the preparation of an EIS.

### 1. Impacts on the subdivisions

Plaintiff argues that Forest Service failed to analyze the "aesthetic, economic, social and health impacts of the new grazing scheme" on the subdivisions within the Colcord Canyon grazing allotment. Pl's. Br. 29 (cleaned up). But federal agencies must only "examine the 'reasonably foreseeable'

31

environmental effects of their proposed actions when conducting environmental review." *Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy*, 383 F.3d 1082, 1089 (9th Cir. 2004) (citing 40 C.F.R. §§ 1502.16, 1508.8(b)). To determine whether NEPA "requires consideration of a particular effect," an agency "must look at the relationship between that effect and the change in the physical environment caused by the major federal action at issue." *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 773 (1983). Here, the Forest Service took the required "hard look" at these potential impacts.

*First*, the Forest Service reasonably explained that impacts on the subdivisions were insignificant because the "subdivisions have always been within an active grazing allotment." 2-ER-56. As the district court held, these subdivisions "have indeed fallen within an active grazing allotment for over a century." 1-ER-12; *see* SER-77–80. The 1985 Forest Plan also classified the entire Bar X, including the Colcord/Turkey pasture, as suitable for grazing. 2-ER-29–30. Contrary to Plaintiff's arguments, the Forest Service declining to regularly authorize grazing on the Colcord/Turkey pasture since 1979 does not change these facts. *See* Pl's. Br. 34. Given that the subdivisions have always been within an active grazing allotment, it was possible that grazing would resume in this area, which tempers the significance of potential effects on the subdivisions.

For example, when Plaintiff asserts that the Forest Service should have further studied impacts to the subdivisions, such as "potential decreases in property values," Pl's. Br. 31, it appears to be arguing that subdivision residents have a reliance interest in the absence of grazing on the Colcord/Turkey pasture. *See* Pl's. Br. 34 ("[F]ew residents . . . have ever had to regularly contend with cattle grazing near their property."). But the residents have no such reliance interest, because they had notice that grazing could potentially resume. They live within an active grazing allotment, and the Forest Plan, a document noticed in the Federal Register, designated the *entire* Bar X, including the Colcord/Turkey pasture, as suitable for grazing. *See* 2-ER-29–30.[12] In any event, Plaintiff conceded at oral argument, and the district court held, that "reliance interests are not cognizable as an effect that the Forest Service must consider in an EA." SER-4; 1-ER-12.

*Second*, the Forest Service properly deemed impacts resulting from cattle entering the subdivisions not significant because landowners carry the burden of fencing their property. Plaintiff complains of "'cow pies on' . . . community members' properties," and cattle on "septic leach fields." Pl's. Br. 10. It also raises the alleged risk of "dangerous run-ins between humans and cattle," Pl's. Br.

---

[12] Although agencies do consider reliance interests when they change their policies, *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), the Forest Service's grazing authorization here was not such a change because the Forest Plan always designated the entire Bar X as suitable for grazing. *See* 2-ER-29–30.

31, based on interactions between human and cattle within the subdivisions. *See id.* at 10 (citing 3-ER-326, 330, 331, 375). The EA acknowledged these concerns, writing that "[u]nfenced private property exists within the allotment boundaries, causing contention with some homeowners." 2-ER-56. It then explained that "Arizona is an open range state which has enacted laws making it the responsibility of private landowners and private communities to construct a lawful fence to keep out cattle ((ARS) Title 3, Chapter 11, Article 8)," and that "it is not the responsibility of the grazing permittee nor federal agency to keep cattle off private lands." 2-ER-56. Thus, any potential impacts associated with cattle entering private property would be proximately caused by landowner responsibilities. There is no "reasonably close causal relationship" between the proposed action and these impacts, *Metro. Edison Co.*, 460 U.S. at 774, and the Forest Service rationally determined it was not required to further study such impacts.

Plaintiff misconstrues the Arizona law cited in the EA. It argues that because the law "incentivizes" rather than "mandates" fencing, and some property owners claimed they could not afford or did not want fencing, the Forest Service should have assessed the "probable impacts" of grazing on these property owners. Pl's. Br. 33–34. But it is irrelevant whether the law "mandates" fencing; it is clear it does not. Rather, Arizona's status as an "open range state," reflected in its tort law, shifts the burden to landowners to enclose their property with a fence to keep

out cattle.  *See generally*, Ariz. Rev. Stat. Ann. § 3-1427; *Carrow Co. v. Lusby*, 167 Ariz. 18, 22 (1990).  Because landowners bear the responsibility of keeping out cattle, whether they decide to build a fence or not, any impacts to private property from cattle that could have been kept out with a fence are attributable to landowner choices rather than the Forest Service's proposed action.

Plaintiff strains NEPA's causal nexus to argue that the Forest Service should have studied "economic" and "aesthetic" impacts of fencing.  Pl's. Br. 34.  The cost or visual appearance of particular types of fences are not a "reasonably foreseeable indirect effect" of the proposed action, given that such impacts are both contingent on state law and within the discretion of private landowners.  *Center for Biological Diversity v. Bernhardt*, 982 F.3d 723, 738 (9th Cir. 2020); *see also Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 770 (2004).  In particular, the Forest Service need not analyze potential effects of Arizona's statutes, over which it has no authority or control.  *Cf. Carmel-By-The-Sea*, 123 F.3d at 1162–63 (holding that "[n]o further analysis is warranted" because "the absence of a more thorough discussion in an [EIS] of an issue that was sufficiently analyzed in referenced state materials does not violate [NEPA]").

*Third*, the Forest Service was not required to further study "same-place same-time encounters" beyond how it addressed this issue in the EA.  Pl's. Br. 36. To the extent Plaintiff raises concerns about hypothetical "impacts to safety"

35

regarding interactions between human and cattle in the subdivisions and on its roads, Pl's. Br. 31, 36, the Forest Service was not required to further study these impacts because private landowners and communities bear the burden of building fences to keep cattle off private property. *See supra*, pp. 33–35. Plaintiff also claims the agency should have further studied encounters between humans and cattle as related to recreational impacts outside of the subdivisions. Pl's. Br. 11, 31, 36. But as the EA explained:

> Although 'same place-same time' encounters between uses are understood, they are not considered conflicts or safety issues that require consideration in grazing authorization planning analyses. Through development of this document, this issue has been determined to be not significant in the context where substantial scientific dispute exists, rather than to public opposition of a proposed action.

