**No. 22-15259**

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

NEIGHBORS OF THE MOGOLLON RIM, INC.,
*Plaintiff-Appellant,*

v.

UNITED STATES FOREST SERVICE ET AL.,
*Federal Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Arizona
No. 2:20-cv-00328-DLR
Hon. Douglas L. Rayes

---

**PLAINTIFF-APPELLANT'S REPLY BRIEF**

---

Andrew R. Missel
Lauren M. Rule
ADVOCATES FOR THE WEST
3701 SE Milwaukie Ave., Ste. B
Portland, OR 97202
(503) 914-6388

amissel@advocateswest.org
lrule@advocateswest.org

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................... iii

INTRODUCTION ................................................................................. 1

ARGUMENT ........................................................................................ 2

I.   THE FOREST SERVICE'S ANSWERING BRIEF OFFERS WEAK
     AND INADEQUATE EXCUSES FOR NOT CONSIDERING A THIRD
     ALTERNATIVE ACTION IN THE EA. ........................................................ 2

II.  THE FOREST SERVICE'S DECISION TO ALLOW CATTLE TO
     GRAZE ON THE COLCORD/TURKEY PASTURE WILL
     PROXIMATELY CAUSE ADVERSE EFFECTS TO NEARBY
     COMMUNITIES, AND THE AGENCY IGNORED THOSE EFFECTS...12

III. THE FOREST SERVICE STILL CANNOT EXPLAIN HOW
     EXPANDING GRAZING WHILE USING THE SAME
     MANAGEMENT STRATEGY WILL BENEFIT ECOLOGICAL
     RESOURCES. ............................................................................... 19

IV.  THE FOREST SERVICE'S EXPLANATIONS OF THE EA'S MANY
     ERRORS AND MISLEADING STATEMENTS ONLY HIGHLIGHT
     HOW EGREGIOUS THOSE ERRORS ARE. ........................................... 21

V.   THE FOREST SERVICE'S DECISION "MAY" HAVE SIGNIFICANT
     CONSEQUENCES, WARRANTING AN EIS. .......................................... 25

VI.  THE FOREST SERVICE'S DECISION SHOULD BE VACATED. .......... 27

CONCLUSION ................................................................................... 29

CERTIFICATE OF COMPLIANCE ....................................................... 30

## <u>TABLE OF AUTHORITIES</u>

### Cases

*350 Montana v. Haaland*,
    50 F.4th 1254 (9th Cir. 2022) ........................................................28, 29 n.10

*Alliance for the Wild Rockies v. U.S. Forest Service*,
    907 F.3d 1105 (9th Cir. 2018) .........................................................................27

*Bark v. U.S. Forest Service*,
    958 F.3d 865 (9th Cir. 2020) ...........................................................................18

*Bicycle Trails Council v. Babbitt*,
    82 F.3d 1445 (9th Cir. 1996) ......................................................................18 n.8

*Bob Marshall Alliance v. Hodel*,
    852 F.2d 1223 (9th Cir. 1988) ...................................................................11, 12

*Castro v. County of Los Angeles*,
    833 F.3d 1060 (9th Cir. 2016) (en banc) ..........................................................4

*Center for Biological Diversity v. Bernhardt*,
    982 F.3d 723 (9th Cir. 2020) ...........................................................................11

*Center for Biological Diversity v. Salazar*,
    695 F.3d 893 (9th Cir. 2012) ...........................................................................19

*Cook Inletkeeper v. Raimondo*,
    541 F.Supp.3d 987 (D. Alaska 2021) .............................................................28

*Environmental Defense Center v. Bureau of Ocean Energy Management*,
    36 F.4th 850 (9th Cir. 2022) ...........................................................11, 25, 27

*Farr v. NC Machinery, Inc.*,
    186 F.3d 1165 (9th Cir. 1999) ...................................................................16, 17

*Humane Society v. Locke*,
    626 F.3d 1040 (9th Cir. 2010) ..............................................................9, 13–14

*Idaho Wool Growers Association v. Vilsack*,
    816 F.3d 1095 (9th Cir. 2016) ........................................................24

*Jones v. Gordon*,
    792 F.2d 821 (9th Cir. 1986) .........................................................19

*LaFlamme v. FERC*,
    852 F.2d 389 (9th Cir. 1988) ...................................................18 n.8

*Metropolitan Edison Co. v. People Against Nuclear Energy*,
    460 U.S. 766 (1983).......................................................................14

*Native Ecosystems Council v. U.S. Forest Service*,
    428 F.3d 1233 (9th Cir. 2006) ..........................................................3

*Native Village of Chickaloon v. National Marine Fisheries Service*,
    947 F.Supp.2d 1031 (D. Alaska 2013) ...........................................24

*N.J. Department of Environmental Protection v. Nuclear Regulatory Commission*,
    561 F.3d 132 (3d Cir. 2009) ...........................................................15

*NRDC v. U.S. Forest Service*,
    421 F.3d 797 (9th Cir. 2005) ..........................................................24

*Oregon Natural Desert Association v. Bureau of Land Management*,
    625 F.3d 1092 (9th Cir. 2010) ...............................................5, 6, 20

*Oregon Natural Desert Association v. Jewell*,
    840 F.3d 562 (9th Cir. 2016) ....................................................14, 24

*Reynaga Hernandez v. Skinner*,
    969 F.3d 930 (9th Cir. 2020) ..........................................................14

*San Luis Obispo Mothers for Peace v. Nuclear Regulatory Commission*,
    449 F.3d 1016 (9th Cir. 2006) .................................................18 n.8

*Southeast Alaska Conservation Council v. U.S. Forest Service*,
    468 F.Supp.3d 1148 (D. Alaska 2020) ............................................28

REPLY BRIEF                    iv

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*,
  985 F.3d 1032 (D.C. Cir. 2021) ....................................................................28