2-ER-56. For example, the EA described how livestock encounters "could result in a positive or negative experience depending on the individual recreational user's attitude towards livestock and their desired recreational experience," 2-ER-154, and identified how "[f]encing of popular dispersed recreation corridors or scheduling cows to avoid popular dispersed areas . . . could help mitigate these encounters." 2-ER-155. Given the Forest Service's comprehensive analysis here, these issues did not require further study.

*Fourth*, Plaintiff argues that the Forest Service "ignored . . . the threat cattle might drive away other wildlife," such as elk, deer, and turkey, that residents of the subdivisions "enjoy viewing from their properties." Pl's. Br. 31–32. However, the

EA includes a robust analysis of impacts to wildlife, including elk, mule deer, whitetail deer, and Merriam's turkey, among other species. *See* 2-ER-141, 146–47. It specifically addressed the concern that cattle might crowd out other wildlife when it noted that the "light to moderate managed grazing" at issue in the proposed action "does not generally damage wildlife habitats even in arid areas." 2-ER-147.

*Fifth*, Plaintiff argues the Forest Service failed to address "smells associated with cattle congregating near the [subdivisions]." Pl's. Br. 31. To the extent Plaintiff is arguing about the alleged "[c]ow pies on . . . community members' properties," Pl's. Br. 10, the agency addressed these possible impacts in discussing private property owners' burden of construct fencing. *See supra*, pp. 33–35. And the Forest Service is not required to study the highly unlikely possibility that the light-to-moderate cattle grazing authorized here across tens of thousands of acres, *see* 2-ER-24–25, would result in odors migrating into the subdivisions. *See Trout Unlimited v. Morton*, 509 F.2d 1276, 1283 (9th Cir. 1974) ("An EIS need not discuss remote and highly speculative consequences."). In any event, the Forest Service took a hard look at cattle waste in its analysis of water and riparian resources. 2-ER-89.

*Finally*, Plaintiff argues that the proposed action would have "a general diminishment in community members' quality of life." Pl's. Br. 31. But "impacts on citizens' subjective experiences" are not appropriate for study under NEPA.

*Bicycle Trails Council v. Babbit*, 82 F.3d 1445, 1466 (9th Cir. 1996); *see also Metro. Edison Co.*, 460 U.S. at 778.

### 2. Ecological impacts

Plaintiff argues that the Forest Service failed to take a "hard look" at ecological impacts by concluding that the proposed action "is unlikely to lead to a further degradation" of vegetation, soil, water, riparian, and wildlife resources. Pl's. Br. 37. But the Forest Service conducted a detailed analysis of effects to these different ecological resources, and reasonably concluded that the proposed action, including its management practices, would not have a significant effect on the environment. Indeed, the agency determined it could implement its new grazing decision while also moving resources towards desired conditions, as outlined in the Forest Plan. *See* 2-ER-76–162.

Plaintiff asserts (1) that resources on the Bar X under prior grazing management "have remained stubbornly suboptimal," (2) that the proposed action's new grazing management system is similar to the Bar X's old system, and therefore (3) the EA improperly concluded that the new grazing scheme, which allegedly allows for a "much higher" amount of grazing than the old scheme, would continue to improve resource conditions. Pl's. Br. 37–38. These arguments distort the record.

As an initial matter, resource conditions have improved under the Bar X's prior grazing management system as compared to historical conditions. As early as 1985, the Forest Service determined that range in the Bar X "which was classified as poor and very poor with a downward trend is in the fair to good category with an upward trend." 3-ER-496. The EA at issue here presented a detailed inventory of baseline resource conditions in the Bar X utilizing the best available science and monitoring data collected over the past 12 years. *See* 2-ER-29–54. Although some resources have not yet achieved the highest possible rating, resources are largely meeting or moving towards desired conditions. *See id.* As the EA noted, the Bar X's management plan "has been in place for the last 40 years and during this time conditions have improved." 2-ER-26; *see also* 2-ER-76 ("[C]urrent management has improved allotment vegetative conditions . . . .").

In addition, the proposed action expands and improves upon the successes of the prior management system. The proposed action uses adaptive management and monitoring measures over a new, expanded set of pastures to ensure that grazing will meet specific utilization guidelines or "use thresholds," which are maximum allowable levels of grazing for particular categories of vegetation. *See* 2-ER-63. As Plaintiff points out, the utilization guidelines are relatively similar to those used in 2007-15 and 2016-19. *See* 2-ER-267, 289. However, Plaintiff never challenged the Forest Service's utilization guidelines, which means that it has failed to

demonstrate that the Forest Service's reliance on these guidelines to move resources toward desired conditions is arbitrary and capricious. *See* SER-20–62; 2-ER-61–63; *Sierra Medical Services Alliance*, 883 F.3d at 1223.

Accordingly, the Forest Service reasonably determined that the proposed action would continue to move resources towards desired conditions, even though it might do so at a slower rate than in the absence of grazing. The proposed action does not necessarily increase grazing or grazing intensity relative to prior levels, but allows for a higher maximum level of grazing only when the agency meets desired resource conditions, over an area more than twice as large as the prior Bar X grazing area. *See* 2-ER-24–25, 41, 61–62. Ultimately, the Forest Service made a technical judgment requiring scientific expertise, based on the best available data concerning range resources, which was entitled to deference. *See United States v. Alpine Land and Reservoir Co.*, 887 F.2d 207, 213 (9th Cir. 1989) ("Deference to an agency's technical expertise and experience is particularly warranted with respect to questions involving . . . scientific matters."); *accord Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983).

Plaintiff further argues that the EA's analysis was deficient for three different categories of resources, but in each category the Forest Service reasonably determined that the proposed action would not have a significant

40

impact on the environment because it would not limit the attainment of desired resource conditions.