*Te-Moak Tribe of Western Shoshone of Nevada v. Department of Interior*,
  608 F.3d 592 (9th Cir. 2010) ..........................................................................3

*WildEarth Guardians v. Provencio*,
  923 F.3d 655 (9th Cir. 2019) ........................................................................26

## Statutes and Court Rules

Ariz. Rev. Stat. Ann. § 3-1427 ...................................................................16

## Regulations

40 C.F.R. § 1508.8 (2019) .......................................................................14, 15

40 C.F.R. § 1508.14 (2019) ............................................................10 n.5, 13 n.6

40 C.F.R. § 1508.27 (2019) .........................................................................26

## Other Authorities

Forest Service Handbook 2209.13, ch. 90, § 91 (2005) ........................................6–7

Forest Service Handbook 2209.13, ch. 90, § 94 (2005) ...........................................8

## INTRODUCTION

The Forest Service's environmental assessment ("EA") at issue in this case concludes that resuming grazing on a pasture used by cattle just once in the last 40 years will have minimal effects to ecological resources, wildlife, and the human communities located within that pasture. To reach that conclusion, the Forest Service simply ignored or cursorily dismissed key facts in the record before it and overlooked entire categories of impacts that its decision will cause. The agency's answering brief attempts to justify its sloppy work, but the holes in the EA's analysis are simply too large to patch up.

Indeed, one error in the Forest Service's analysis is so large that the agency is now forced to admit it: the EA authorizes roughly 30% more grazing on the Bar X Allotment than the agency's own grazing capacity analysis calculated as sustainable. The answering brief tries to downplay this as a mere "transcription error," but it is more than that: it is one of many examples of misleading or inaccurate analysis in the EA that renders the document defective as a useful decisionmaking tool.

The answering brief's responses to Plaintiff-Appellant Neighbors of the Mogollon Rim's ("NOMR") other claims are similarly unconvincing. The agency cannot explain how its refusal to consider a third alternative action—one that would keep the Colcord/Turkey Pasture off-limits to grazing while allowing

grazing to continue on the rest of the Bar X—comports with the National Environmental Policy Act's ("NEPA") emphasis on fostering informed decisionmaking. Nor can the Forest Service justify its failure to give any serious consideration to the effects of its decision on the communities located within the Colcord/Turkey Pasture.

The flaws in the Forest Service's analysis made it impossible for the agency to make an informed decision about the future of grazing on the Bar X Allotment. Accordingly, both the EA and the decision documents relying on the EA must be vacated, and the Forest Service must be ordered to prepare a full environmental impact statement ("EIS") that accurately and completely accounts for the impacts of the agency's decision.

## **ARGUMENT**

### I. THE FOREST SERVICE'S ANSWERING BRIEF OFFERS WEAK AND INADEQUATE EXCUSES FOR NOT CONSIDERING A THIRD ALTERNATIVE ACTION IN THE EA.

In its answering brief, the Forest Service offers several weak justifications for its failure to consider a third alternative action that would keep the Colcord/Turkey Pasture closed to grazing[1] while allowing grazing to continue on

_____

[1] The Forest Service takes issue with the phrase "closed to grazing" to describe the status of the Colcord/Turkey Pasture prior to the agency's 2019 decision. Answer. Br. at 30 n.11. Whatever word or phrase is used, however, it is simply a fact that

REPLY BRIEF                                    2

the parts of the Bar X that have been grazed in the past. Because such an alternative is reasonable, it should have been analyzed in the EA.

The Forest Service's first argument is that, because NEPA "does not impose a numerical floor on alternatives to be considered," the two alternatives considered by the agency are sufficient. Answer. Br. at 22 (quoting *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005)). This is a specious argument. Agencies preparing EAs "must give full and meaningful consideration to *all reasonable alternatives*." *Te-Moak Tribe of W. Shoshone of Nev. v. Dep't of Interior*, 608 F.3d 592, 601–02 (9th Cir. 2010) (emphasis added). Sometimes there are only two reasonable alternatives; in those cases, consideration of two alternatives is enough. But just because two alternatives are *sometimes* enough does not mean that two alternatives are *always* enough. Where, as here, there is a third viable alternative, an agency's failure to give "full and meaningful consideration" to that alternative renders its NEPA analysis inadequate. *Id.* at 602.

The Forest Service's second argument is that the agency was not required to consider any third alternative aside from a pure "continue current management" alternative. Answer. Br. at 23. Essentially, the Forest Service is arguing that

_____

the Colcord/Turkey Pasture was "exclude[d] . . . from grazing" under the prior allotment management plan. 3-ER-442, 454. A third "keep Colcord closed" alternative would keep that provision in the new allotment management plan.

NOMR and other commenters were not specific enough in their comments, and that the agency inferred from that lack of specificity "that commenters were proposing continuing current grazing management . . . ." *Id.*

As an initial matter, the Forest Service failed to preserve this argument in the District Court. *See, e.g.*, *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1074 n.7 (9th Cir. 2016) (en banc) (finding that an argument was waived or forfeited when it was not made in the district court). In the District Court, the Forest Service never argued that it construed requests for consideration of a third alternative as requests for consideration of a pure "continue current management" alternative. *See* FER-7–9; FER-18–26 (relevant portions of summary judgment papers).

But, even putting that aside, this argument is preposterous. What NOMR, its supporters, and many others clearly cared about was that the Forest Service consider keeping cattle off the Colcord/Turkey Pasture. *See, e.g.*, 2-ER-297, 308, 310 (NOMR comments asking for a third alternative); 3-ER-320, 322, 325, 328–29, 331, 333, 353 (comments from community members). The Forest Service knew this—indeed, the entire reason it was sued in 2018 was because it was set to allow grazing on the Colcord/Turkey Pasture that summer. *See* 3-ER-576–77; 3-ER-582–83. What NOMR and its allies did *not* care about were the technical details of the third alternative, so long as it preserved the bar on grazing on the Colcord/Turkey Pasture. *See, e.g.*, 2-ER-308 (suggesting various alternatives that would keep the

Colcord/Turkey Pasture off-limits to grazing), 310 ("NOMR is . . . asking the Forest Supervisor to look to the future and make a visionary choice to permanently protect the Colcord pasture and Haigler Creek from livestock grazing . . . ."). They certainly never expressed that they were opposed to "formally incorporat[ing] adaptive management," which is one of the key deficiencies the Forest Service identified in a pure "continue current management" alternative.[2] *See* 2-ER-74.