*First*, as to vegetation and soil, the EA reasonably concluded that the proposed action is "likely to result in attainment of desired conditions . . . but at a slower rate than for [the no-grazing alternative]."[13] 2-ER-87. Regarding vegetation, the EA clarified that "[m]onitoring has demonstrated that current management has resulted in improvements to vegetative condition in the allotment," 2-ER-84, and ground cover "remain[s] stable." 2-ER-33. Thus, the EA determined that further management under the proposed action would be "likely to maintain or improve the overall vegetative condition of the allotment," notwithstanding the proposed action's changes to grazing. 2-ER-84. Such an outcome would meet the "desired condition" outlined in the EA for vegetation of "maintenance and/or restoration of sustainable ecosystems." 2-ER-35.

Regarding soils, the Bar X and its four associated Driveway pastures are located within a watershed where 75–95% of overall soil condition is "satisfactory." 2-ER-36–39. Soil conditions are attributable to the cumulative

---

[13] Contrary to Plaintiff's argument, the Forest Service never concluded that the proposed action "will not have negative effects on soil and vegetation." Pl's. Br. 39. Rather, the EA candidly acknowledged that grazing has some such negative impacts, *see, e.g.*, 2-ER-80, 87, and that the proposed action's management practices would continue to improve resource conditions notwithstanding these impacts.

41

effects of many factors, such as fire, roads, invasive plants, and recreation, rather than solely prior grazing use. 2-ER-85. Thus, the Forest Service made a reasoned judgment, relying on its scientific expertise, that the proposed action's adherence to utilization guidelines and other management practices, such as salting, water development, seasonal rotations, and the construction of fences, would meet the desired condition of improving the soils here. *See* 2-ER-40, 85–87.

*Second*, the Forest Service reasonably concluded that the effects of the proposed action are "not likely to limit the attainment of desired conditions" for riparian and water resources, although the Proposed Action would cause resources to improve "at a slower rate than [the no-grazing alternative]." 2-ER-91. As to riparian resources, ten of the eleven watersheds within the project area (97% of total project area) are "considered to be in fair or satisfactory condition." 2-ER-42–43. The Haigler Creek watershed is "stable" in the Colcord/Turkey pasture, and "trending upward based on 2018 field data" in the adjoining Lost Salt Pasture. 2-ER-43, 88. Given this upward trend in resources, *see also* 2-ER-26, the Forest Service made a rational determination that under the proposed action, "[i]f riparian area utilization guidelines are followed and cattle are moved when use guidelines are met . . . condition[s] should improve." 2-ER-89. That would meet the desired condition of managing watersheds "in a manner aimed at improving them." 2-ER-44.

As to water resources, the EA notes that "[n]one of the four stream reaches within the project area . . . are impaired." 2-ER-89. As Plaintiff emphasizes, *see* Pl's. Br. 40, Haigler Creek does not currently meet the "designated use" of "full body contact." 2-ER-45. But the EA notes that this finding is "inconclusive" due to just "[one] *E. coli* exceedance," and requires "more samples" to clarify the minor issue. *Id.* The EA also acknowledges, as Plaintiff argues, *see* Pl's. Br. 40, that livestock "tend to deposit a greater amount of waste close to water sources." 2-ER-89. But after surveying the best available science, the EA clarifies that the "literature is inconclusive as to the relative role that cattle play in [water] contamination." 2-ER-89–90. It also described how impacts would be "mitigated through implementation of established Best Management Practices." 2-ER-89. Taking a hard look at this data and science, the Forest Service reasonably concluded that the proposed action would not prevent water resources from meeting desired conditions. 2-ER-47, 91.

*Third*, as to wildlife resources, the EA rationally concluded that the proposed action would not have a significant effect regarding turkey, elk, or deer, notwithstanding that it disclosed that the proposed action might have some negative impacts on wildlife. Plaintiff selectively quotes the EA by stating that elk and deer "would likely prefer grazing in pastures with no livestock," *see* Pl's. Br. 41, but the EA provides that "this social aversion appears to be of minor

importance provided stocking rates are light to moderate," exactly the situation here. 2-ER-147. Similarly, the EA reasonably concluded that overall impacts to deer and elk would not be significant because "light to moderate managed grazing does not generally damage wildlife habitats." *Id.* The Forest Service also appropriately examined impacts to birds, including Merriam's turkey, and concluded that grazing would have only minor impacts to bird forage. *See* 2-ER-141, 146.[14]

Plaintiff argues that the agency erroneously concluded that the proposed action "will not seriously affect turkey, elk, and deer," Pl's. Br. 42, because the agency relied on management practices like forage utilization guidelines and conservative grazing techniques, some of which were previously used in the project area. 2-ER-147. However, the EA indicated that elk, deer, and turkey were "stable," "improving," or in some cases "high," within the project area. *See* 2-ER-141. Given that these management practices were previously successful in maintaining or improving elk, turkey and deer populations, it was reasonable for the Forest Service to conclude that continuing such management practices under the proposed action would not have a significant effect on wildlife.

---

[14] Plaintiff speculates that elk and turkey have congregated on the Colcord/Turkey and Lost Salt pastures due to the absence of cattle grazing, Pl's. Br. 25, 41, but the best available science in the EA establishes no such causal link. *See* 2-ER-141.

### C.     Plaintiff misconstrues the Forest Service's EA.

Plaintiff selectively interprets the Forest Service's EA and underlying data in the administrative record to argue that the agency violated NEPA.  Pl's. Br. 42–55. But this Court should reject Plaintiff's invitation to "flyspeck" the Forest Service's EA.  *Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 508 (9th Cir. 1988).  At most, the EA includes harmless error that had no impact on the Forest Service's presentation and analysis of potential environmental impacts.