Given this context, it would not have been reasonable for the Forest Service to treat the many requests for consideration of a third "keep Colcord closed" alternative as requests for consideration of a pure "continue current management" alternative. The record is clear that what many members of the public wanted was consideration of *some* alternative in which the Colcord/Turkey Pasture would remain closed to grazing, as it was for 40 years. It was not incumbent on the public to describe every detail of that third alternative. *See Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1120 n.23 (9th Cir. 2010) (discussing the relatively low burden on NEPA commenters).

---

[2] As NOMR pointed out in its opening brief, because the Forest Service has actually been practicing adaptive management on the Bar X pursuant to the Forest Service Handbook since 2008, "formally incorporating adaptive management" is a paper exercise. Opening Br. at 8, 37–38.

The Forest Service's remaining arguments concern the three reasons given by the agency in the Final EA for rejecting consideration of a third alternative. Answer Br. at 23–31. As explained in NOMR's opening brief, none of these reasons holds water. *See* Opening Br. at 22–28. The Forest Service's answering brief only reinforces this conclusion.

*First*, as to the "purpose and need" rationale, the answering brief fails to contend with the breadth of the purpose and need statement in the EA: "to *consider* livestock grazing opportunities on public lands *where consistent with management objectives*." 2-ER-54. Given that NEPA is a "decisionmaking tool," *Or. Nat. Desert Ass'n v. BLM*, 625 F.3d at 1121 n.24, the phrase "consider . . . grazing opportunities" implies that the purpose of the Forest Service's NEPA analysis was to help the agency decide *whether and where* to allow grazing on the Bar X Allotment, including whether to authorize use of the Colcord/Turkey Pasture.

This interpretation of the purpose and need statement is bolstered by the Forest Service Handbook, which specifies that, even when an area is deemed "suitable" for grazing in a forest plan, "a project-level analysis evaluating the site-specific impacts of the grazing activity, in conformance with NEPA, is required in order to authorize livestock grazing on specific allotment(s)." FS Handbook

("FSH") 2209.13, ch. 90, § 91 (2005).[3] Suitability is a necessary, but not sufficient, condition for permitting grazing in a particular area, and the site-specific NEPA analysis is intended to help the Forest Service determine how to exercise its discretion to allow or disallow grazing in suitable areas. For this reason, the Forest Service's argument that a "keep Colcord closed" alternative wouldn't meet the purpose and need of the action because the Tonto Forest Plan "designates the Colcord/Turkey pasture as suitable for grazing" makes no sense. *See* Answer. Br. at 25. Considering a third "keep Colcord closed" alternative is essential so that the Forest Service can compare that alternative to the preferred alternative and decide how to exercise its discretion.

This is especially true given the historical context in which the Forest Service conducted its NEPA analysis. Aside from 2015, the Colcord/Turkey Pasture was not grazed for 40 years, making it (along with the adjacent Lost Salt Pasture) unique among the Bar X pastures. 2-ER-26; 2-ER-265. The agency only began its NEPA process after being sued by NOMR in 2018 over the authorization of grazing on the Colcord/Turkey Pasture for that summer. 3-ER-586. The Forest Service recognized that, without amending the existing allotment management plan or issuing a new one—something that requires a NEPA process, 2-ER-248—it

───────────────

[3] *See* Opening Br. Addendum at A-4.

could not legally allow grazing on the Colcord/Turkey Pasture. *See* FSH 2209.13, ch. 90, § 94 (2005) (describing the relationship between allotment management plans, grazing permits, and annual operating instructions).[4] Given that context, the issue of whether to reopen the Colcord/Turkey Pasture to grazing was one of the key decisions that the agency's NEPA analysis was supposed to help it make. To facilitate that decision, the agency should have considered a "keep Colcord closed" alternative along with the preferred alternative.

*Second*, the "adaptive management" rationale, *see* Answer. Br. at 26–28, makes no sense as a reason to reject a third alternative; it is a rationale that applies only to a pure "continue current management" alternative. *See* Opening Br. at 23. There is nothing inconsistent about keeping the Colcord/Turkey Pasture off-limits to cattle while using adaptive management techniques on the rest of the Bar X. Indeed, that is what the Forest Service has actually done on the ground for nearly 15 years. *See* Opening Br. at 8, 37–38.

The Forest Service's answering brief argues that keeping the Colcord/ Turkey Pasture off-limits to grazing "would hamper the agency's ability to practice adaptive management." Answer. Br. at 27. The idea appears to be that having more pastures open to grazing might help the agency respond to changes in resource

---

[4] *See* Opening Br. Addendum at A-6 through A-8.

conditions by, *e.g.*, shifting grazing from one area to another. *See id.* at 27–28. The

Forest Service made this same argument in the District Court, but it did not

advance this rationale at any point during the NEPA process, which NOMR

pointed out in its summary judgment reply. *See* FER-25–35 (relevant portion of

Forest Service's opening summary judgment brief); FER-11–12 (relevant portion

of NOMR's summary judgment reply). In the EA, the Forest Service said only that

a pure "continue current management" alternative was not reasonable because it

did not "formally incorporate adaptive management." 2-ER-74–75. The Forest

Service's new rationale cannot be entertained by this Court because explanations

for agency decisions "raised for the first time in . . . briefs and . . . not mentioned

. . . in the decision under review" are "not part of [this Court's] review." *Humane*

*Soc'y v. Locke*, 626 F.3d 1040, 1049–50 (9th Cir. 2010).