The APA provides that the reviewing court shall take "due account" of "the rule of prejudicial error."  5 U.S.C. § 706.  Thus, in reviewing a NEPA challenge, this Court conducts a "harmless-error analysis" that asks whether a procedural NEPA violation "materially impeded NEPA's goals."  *Idaho Wool Growers Ass'n v. Vilsack*, 816 F.3d 1095, 1104 (9th Cir. 2016).  It considers "whether the error caused the agency not to be fully aware of the environmental consequences of the proposed action, thereby precluding informed decisionmaking and public participation, or otherwise materially affected the substance of the agency's decision."  *Id.*; *see also* 40 C.F.R. § 1500.3 (providing that "trivial violations" do not give rise to NEPA claims).  "[I]t is the burden of the opponent of the action to demonstrate than an error is prejudicial."  *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 969 (9th Cir. 2015).

### 1. Plaintiff's cumulative allegations of error

Plaintiff argues that a variety of alleged errors in the EA make the agency's decision arbitrary and capricious, *see* Pl's. Br. 49–50, but a basic examination of the record and the requirements of NEPA demonstrates that this argument has no merit.

First, Plaintiff's summary table of alleged errors in the EA badly misrepresents the record. *See* Pl's. Br. 50. Plaintiff used background information in the EA to calculate its own inaccurate estimate of average prior grazing on the Bar X and Driveway. *See infra*, pp. 47–51. The Forest Service's capacity analysis supports its decision, even though the agency incorrectly transcribed AUMs in the EA. *See infra*, pp. 51–53. The subdivisions have always been within the boundaries of an active grazing allotment, although grazing has not been *authorized* on that allotment for some time. *See supra*, pp. 32–33. The agency evaluated current management history by looking at 12 years of data, notwithstanding that it collected less than 12 years of "forage data" in some areas. *See infra*, pp. 53–54. The agency relied on the best available science and its technical expertise to develop its capacity analysis. *See infra*, pp. 54–55. The EA correctly provided that trial grazing was *authorized* in 2015 and 2018, notwithstanding that Plaintiff's prior litigation prevented 2018 trial grazing from occurring. *See infra*, p. 55.

Even addressing all these points in conjunction, Plaintiff fails to meet its burden of establishing prejudicial error. Courts "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974). Plaintiff raises at most two harmless errors here: (1) reporting 3,707 AUMs as average grazing use in the Bar X over the past 12 years, slightly higher than actual prior use, and (2) incorrectly transcribing a maximum authorized use of 9,250 AUMs in the EA, even though the agency still reported and relied on the correct number of maximum authorized cattle. Plaintiff's other points simply amount to misreadings of the EA's text. *See Native Ecosystems Council v. Marten*, 883 F.3d 783, 796 (9th Cir. 2018) (agreeing that plaintiff "misread" document in administrative record). None of this prevented the public or decisionmaker from being properly informed of the potential environmental impacts associated with the proposed action. *See Idaho Wool Growers Ass'n*, 816 F.3d at 1104. Federal Defendants further address these issues below.

### 2. Management history

As Plaintiff points out, the EA contains background information in its "management history" section that livestock grazing has "averaged 3,707 [AUMs] per year" on the Bar X from 2007-19, and 1,720 AUMs on the Driveway from 2011-18. 2-ER-26–27. Plaintiff adds these figures together and compares them to

other data in the record to argue that the Forest Service's EA "overstates the amount of [prior] grazing" on the Bar X and Driveway "by some 45-70%." Pl's. Br. 44. Plaintiff's approach of recalculating information provided in the EA as background in an attempt to show prejudicial error is a paradigm example of an effort to "flyspeck" the EA. *Half Moon Bay*, 857 F.2d at 508. The minor error Plaintiff raises here is harmless.

First, as it admitted in the district court, the Forest Service made a harmless error in describing average AUMs for the Bar X over the past 12 years. SER-12. The EA states that livestock have "averaged 3,707 [AUMs] per year" over the past 12 years on the Bar X from 2008-2019, 2-ER-26, when grazing authorizations on the Bar X and associated Driveway pastures averaged 3,187 AUMs. SER-71; 2-ER-272. This indicates the Forest Service slightly overestimated the prior average AUMs on the Bar X.

In its approach of recalculating the averages presented in the EA, Plaintiff also incorrectly adds the EA's estimate of prior grazing on the Bar X to the EA's estimate of prior grazing on the Driveway.[15] *See* Pl's. Br. 43–44. The EA estimated prior grazing on the Bar X over the past twelve years, from 2008-2019, at 3,707 AUMs, whereas it estimated prior grazing on the Driveway over the past

---

[15] Plaintiff waived any claim regarding the EA's estimate of prior grazing on the Driveway by failing to raise such a claim in its complaint or in the district court.

eight years, from 2011-2018, at 1,720 AUMs. 2-ER-26–27. The Forest Service never intended these background figures to be added together for comparison purposes; Plaintiff doing so here obscures four years of data on the Driveway and renders its recalculations inaccurate.

In any event, as the district court held, 1-ER-10, any error related to a slight misestimate of past grazing on the Bar X does not "preclud[e] informed decisionmaking and public participation, or otherwise materially affect[] the substance of the agency's decision." *Idaho Wool Growers Ass'n*, 816 F.3d at 1104. Importantly, the EA only provides information about prior average grazing levels on the Bar X and Driveway as part of background information on the project area's "management history." 2-ER-26–27. Thus, the substance of the agency's decision, the Forest Service's proposed grazing authorization levels, does not rest on specific calculations concerning historical grazing data. Indeed, those proposed grazing authorization levels rely on a separate, broader analysis of rangeland capacity (discussed *infra*, pp. 51–53), evaluated in conjunction with monitoring data, best available science, and agency expertise. *See* 2-ER-29, 59.

Ultimately, the EA's information on prior average grazing levels still met its limited purpose. On review of the "management history" section of the EA, both the decisionmaker and the public reasonably understood that the proposed action, authorizing a maximum of 552 adult cattle, could be a departure from prior

average authorized levels of grazing on the Bar X and Driveway. *See* 2-ER-58.[16]

In support of its argument, Plaintiff cites *Natural Resources Defense Council v.*

*U.S. Forest Service*, where had the public and decisionmaker known the accurate

demand forecast for a timber project the agency may have selected an alternative

with less environmental impact. 421 F.3d 797, 812 (9th Cir. 2005). Unlike in that

case, here slight changes in the estimate of prior average grazing, used only as

background information, would not have caused the agency to choose a different

alternative.