    *Third*, the answering brief's recapitulation of the EA's argument that a third

"keep Colcord closed" alternative "is not significantly distinguishable from" the

chosen alternative is unpersuasive. *See* Answer. Br. at 28–31. The Colcord/Turkey

Pasture is differently situated from other Bar X pastures because of its 40-year

history of non-use and its proximity to human communities. For that reason,

grazing on the Colcord/Turkey Pasture will cause different types of effects on the

"human environment" than grazing on other portions of the Bar X—such as the

aesthetic, recreational, economic, and social effects outlined in NOMR's opening

brief and discussed further below. *See* Opening Br. at 29–37; *infra* pp. 12–19. Given the disruptive changes that would occur from re-opening the Colcord/ Turkey Pasture to grazing, a third alternative in which that pasture would remain off-limits is not simply a reduced-grazing version of the chosen alternative—it is different in kind, not merely degree, from the chosen alternative.[5]

That feature distinguishes this case from cases in which this Court has upheld an agency's refusal to consider "middle-ground" alternatives. *See* Answer. Br. at 29 (discussing one such case). Where a proposed middle-ground alternative differs from more environmentally damaging alternatives in degree, but not in kind, then there may be no need for an agency to consider the middle-ground alternative in depth—after all, its effects will be like the effects of the other alternatives, only less so. On the other hand, a middle-ground alternative that differs in kind from other alternatives in some respect should be studied, because it offers a real contrast to those other alternatives and thus aids the agency's

---

[5] The Forest Service is simply wrong that a "keep Colcord closed" alternative would not differ from the preferred alternative in terms of its "environmental effects." *See* Answer. Br. at 30. Under a "keep Colcord closed" alternative, there would be very minimal effects from grazing on the Colcord and Ponderosa Communities; under the preferred alternative, on the other hand, there are likely to be serious adverse effects on "the natural and physical environment" in the Colcord/Turkey Pasture "and the relationship of people with that environment," as discussed *infra*. 40 C.F.R. § 1508.14 (2019).

decisionmaking process. *See Envt'l Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 877–78 (9th Cir. 2022) (holding that the agency needed to study a "middle-ground" alternative because that alternative, unlike the studied alternatives, would impose limits on the number of well stimulation treatments).

Finally, the Forest Service argues that, because the "no grazing" alternative involves leaving the Colcord/Turkey Pasture closed to grazing and the preferred alternative involves opening it up, "[n]othing more [could] be gained . . . by separately analyzing" a third "keep Colcord closed" alternative. Answer. Br. at 30. This is incorrect. Alternatives in an EA must be selected so that an agency can make an "'informed and meaningful' choice" among them. *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 735 (9th Cir. 2020) (quoting *Bob Marshall All. v. Hodel*, 852 F.2d 1223, 1228 (9th Cir. 1988)). The "no grazing" alternative studied by the Forest Service was never a realistic option; it was studied only because the Forest Service Handbook requires consideration of such an alternative in range analyses. 2-ER-176. In order to have a "meaningful choice" among alternatives vis-à-vis the continued closure of the Colcord/Turkey Pasture, the Forest Service needed to consider an alternative that combined excluding grazing from the Colcord/Turkey Pasture with allowing grazing elsewhere. Because it failed to consider such a reasonable alternative, the agency did not "take into proper account all possible approaches . . . which would alter the environmental

impact and the cost-benefit balance." *Bob Marshall All.*, 852 F.2d at 1228 (cleaned up).

## II. THE FOREST SERVICE'S DECISION TO ALLOW CATTLE TO GRAZE ON THE COLCORD/TURKEY PASTURE WILL PROXIMATELY CAUSE ADVERSE EFFECTS TO NEARBY COMMUNITIES, AND THE AGENCY IGNORED THOSE EFFECTS.

As discussed in NOMR's opening brief, the Forest Service either ignored or provided cursory analysis of many aesthetic, social, economic, recreational, and health impacts of its decision. *See* Opening Br. at 13–15, 29–37. In its answering brief, the agency tries to justify its lack of analysis of these impacts, but it falls short.

The Forest Service first reiterates the "always been within an active grazing allotment" rationale used in the EA to downplay or ignore the effects of the agency's decision on the Colcord and Ponderosa Communities. *See* Answer. Br. at 32–33; *see also* Opening Br. at 34–35. As explained in NOMR's opening brief, the statement that the communities have "always been within an active grazing allotment" is deeply misleading. *See* Opening Br. at 34–35. Save for 2015, there was no cattle grazing on the Colcord/Turkey Pasture for 40 years, so there were no on-the-ground effects from cattle in the communities for four decades. 2-ER-265. Moreover, the allotment management plan governing the Bar X prior to the 2019 decision "exclude[d] the [Colcord/Turkey Pasture] from grazing," 3-ER-442, 454, so it would not have been possible for the Forest Service to allow grazing in any

given year without first revising that plan, which requires a NEPA process.[6] 2-ER-248.

In addition to being misleading, the "always been within an active grazing allotment" rationale for discounting the effects to the Colcord and Ponderosa Communities ignores the events of 2015. The summer of 2015 was something of an accidental experiment, and it demonstrated that, whatever the legal status of the Colcord/Turkey Pasture, the communities located in the Pasture are unaccustomed to grazing in their vicinity and will suffer adverse effects to their aesthetic, recreational, economic, and other interests due to the presence of cattle. *See* Opening Br. at 10–11, 14–15. The "always been within an active grazing allotment" rationale evinces an utter disregard of these facts, as if 2015 never happened. Agencies are not free to ignore reality in this way. *See Locke*, 626 F.3d at 1051 n.5 (noting that, under the APA, agencies "must examine the 'relevant data' and articulate a rational connection between the facts found and the choice

---

[6] The answering brief spends a good deal of energy trying to show that members of the Colcord and Ponderosa Communities lacked "reliance interests" in the absence of grazing on the Colcord/Turkey Pasture. Answer Br. at 33. This is a red herring. Regardless of the existence of any legally cognizable reliance interests, the facts on the ground were that (1) there was no grazing on the pasture for 40 years (save 2015) and (2) the introduction of cattle to the pasture in 2015 was highly disruptive to the communities and affected the "human environment." *See* 40 C.F.R. § 1508.14 (defining the "human environment").

made") (cleaned up); *Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 570 (9th Cir. 2016) (analysis in a NEPA document "must be based on accurate information and defensible reasoning").