Contrary to Plaintiff's arguments, *see* Pl.'s. Br. 44–45, any harmless error

here does not render the EA's entire analysis of baseline conditions arbitrary and

capricious. In a NEPA analysis, there is only a "practical requirement" to establish

baseline conditions in order "to identify the environmental consequences of a

proposed agency action." *Am. Rivers v. FERC*, 201 F.3d 1186, 1195 n.15 (9th Cir.

1999). The EA here met that standard by using monitoring data "gathered and

analyzed collaboratively with the University of Arizona Cooperative Extension,"

---

[16] Plaintiff argues that the EA's reported prior average grazing levels obscure that the proposed action could result in grazing "as high as 9,250 AUMs, nearly three times higher" than previously authorized. Pl.'s. Br. 44. That claim is inaccurate. The proposed action's maximum level of grazing is roughly 30% below 9,250 AUMs, as reflected by the maximum level of authorized cattle. *See infra*, pp. 51–53. In any event, the comparison obscures how the proposed action's maximum level of grazing applies to an area more than twice as large as that available under the prior Bar X authorization. *See supra*, p. 14.

2-ER-206–07, as well as other best available science, to conduct a broad survey of existing conditions for different categories of resources on the Bar X and Driveway. *See* 2-ER-28–54. While the EA's statements about prior average livestock authorizations provide context about baseline conditions, the prior historical grazing authorizations themselves are not part of the measureable environmental conditions that comprise the EA's baseline. *See id.* Thus, the Forest Service's minor error describing an average of prior authorized AUMs does not skew, or preclude the public of being properly informed about, the actual baseline environmental conditions described and evaluated in the EA. *See Native Ecosystems*, 883 F.3d at 795.[17]

### 3. Capacity analysis

Plaintiff also argues that the Forest Service's "grazing capacity analysis," referenced in the EA, does not support the proposed action's maximum authorized grazing levels. *See* Pl's. Br. 45. But the Forest Service's grazing capacity analysis was accurate and supports the agency's decision, although the Forest Service made a harmless transcription error in reporting AUMs in its EA.

The Forest Service's capacity analysis used data on forage production, distance to water, and slope, as well as a measure of allowable forage use, to

---

[17] Plaintiff's suggestion that the Bar X exhibits "poor soil and watershed health" and is "struggling to meet desired conditions," *see* Pl's. Br. 44–45, mischaracterizes the record. *See supra*, pp. 38–44.

estimate the range's grazing capacity.  *See* 2-ER-33, 59, 312.  As shown on the

Forest Service's capacity worksheet, the agency estimated capacity of the Bar X

and its associated Driveway pastures as 590 adult cattle year-long, or 7,081 AUMs.

2-ER-312–14.  Relying on this analysis, "in combination with utilization, condition

and trend data," the EA properly indicated that the proposed action would

authorize up to 552 adult cattle year-long and 160 yearlings for a period of months,

within the capacity analysis estimate of 590 adult cattle year-long.  *See* 2-ER-58–

59.[18]  However, the Forest Service made a transcription error by listing the AUMs

associated with the proposed action as 9,250 AUMs, approximately 30% higher

than the intended AUMs figure.  *See* 2-ER-58.

     This Court should affirm the judgment of the district court on the grounds

that the Forest Service's transcription error was harmless.  *See McQuillion v.*

*Schwarzenegger*, 369 F.3d 1091, 1096 (9th Cir. 2004) (holding that this Court

"may affirm on any ground supported by the record").  Although the Forest

Service listed 9,250 AUMs as the upper limit of possible authorizations in the EA,

the public was informed of the actual maximum authorization levels of the

---

[18] The proposed action's authorization of 160 yearlings for a period of 4.5 months on an annual basis is equivalent to 498 AUMs.  2-ER-58.  Although these yearlings consume spring "green-up" not ordinarily counted towards capacity, the extra 498 AUMs is equivalent to an additional 42 adult cattle, which in combination with the proposed action's 552 adult cattle is roughly equivalent to the estimated maximum number of cattle in the capacity analysis.  *See* 2-ER-312–14.

proposed action based on the EA's listed number of cattle. *See* 2-ER-58. The Forest Service was also "fully aware of the environmental consequences" because it consistently relied on the correct number of cattle throughout its EA analysis. *Idaho Wool Growers Ass'n*, 816 F.3d at 1104. The Forest Service relied on these correct cattle numbers in its subsequent 2019 term grazing permit, and again in its AOIs issued in 2020 and 2021. *See* SER-63; 3-ER-564, 568. Thus, like this Court's examination of a similar calculation error in *Native Ecosystems Council v. Marten*, "it does not appear . . . that the mistake was a significant factor in the Forest Service's approval of [the challenged action,]" nor does it "appear that this mistake prevented the public from making an informed decision about the likely effects of" the action. 883 F.3d at 796.

### 4.    Plaintiff's other misperceptions of the EA

Plaintiff's other arguments about alleged errors in the EA amount to misperceptions of the record. *See* Pl's. Br. 48.

*First*, Plaintiff argues that the EA's statement that "[c]urrent management history [wa]s evaluated by looking at the last 12 years of data," 2-ER-26, is inaccurate because there was allegedly "only four years of forage [production] data available for the Colcord/Turkey pasture and no forage data for the Lost Salt Pasture." Pl's. Br. 48 (citing 2-ER-290–91). But when the EA provided that "[c]urrent management history is evaluated by looking at the last 12 years of data,"

it was summarizing for the reader how the entire "existing conditions" portion of the EA, which drew on a variety of different types of data, evaluated current management history. *See* 2-ER-26, 28–54. For example, the EA relied on 12 years of monitoring data from 8 different Bar X monitoring locations. *See* 2-ER-31–33. Although some other monitoring areas were established more recently that collected less data, that does not mean that the EA misled the public or hampered the Forest Service's ability to make a reasoned decision. *See Native Ecosystems*, 883 F.3d at 795.