Next, the Forest Service's answering brief argues that impacts to the communities that could be prevented by community members installing fencing were properly discounted in the EA because they would not be proximately caused by the decision to reopen the Colcord/Turkey Pasture to grazing. Answer. Br. at 33–35. According to the Forest Service, "any impacts to private property from cattle that could have been kept out with a fence are attributable to landowner choices rather than the Forest Service's proposed action." Answer Br. at 35.

This is legally incorrect. Under NEPA, an effect must be taken into account if there is "a reasonably close causal relationship between a change in the physical environment and" that effect. *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 774 (1983). "This requirement is like the familiar doctrine of proximate cause from tort law." *Id.* Just as foreseeability is key to the proximate cause inquiry in tort law, *Reynaga Hernandez v. Skinner*, 969 F.3d 930, 941–42 (9th Cir. 2020), foreseeability is key to the question of whether an effect must be taken into account under NEPA. *See* 40 C.F.R. § 1508.8(b) (2019) (defining "indirect effects" as effects "caused by the action and . . . later in time or farther

removed in distance [than direct effects], but . . . *still reasonably foreseeable*")
(emphasis added).

The Forest Service's decision to allow grazing again on the Colcord/Turkey
Pasture is reasonably likely to cause adverse impacts to members of the Colcord
and Ponderosa Communities who lack fences around their property, as the events
of 2015 amply demonstrate. These effects—damage to septic systems, injuries
from charging cattle, foul smells, car accidents caused by cattle on roads, etc., *see*
Opening Br. at 10–11, 13–15—should have been considered by the Forest Service
in its EA, because they are all "reasonably foreseeable" effects of reintroducing
cattle to the Colcord/Turkey Pasture. 40 C.F.R. § 1508.8(b) (2019); *see also*
Opening Br. at 29–37.

The Forest Service cannot seriously argue that these effects are not
"foreseeable," and indeed the answering brief does not try to do so. But the
answering brief still insists that these effects will be proximately caused by
"landowner choices rather than the Forest Service's proposed action." Answer. Br.
at 34–35. It appears, then, that the Forest Service is arguing that community
members' decisions *not* to put up fencing will be a "superseding cause"—that is,
an intervening cause that breaks the chain of legal causation. *See, e.g.*, *N.J. Dep't
of Envt'l Prot. v. Nuclear Reg. Comm'n*, 561 F.3d 132, 140–41 (3d Cir. 2009)
(discussing the concept of superseding cause in the NEPA context).

This "superseding cause" argument is incorrect. In general, a "superseding cause" that breaks the chain of proximate causation is one that is unforeseeable to the entity disclaiming responsibility for the results of its actions—here, the Forest Service. *See Farr v. NC Machinery, Inc.*, 186 F.3d 1165, 1169 (9th Cir. 1999) ("the doctrine of superseding intervening cause is at bottom an expression of the requirement of foreseeability"). There was nothing "unforeseeable" to the Forest Service about members of the Colcord and Ponderosa Communities not putting up fences in the event of a reopening of the Colcord/Turkey Pasture. On the contrary, many comments submitted to the Forest Service suggested that community members did not want to put up fencing for financial and/or aesthetic reasons. *See* 3-ER-329, 334; FER-27–29.

Nor is the decision not to install fencing "wrongful" such that any damage to community members' unfenced property should be attributable to "landowner choices" rather than the Forest Service's decision to allow cattle back on the Colcord/Turkey Pasture. *See Farr*, 186 F.3d at 1169–70 (wrongful intervening act can cut off proximate causation). As the Forest Service concedes, there is nothing in Arizona law that requires anyone to install fencing. Answer. Br. at 34. By not installing fencing, community members are depriving themselves of the opportunity to pursue state-law tort suits for damage caused by cattle, but they are not breaking any law. *See* Ariz. Rev. Stat. Ann. § 3-1427.

Relatedly, the Forest Service's argument that the EA properly discounted or didn't consider the economic and aesthetic effects of the decision to put up fencing reflects a misunderstanding of NEPA and basic proximate cause principles. *See* Answer Br. at 35. Just as it was foreseeable to the agency that many community members would not install fencing in response to the reopening of the Colcord/Turkey Pasture to grazing, it was foreseeable that other community members would reluctantly do so. *See, e.g.*, 3-ER-325, 346. The choice to put up fencing to protect one's property is not a "superseding cause" when the need to install such fencing flows foreseeably from the Forest Service's decision. *See Farr*, 186 F.3d at 1169. Accordingly, the Forest Service should have considered the economic and aesthetic effects of fencing rather than summarily dismissing them.[7]

The Forest Service's remaining excuses for not taking a closer look at the effects of its decision on aesthetic, social, economic, recreational, and health impacts merit little attention. The EA's "analysis" of "same place-same time" encounters cited in the answering brief, *see* Answer. Br. at 36, is almost comically insufficient—for instance, saying that recreationists could have "positive or negative experience[s]" with cattle provides literally no information. 2-ER-154.

---

[7] There are many impacts that will likely occur whether or not members of the Colcord and Ponderosa Communities install fencing. *See* Opening Br. at 33. The EA's "fencing" rationale is not responsive to those impacts at all.