*Second*, Plaintiff claims that "[t]he EA states that production-utilization studies were done to evaluate the probable effects of the new grazing scheme . . . but it is not possible that any such studies were done for the Colcord/Turkey and Lost Salt pastures, because the Forest Service did not gather utilization data following 2015, the one year any of those pastures was grazed." Pl's. Br. 48. This argument distorts the Forest Service's EA and underlying analysis. The agency used available "production utilization" studies to develop its grazing capacity analysis, which in turn informed further analysis in the EA.[19] *See* 2-ER-59, 312. As Plaintiff points out, no "production utilization" studies were available for the Colcord/Turkey and Lost Salt pastures. *See* Pl's. Br. 48. However, the agency

---

[19] "Production utilization" studies use both production and utilization data to measure "how much herbaceous forage is available in a given key area compared to how much is being consumed by cattle." 2-ER-33.

relied on other best available science and its technical expertise to complete a detailed capacity analysis for both of these pastures.[20]  *See* 2-ER-312–314.  Given that the Forest Service's scientific and technical judgments are entitled to deference, the Forest Service's treatment of production utilization studies was reasonable.  *See Alpine Land and Reservoir Co.*, 887 F.2d at 213.

*Third*, Plaintiff argues that the EA's statements about "trial grazing" are "misleading," because "grazing was not authorized on Colcord/Turkey in 2015 for trial purposes, . . . no utilization data was actually gathered following that grazing season, . . .  and there was no grazing at all on Colcord/Turkey in 2018."  Pl's. Br. 48–49.  To the contrary, the EA explained that "[d]uring the 2015 and 2018 grazing season[s], cattle were authorized to use [the Colcord/Turkey pasture] on a trial basis so data could be gathered for this [NEPA] analysis of the proposed grazing authorization to determine if there were negative effects to the other resources (FSH 2209.13)."  2-ER-26; *see also* 2-ER-76; FSH 2209.13, ch. 10, § 16.16.  In addition, despite the Forest Service originally *authorizing* trial grazing for the 2018 grazing season on the Colcord/Turkey pasture, that grazing never occurred due to Plaintiff's prior lawsuit.  *See supra*, pp. 13–14; 2-ER-184.

---

[20] The Forest Service relied on forage production and monitoring data for the Colcord/Turkey pasture, *see* 2-ER-32; SER-15–17, and estimated forage production based on mapping data and statistical modeling for the Lost Salt pasture.  *See* 2-ER-312.

**D.      The Forest Service was not required to prepare an EIS.**

Plaintiff argues that the Forest Service was required to complete an EIS because the proposed action has "significant" effects under two of the intensity factors listed in 40 C.F.R. § 1508.9(b), essentially rehashing its attacks on the EA. *See* Pl's. Br. 51.  But the Forest Service, relying on its EA, examined these and all other required intensity factors, as well as the context of the action, and properly determined in its decision notice that the proposed action would not have significant environmental effects.  2-ER-177–80.

*First*, the Forest Service reasonably determined that the proposed action would have no significant effects in terms of "[t]he degree to which the proposed action affects public health or safety."  40 C.F.R. § 1508.27(b)(2); *see* 2-ER-177. Plaintiff speculates that "close encounters between Bar X cattle and community members" and cattle on "roads passing through the [subdivisions]" pose safety risks.  Pl's. Br. 53.  But private landowners and communities bear the burden of keeping cattle off their property and roads, and in any event the Forest Service examined the effects of same-place same-time encounters throughout the EA and determined they were not significant.  *See supra*, pp. 33–37.  Plaintiff also argues that cattle may impact water quality.  *See* Pl's. Br. 53.  But the Forest Service concluded that such impacts would not be significant based on the best available science and the proposed action's management practices.  *See supra*, p. 43.

*Second*, the Forest Service determined that the proposed action does not present any significant effects on the quality of the human environment in terms of "the degree to which the effects . . . are likely to be highly controversial." 40 C.F.R. § 1508.27(b)(4). "A project is 'highly controversial' if there is a 'substantial dispute [about] the size, nature, or effect of the major Federal action rather than *the existence of opposition to a use*.'" *Native Ecosystems*, 428 F.3d at 1240 (emphasis added). Plaintiff argues that the proposed action is highly controversial because the residents of the subdivisions and recreationists "have come to rely on the absence of cattle on the Colcord/Turkey pasture." Pl's. Br. 54. Yet Plaintiff already admitted that reliance interests are "irrelevant for NEPA purposes." SER-4. In reality, Plaintiff is arguing that the mere existence of opposition to the proposed action renders it highly controversial, but this Court has repeatedly rejected this argument. *See Native Ecosystems*, 428 F.3d at 1240; *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1162 (9th Cir. 1998).

In addition, reports "incorporated into the 1976 Range Analysis" for the Bar X, 3-ER-414, do not make the proposed action highly controversial. *See* Pl's. Br. 54. Plaintiff argues that these studies from the 1970s "are still the best indication of what will happen" if cattle graze on the Colcord/Turkey pasture. *Id.* But as explained previously, these and similar studies from the 1970s attribute damage to the range to obvious mismanagement of range resources, in contrast

57

with the careful adaptive management approach of the challenged proposed action. *See supra*, pp. 9–10. Studies from the 1970s also do not supersede the Forest Service's careful, comprehensive analysis based on updated range data from the past 12 years. *See* 2-ER-31–32.[21]

Nor do the Forest Service's harmless errors make the proposed action highly controversial. As described *supra*, Plaintiff raises at most two harmless errors in the Forest Service's EA: slightly misreporting the average AUMs over the past 12 years on the Bar X, and incorrectly transcribing the proposed action's maximum AUMs. *See supra*, pp. 47–53. "Simply because a challenger can cherry pick information and data out of the administrative record to support its position does not mean that a project is highly controversial or highly uncertain." *Native Ecosystems*, 428 F.3d at 1240.