And the EA's conclusion that "same place-same time" encounters will not be significant, 2-ER-56, is entirely conclusory. *See Bark v. U.S. Forest Serv.*, 958 F.3d 865, 872 (9th Cir. 2020) ("conclusory statements, based on vague and uncertain analysis, . . . are insufficient to satisfy NEPA's requirements") (cleaned up). One of the central purposes of an EA is to determine *whether* the effects of a decision will be significant. *Id.* at 868. The Forest Service knew that, in 2015, there were actual "same place-same time" encounters that negatively affected recreation and even safety.[8] Rather than try to determine the extent to which such effects would happen going forward, the Forest Service, without analysis, labelled those effects "insignificant" and moved on. NEPA demands more.

The Forest Service's answering brief tries in vain to excuse the agency's failure to meaningfully examine the social, economic, aesthetic, recreational, and health effects of its decision on the Colcord and Ponderosa Communities and

---

[8] The Forest Service overreads *Bicycle Trails Council v. Babbitt*, 82 F.3d 1445 (9th Cir. 1996). That case merely reaffirms the holding of *Metropolitan Edison*—namely, that an agency conducting a NEPA analysis need not take into account the subjective psychological effects flowing from an *increased risk* caused by the agency's action. *See id.* at 1466–67. When, in contrast, an action is reasonably likely to affect recreational opportunities by *actually* changing the physical environment, those effects must be taken into account. *See, e.g.*, *LaFlamme v. FERC*, 852 F.2d 389, 399–400 (9th Cir. 1988); *see also San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n*, 449 F.3d 1016, 1029–30 (9th Cir. 2006).

recreationists. The truth is that the agency swept those effects under the rug in its NEPA analysis. By ignoring those effects or dismissing them as insignificant in a cursory fashion, the Forest Service violated the requirement that it take a "hard look" at the effects of its decision. *See Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 916–17 (9th Cir. 2012) ("Taking a 'hard look includes considering all foreseeable direct and indirect impacts.") (cleaned up); *Jones v. Gordon*, 792 F.2d 821, 828 (9th Cir. 1986) ("An agency cannot avoid its statutory responsibilities under NEPA merely by asserting that an activity it wishes to pursue will have an insignificant effect on the environment.") (cleaned up).

## III. THE FOREST SERVICE STILL CANNOT EXPLAIN HOW EXPANDING GRAZING WHILE USING THE SAME MANAGEMENT STRATEGY WILL BENEFIT ECOLOGICAL RESOURCES.

The Forest Service claimed that its decision to expand grazing on the Bar X would help the Bar X "achieve[] the desired conditions in the [Tonto] Forest Plan," 2-ER-185, and would not have serious adverse effects on soil, vegetation, and riparian resources, *see* Opening Br. at 37. As NOMR pointed out in its opening brief, there is a disconnect between these conclusions and the facts in the record. In short, the Forest Service never adequately explained how increasing the amount of grazing authorized on the Bar X while keeping the same grazing management scheme will *improve* ecological conditions, particularly when those conditions are still failing to meet Forest Plan objectives. *See* Opening Br. at 37–42, 55–59. The

lack of such an explanation violates both NEPA and the National Forest Management Act ("NFMA"). Opening Br. at 38–42, 58–59.

In its answering brief, the Forest Service touts the new grazing scheme's "adaptive management and monitoring measures," which will "ensure that grazing will meet specific utilization guidelines." Answer. Br. at 39. But, as pointed out in NOMR's opening brief, the adaptive management strategy incorporated in the decision has already been in use for nearly 15 years, and the utilization guidelines in the new grazing scheme are the same as the ones in the old scheme. Opening Br. at 37–38. Despite 40 years of no grazing, soil conditions on the Colcord/Turkey Pasture are only rated as "fair," 2-ER-37, and "[t]en of the 11 watersheds that touch the project area are considered functioning at risk," 2-ER-87. How, exactly, will these conditions *improve* when the amount of grazing is increased and the Colcord/Turkey Pasture is reopened to cattle? The answering brief waves its hands and asks the Court to rely on the Forest Service's "scientific expertise." Answer. Br. at 38–44.

Agency expertise goes a long way, but this Court "cannot defer to a void." *Or. Nat. Desert Ass'n v. BLM*, 625 F.3d at 1121. What the EA is lacking is any explanation for how keeping the same management strategy while increasing the amount of grazing on the Bar X will improve conditions. On the contrary, the EA suggests—inaccurately—that some of the key features of the scheme are somehow

new and improved. *See, e.g.*, 2-ER-74 (stating that "there is no opportunity for adaptive management" under the old scheme, despite the fact that adaptive management consistent with the Forest Service Handbook has been practiced on the Bar X since at least 2008).

The Forest Service never provided an adequate explanation for why increasing the amount of grazing authorized on the Bar X and expanding grazing into the Colcord/Turkey Pasture, while keeping the same management strategy, will not cause adverse effects to soil, vegetation, riparian, and wildlife resources. Nor did the agency adequately explain how its decision will help the Bar X meet the "desired conditions" set out in the Tonto Forest Plan. The answering brief does not point to such explanations in the record. This failure violates NEPA, NFMA, and the APA.

## IV. THE FOREST SERVICE'S EXPLANATIONS OF THE EA'S MANY ERRORS AND MISLEADING STATEMENTS ONLY HIGHLIGHT HOW EGREGIOUS THOSE ERRORS ARE.

The Forest Service's answering brief finally admits that the agency made an error with respect to its own grazing capacity analysis. Answer. Br. at 51–53. But the Forest Service *still* gets it wrong. The problem is not that the agency made a "harmless transcription error," Answer. Br. at 51; the problem is that the agency miscalculated the maximum number of cattle that can sustainably graze the Bar X and then adopted that number in the EA and decision documents.