## II. The proposed action complies with NFMA.

Plaintiff argues that the proposed action violates NFMA because it is "inconsistent with the Tonto Forest Plan," and the Forest Service "did not provide a reasoned explanation for how the new grazing scheme is consistent with the Forest Plan." Pl's. Br. 55. But the Forest Service provided a detailed explanation

---

[21] Plaintiff raises the "absence of any recent production-utilization data for the Colcord/Turkey [p]asture," Pl's. Br. 54, but the Forest Service still collected forage and other monitoring data from that pasture. *See supra*, p. 55, n.20.

of such consistency within its EA, *see, e.g.*, 2-ER-29, as well as in a formal consistency determination in its FONSI. *See* 2-ER-180.

When a plaintiff challenges a site-specific action for inconsistency with a forest plan pursuant to 16 U.S.C. § 1604(i), this Court reviews whether that action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 957 F.3d 1024, 1032 (9th Cir. 2020). "[T]he Forest Service acts arbitrarily and capriciously only when the record plainly demonstrates that the Forest Service made a clear error in judgment in concluding that a project meets the requirements of the NFMA and relevant Forest Plan." *Id.* at 1035. In addition, "the Forest Service's interpretation and implementation of its own Forest Plan is entitled to substantial deference." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012).

Plaintiff's assertion that the Forest Plan will "not move the Tonto National Forest towards the long-term resource goals set out in the Forest Plan" is no more than a rehashing of its previous arguments, Pl's. Br. 57, which we have refuted. *See supra*, pp. 21–55. The Forest Service carefully explained how the proposed action would move the Bar X and Driveway towards the EA's "desired conditions," which are "defined by 1985 Tonto [Forest Plan] [s]tandards and guidelines." 2-ER-29. The agency made a reasonable judgment that the proposed

action would maintain or improve resources through practices such as utilization guidelines, adaptive management, monitoring, and rangeland improvements, thereby meeting Forest Plan standards. *See* 2-ER-57–74. Such an approach is consistent with the Forest Plan, which provides guidance for grazing even in areas with less than satisfactory resource conditions. *See* 3-ER-484 ("Rangeland in less than satisfactory condition will be treated with improved grazing management along with the installation of structural and non-structural improvements.").[22]

To be clear, Plaintiff highlights various Forest Plan goals, standards, and guidelines, but the proposed action is consistent with all of them. Plaintiff selectively quotes Forest Plan goals associated with improving range resources, *see* Pl's. Br. 57–58; 3-ER-469 ("emphasize improvement of soil productivity," "enhance riparian ecosystems"); 3-ER-473 ("[e]mphasize a program [which will] improve range forage conditions"), but a goal "is usually not quantifiable and may not have a specific date for completion." 3-ER-469; *cf. Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 72 (2004) ("'[P]rojections of agency action set forth in land use plans—are not a legally binding commitment . . . .'"). In any event, the Forest Service adequately met the discretionary language of these goals by, among

---

[22] Plaintiff's arguments again misrepresent resource conditions within the project area. *See* Pl's. Br. 57–58. Resource conditions have improved in recent decades, and resources are generally in compliance with, or moving towards, Forest Plan standards. *See supra*, p. 39.

other things, developing the proposed action's purpose and need statement based on such goals, and incorporating such goals throughout the EA. *See* 2-ER-40, 54, 91.

Plaintiff suggests the proposed action does not meet various Forest Plan standards and guidelines, but the EA describes how its "[d]esired conditions . . . are defined by 1985 Tonto [Forest Plan] Standards and guidelines . . . ." 2-ER-29. Indeed the EA incorporates many of the standards Plaintiff cites in its brief as "desired conditions." *Compare* Pl's. Br. 57 (citing riparian vegetation and watershed standards) *with* 2-ER-35, 44 (incorporating these same standards verbatim). The EA similarly includes the "management emphasis" cited by Plaintiff, *see* Pl's. Br. 57, as part of desired conditions. *See* 2-ER-29.[23] The proposed action is consistent with the Forest Plan because the EA explains in detail how the proposed action will meet these desired conditions. *See* 2-ER-76–162. The FONSI similarly notes that the project "was designed in conformance with land and resource management plan standards and incorporates appropriate land and resource management plan guidelines." 2-ER-180.

---

[23] Plaintiff cites to the Colcord/Turkey pasture's management emphasis that prioritizes "renewable resource outputs." 2-ER-29. The Forest Plan also notes that this area should be managed for livestock grazing. *See* 3-ER-492, 484.

**III.    Plaintiff's requested remedy is inappropriate.**

On remedy, Plaintiff argues that the Court should set aside the Forest Service's decision notice and "all decisions flowing from it," including the 2019 AMP, as well as vacate the EA. Pl's. Br. 59. But if the Court finds for Plaintiff on any issue, it should remand to the Forest Service without vacatur.

Any possible error here is minor, and the agency should be able to correct such an error without corresponding harm to the agency and permittee. *See California Communities Against Toxics v. U.S. E.P.A*., 688 F.3d 989, 992 (9th Cir. 2012) (citing *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)). Vacating the decision notice would require the agency to immediately destock the allotment, which not only imposes obvious harm on the permittees, but would also strain agency resources and staff in ensuring that the permittee clears livestock from the allotment.

In addition, the district court denied Plaintiff's requested preliminary injunction against grazing on the Colcord/Turkey pasture during the 2021 grazing season because the harm to the permittee and grazing operations outweighed Plaintiff's showing of harm. SER-7–9. A similar consideration of harm to the permittee and grazing operations would apply in considering vacatur, *see Allied-Signal, Inc.*, 988 F.2d at 150–51, except that these harms would be much greater

because Plaintiff's requested remedy would prevent all grazing on the Bar X, rather than just on the Colcord/Turkey pasture.

If the Court is contemplating any remedy beyond remanding without vacatur, it should remand to the district court to consider remedy in the first instance.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

s/ *Benjamin Richmond*
TODD KIM
*Assistant Attorney General*
BRIAN TOTH

Of Counsel:                                    EMMA HAMILTON
                                               BENJAMIN RICHMOND
DAWN DICKMAN                                   *Attorneys*
*Attorney*                                     Environment and Natural Resources Division
Office of the General Counsel                  U.S. Department of Justice
U.S. Department of Agriculture

September 14, 2022
90-1-4-15991

63

## STATEMENT OF RELATED CASES

The undersigned counsel is aware of no related cases within the meaning of

Circuit Rule 28-2.6.

s/ *Benjamin Richmond*
Counsel for Federal Appellees

**Form 8.  Certificate of Compliance for Briefs**

**9th Cir. Case Number(s)**        22-15259

     I am the attorney or self-represented party.