The grazing capacity analysis relied on by the agency calculated the maximum animal unit months ("AUMs") for the Bar X based on forage production data and utilization guidelines. *See* 2-ER-312 (describing the method for calculating carrying capacity). The maximum number of "animals" was then calculated from the AUMs. 2-ER-293. To get the maximum number of "animals," the Forest Service divided AUMs by 12. *Id.* That number was then reported in the EA. *Compare* 2-ER-314 (capacity analysis result of 259 total "animals" on the Bar X, not including the Driveway pastures), *with* 2-ER-58 (allowing 239 cattle plus 67 yearlings for 4.5 months on the Bar X pastures, equivalent to roughly 252 cattle); *see also* Answer. Br. at 51–53.

The error the Forest Service made was to divide the calculated maximum AUMs by 12 to arrive at a maximum number of "animals" in the grazing capacity analysis. The default "animal"—that is, "cattle"—is a cow-calf pair. 2-ER-75; 3-ER-568. Because a single cow-calf pair consumes forage that equates to 1.32 AUMs per month, 2-ER-190, the AUMs calculated in the grazing capacity analysis should have been divided by 12 *and then* by 1.32 to arrive at a total number of "animals" (*i.e.*, cow-calf pairs) that could sustainably graze the Bar X year-round. Instead, the Forest Service simply divided by 12, leading to a maximum number of "cattle" roughly 30% higher than actually supported by the capacity analysis. That number of cattle was then carried over to the EA. As discussed in NOMR's

opening brief, *see* Opening Br. at 45–46, and now admitted by the Forest Service, the maximum AUMs reported in the EA are also roughly 30% higher than the AUMs from the capacity analysis—apparently because the Forest Service correctly used the 1.32 conversion factor to convert back to AUMs in the EA. *See* 2-ER-58 (equating 239 cattle grazing year-round to $239 \times 12 \times 1.32 \approx 3{,}794$ AUMs).

What this means is that the maximum number of cattle allowed under the preferred alternative is not actually supported by the grazing capacity analysis. It is not simply a matter of the agency making "a harmless transcription error." Rather, the agency miscalculated the total number of cattle[9] that can sustainably graze the Bar X and then enshrined that number in the term permit and annual operating instructions ("AOIs"). *See* 3-ER-568 (2021 AOI); SER-63 (term permit). And the EA incorrectly reported to both the public and decisionmakers the number of cattle that can sustainably graze the Bar X. "Significant mathematical errors" like this "can render an agency decision arbitrary and capricious," because they reflect a

---

[9] The Forest Service admits in its answering brief that the maximum AUMs listed in the EA are roughly 30% higher than the AUMs calculated in the capacity analysis, but it insists that the maximum number of "cattle" is correct. Answer. Br. at 52–53. This cannot be. As the Forest Service admits, the capacity analysis calculated a maximum number of AUMs on the Bar X and associated Driveway Pastures of 7,081 AUMs. Answer. Br. at 52; *see also* 2-ER-312–14. Using the proper conversion factor of 1.32 AUMs consumed per cow-calf pair per month, that translates to roughly 447 "cattle" grazing year-round, not 590.

disconnect between the facts found and the choice made. *Native Vill. of Chickaloon v. Nat'l Marine Fisheries Serv.*, 947 F.Supp.2d 1031, 1056 (D. Alaska 2013), *appeal dismissed*, No. 13-35805 (9th Cir. Dec. 10, 2013); *see also Jewell*, 840 F.3d at 569–70 (holding that an EIS was defective because it contained inaccurate scientific analysis and inaccurate data).

Contrary to the Forest Service's argument, this error—a 30% error—is not harmless. The Forest Service used the incorrect maximum number of cattle throughout its analysis and enshrined that number in the term grazing permit and AOIs issued under that permit. Thus, the error "materially affected the substance of the agency's decision." *Idaho Wool Growers Ass'n v. Vilsack*, 816 F.3d 1095, 1104 (9th Cir. 2016).

The agency's responses to the other errors and misleading statements discussed in NOMR's opening brief only go to show how misleading those statements are. The Forest Service spends two and a half pages explaining how, *technically speaking*, nothing it said in the EA was false. *See* Answer. Br. at 53–55. It is a lawyerly response suited for a defense to a charge of defamation, but the bar for NEPA documents is significantly higher than "not outright false." NEPA requires agencies "to present complete and accurate information to decision makers and to the public to allow an informed comparison of . . . alternatives." *NRDC v. U.S. Forest Serv.*, 421 F.3d 797, 813 (9th Cir. 2005). As discussed in

NOMR's opening brief, *see* Opening Br. at 48–51, the Forest Service violated this requirement by making many misleading statements in the EA, painting a false picture of a preferred alternative carefully developed based on data analysis and experimentation.

## V.  THE FOREST SERVICE'S DECISION "MAY" HAVE SIGNIFICANT CONSEQUENCES, WARRANTING AN EIS.

"In challenging an agency decision not to prepare an EIS, plaintiffs need not prove that significant environmental effects *will* occur; they need only raise a substantial question that they might. This presents a low standard that is permissive for environmental challenge." *Envt'l Defense Ctr.*, 36 F.4th at 878–79. The events of 2015 alone demonstrate that there is a "substantial question" as to whether allowing grazing on the Colcord/Turkey Pasture "might" have significant effects— specifically, possible effects to human health and safety. *See* Opening Br. at 53.

The Forest Service's answering brief downplays these threats, claiming that any effects due to a lack of fencing are not legally the agency's fault. Answer. Br. at 56. As discussed above, this is incorrect. The Forest Service also claims that it "examined the effects of same-place same-time encounters throughout the EA and determined they were not significant." Answer. Br. at 56. This, again, is incorrect—in fact, the Forest Service claimed in the EA that "'same place-same time' encounters between uses . . . are not considered conflicts or safety issues that require consideration in grazing authorization planning analyses," then concluded

in an entirely cursory fashion that the issue was not significant. 2-ER-56. In the face of evidence that the introduction of cattle to the Colcord/Turkey Pasture in 2015 caused serious safety problems, *see* Opening Br. at 10–11, the Forest Service shut its eyes rather than take the required "hard look."