     **This brief contains 13,969 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

     I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature**    s/ Benjamin Richmond

**Date**        September 14, 2022

# ADDENDUM

## Statutes

16 U.S.C. § 1604 ................................................................................. 2a

16 U.S.C. § 528 .................................................................................. 4a

16 U.S.C. § 531 .................................................................................. 5a

## Other Authorities

Forest Service Handbook 2209.13, ch. 90, § 92.23b .............................. 6a

**16 U.S.C. § 1604 - National Forest System land and resource management plans**

. . .

**(e) Required assurances**

In developing, maintaining, and revising plans for units of the National Forest System pursuant to this section, the Secretary shall assure that such plans—

(1) provide for multiple use and sustained yield of the products and services obtained therefrom in accordance with the Multiple-Use Sustained-Yield Act of 1960, and, in particular, include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness; and

(2) determine forest management systems, harvesting levels, and procedures in the light of all of the uses set forth in subsection (c)(1), the definition of the terms "multiple use" and "sustained yield" as provided in the Multiple-Use Sustained-Yield Act of 1960, and the availability of lands and their suitability for resource management.

. . .

**(i) Consistency of resource plans, permits, contracts, and other instruments with land management plans; revision**

Resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land

management plans.  Those resource plans and permits, contracts, and other such instruments currently in existence shall be revised as soon as practicable to be made consistent with such plans.  When land management plans are revised, resource plans and permits, contracts, and other instruments, when necessary, shall be revised as soon as practicable.  Any revision in present or future permits, contracts, and other instruments made pursuant to this section shall be subject to valid existing rights.

**16 U.S.C. § 528 – Development and administration of renewable surface resources for multiple use and sustained yield of products and services; Congressional declaration of policy and purpose**

It is the policy of the Congress that the national forests are established and shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes. The purposes of sections 528 to 531 of this title are declared to be supplemental to, but not in derogation of, the purposes for which the national forests were established as set forth in section 475 of this title. Nothing herein shall be construed as affecting the jurisdiction or responsibilities of the several States with respect to wildlife and fish on the national forests. Nothing herein shall be construed so as to affect the use or administration of the mineral resources of national forest lands or to affect the use or administration of Federal lands not within national forests.

**16 U.S.C. § 531 – Definitions**

As used in sections 528 to 531 of this title the following terms shall have the following meanings:

(a) "Multiple use" means:  The management of all the various renewable surface resources of the national forests so that they are utilized in the combination that will best meet the needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; that some land will be used for less than all of the resources; and harmonious and coordinated management of the various resources, each with the other, without impairment of the productivity of the land, with consideration being given to the relative values of the various resources, and not necessarily the combination of uses that will give the greatest dollar return or the greatest unit output.

(b) "Sustained yield of the several products and services" means the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the national forests without impairment of the productivity of the land.

**Forest Service Handbook 2209.13, ch. 90, § 92.23b (2005) – Adaptive Management**

1.  When livestock grazing is proposed using an adaptive management strategy, the proposed action shall set defined limits using adaptive management principles of what is allowed, such as timing, intensity, frequency, and duration of livestock grazing.  These limits set standards that can be checked through monitoring to determine if actions prescribed were followed, and if changes are needed in management.  The NEPA analysis discloses the effects for these standards.  Administrative actions within the defined limits of the resultant NEPA-based decision can then be implemented without additional NEPA.  Examples of administrative decisions include:

>   a.  Determination of specific dates for grazing,
>
>   b.  Specific livestock numbers,
>
>   c.  Class of animal,
>
>   d.  Grazing systems, and
>
>   e.  Range readiness when these variables fit within the NEPA-based decision.

2.  Adaptive management utilizes the interdisciplinary planning and implementation process that provides:

>   a.  Identification of site-specific desired conditions;

b.  Definition of appropriate decision criteria (constraints) to guide management;

c.  Identification of pre-determined optional courses of action, as part of a proposed action to be used to make adjustments in management over time, and

d.  Establishment of carefully focused project monitoring to be used to make adjustments in management over time.

Planning for adaptive management may be initiated during development of the proposed action.  It involves identification of future management options that may be needed to accelerate or adjust management decisions to meet desired conditions and/or project standards and objectives, as the need is determined through monitoring.

3.  In circumstances where changes in conditions warrant implementation of a management option that has not been provided for in the NEPA analysis, or when the predicted effects of implementation are determined to be greater than the effects originally predicted, a supplemental or new NEPA analysis and NEPA-based decision is needed.

4.  Building adaptive management flexibility into management allows for decisions that are responsive to needed adjustments in permitted actions. Historically, decisions have been too narrowly focused, such as deciding to

authorize a specific number, kind, or class of livestock with specific on- and off-dates under a specific type of grazing system. These kinds of decisions have restricted management flexibility in meeting desired conditions and project objectives.

5. The key to development of adaptive management actions is to focus on factors that are essential to ensure management objectives are met. Critical factors may consider issues, such as timing restrictions in specific areas to manage conflicts with fisheries, big game, or recreation; or allowable use standards to ensure retention of defined levels of cover or riparian residual vegetation to trap and retain sediments. In any case, the focus must be on defining criteria that are critical to management success and to move away from making decisions that unduly restrict flexibility. Yet, in all cases, the proposed action must adequately detail the type and level of activities that can take place on a given allotment(s).

6. With a well-crafted adaptive management approach, the NEPA-based decision can remain viable for an extended period of time as long as there is periodic review of the actions for consistency with the NEPA-based decision. In most cases, the only situations that would require an updated NEPA analysis would be where unforeseen changed conditions have occurred that require management actions that have not been considered, and which may produce effects outside the scope of those predicted within the original NEPA analysis document.