The agency's answering brief also mischaracterizes NOMR's argument concerning the "likely to be highly controversial" significance factor. *See* Answer. Br. at 57 (quoting 40 C.F.R. § 1508.27(b)(4) (2019)). NOMR has never claimed that this factor is triggered merely because there is substantial public opposition to the expansion of grazing into the Colcord/Turkey Pasture. *See* Opening Br. at 53–54. Rather, this factor is triggered because "evidence[] raised prior to the preparation of [the] FONSI casts serious doubt upon the reasonableness of the [Forest Service's] conclusions." *WildEarth Guardians v. Provencio*, 923 F.3d 655, 673 (9th Cir. 2019) (cleaned up).

Specifically, the evidence put before the agency regarding the events of 2015, as well as the in-depth environmental studies from the 1970s, "cast[] serious doubt" on the agency's breezy conclusions about the effects of grazing on the Colcord/Turkey Pasture and the human communities located within it. *See* Opening Br. at 53–54. The answering brief argues that the 1970s studies "do not supersede the Forest Service's careful, comprehensive analysis based on updated range data from the past 12 years." Answer. Br. at 58. But there has been no

"careful, comprehensive analysis" of the effects of grazing on the Colcord/Turkey Pasture, as discussed in NOMR's opening brief. *See* Opening Br. at 42–51. The studies from the 1970s, though old, are the most recent "careful, comprehensive" analyses of the effects of grazing on the Colcord/Turkey Pasture. They raise a "substantial question" as to whether reopening that pasture to cattle grazing will have a significant impact on the human environment. *Envt'l Defense Ctr.*, 36 F.4th at 878–79. Accordingly, the Forest Service must prepare an EIS. *Id.*

## VI.   THE FOREST SERVICE'S DECISION SHOULD BE VACATED.

If this Court rules for NOMR on any of its claims, it should vacate (or order the District Court to vacate) the relevant decision documents in this case—the EA, Decision Notice/Finding of No Significant Impact, new term grazing permit, and new allotment management plan. Vacatur is the presumptive remedy under the APA when an agency decision is found to be unlawful, and the opponent of vacatur bears the burden of showing why vacatur is *not* appropriate. *See Alliance for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121–22 (9th Cir. 2018).

The Forest Service has not met its burden here. The answering brief claims that "[a]ny possible error here is minor, and the agency should be able to correct such an error" on remand. Answer Br. at 62. But the errors in this case, though procedural, are not "minor"—they go to the heart of the agency's NEPA analysis. And there is special reason to be wary of remand without vacatur in NEPA cases:

"because NEPA is a purely procedural statute, where an agency's NEPA review suffers from a significant deficiency, refusing to vacate the corresponding agency action would vitiate the statute." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1052 (D.C. Cir. 2021) (cleaned up).

The Forest Service also claims that "[v]acating the decision notice would require the agency to immediately destock the allotment," harming both the permittee and the agency. Answer. Br. at 62. To be sure, the possible "disruptive consequences" of vacatur should be considered when deciding on a remedy, *350 Montana v. Haaland*, 50 F.4th 1254, 1273 (9th Cir. 2022), but immediate destocking of the Bar X is not a disruptive consequence that will necessarily flow from vacatur in this case. Vacatur is not an all-or-nothing affair, and the decision documents in this case can be *partially* vacated in a way that still allows grazing on parts of the Bar X outside the Colcord/Turkey Pasture. *See Cook Inletkeeper v. Raimondo*, 541 F.Supp.3d 987, 995 (D. Alaska 2021) (ordering partial vacatur); *Se. Alaska Conservation Council v. U.S. Forest Serv.*, 468 F.Supp.3d 1148, 1155–56 (D. Alaska 2020) (same), *appeal dismissed*, No. 20-35738 (9th Cir. Oct. 22, 2020). The point is to go back to the old management scheme—in which the

Colcord/Turkey Pasture is closed to grazing—until the Forest Service finishes a new NEPA analysis.[10]

## CONCLUSION

For the foregoing reasons, this Court should reverse the District Court's judgment, vacate (or partially vacate) the EA, DN/FONSI, allotment management plan, and term grazing permit, and order the District Court to remand the matter to the Forest Service for preparation of an EIS.

Date:  November 18, 2022              Respectfully submitted,

                                     */s/ Andrew R. Missel*
                                     Andrew R. Missel
                                     Lauren M. Rule
                                     ADVOCATES FOR THE WEST
                                     3701 SE Milwaukie Ave., Ste. B
                                     Portland, OR 97202
                                     (503) 914-6388

---

[10] The fact that the District Court found that the harm to the permittee from a preliminary injunction would outweigh the harm to NOMR from denying such an injunction has little, if any, relevance to the vacatur analysis here. *See* Answer. Br. at 62–63. For one thing, the burden in the injunction context is on the party seeking an injunction (NOMR, in the District Court) to show a favorable balance of equities, whereas the burden in the vacatur context is on the party opposing vacatur (the Forest Service, here). Furthermore, there is a thumb on the scale in favor of vacatur, as remand without vacatur is ordered only in "limited circumstances." *350 Mont.*, 50 F.4th at 1273 (cleaned up). There is no such thumb on the scale in favor of injunctive relief.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Certificate of Compliance for Briefs

**9th Cir. Case Number: 22-15259**

I am the attorney for Plaintiff-Appellant.

**This reply brief contains 6,999 words,** excluding the items exempted by

Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App.

P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[x] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5),
Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

| **Signature** | */s/ Andrew R. Missel* | **Date** | November 18, 2022 |
|---|---|---|---|